## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WINSOME PACKER,**<br>203 Yoakum Parkway<br>Unit 817<br>Alexandria, VA 22304<br><br>     **Plaintiff,**<br><br>  **v.**<br><br>**THE UNITED STATES<br>COMMISSION ON SECURITY<br>AND COOPERATION IN EUROPE**<br>234 Ford House Office Building<br>Washington, DC 20515<br><br>and<br><br>**ALCEE L. HASTINGS**<br>5010 SW 101st Terrace<br>Miramar, FL 33027<br><br>and<br><br>**FRED TURNER**<br>8816 Harness Trail<br>Potomac, MD 20854<br>     **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **Civil Action No. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY
## AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement

1.  This is a civil action against the United States Commission on Security and

Cooperation in Europe ("the Commission"), U.S. Representative Alcee L. Hastings, and Fred

Turner for declaratory and equitable relief and monetary damages for injuries plaintiff Winsome

Packer has sustained as a result of Mr. Hasting's sexual harassment of her and the subsequent

retaliation against her for complaining about the unlawful harassment, in violation of the Section

201 and 207 of the Congressional Accountability Act, 2 U.S.C. §1311, *et seq.* and the First and

Fifth Amendments of the Constitution of the United States.

2.     For over two years, from January 2008 through February 19, 2010, Ms. Packer

was forced to endure unwelcome sexual advances, crude sexual comments, and unwelcome

touching by Mr. Hastings while serving as the Representative of the Commission to the United

States Mission to the Organization for Security and Cooperation in Europe.  Although Ms.

Packer repeatedly rejected Mr. Hastings' sexual attention and repeatedly complained about the

harassment to the Commission Staff Director, Fred Turner, Mr. Hastings refused to stop sexually

harassing her.  Rather, Mr. Hastings and Mr. Turner began to retaliate against Ms. Packer—

including making threats of termination—because she continued to object to Mr. Hastings'

conduct.  Ms. Packer was particularly vulnerable to such threats because she was a Republican

working for the Democratically-controlled Commission, a point that both Mr. Hastings and Mr.

Turner used to threaten and intimidate her.  Eventually, the emotional distress, anxiety, and

humiliation caused by the sexual harassment and retaliation caused Ms. Packer to suffer severe

health problems and forced her to leave her prestigious position.

<u>**Jurisdiction and Venue**</u>

3.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331

and 2 U.S.C. § 1408.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to Ms. Packer's claims occurred in the District of

Columbia.  In the alternative, venue is proper in this district under 28 U.S.C. § 1391(b)(3)

because the Commission can be found in the District of Columbia and there is no other district in which the action may otherwise be brought.

## Parties

5.      Winsome Packer is a citizen of the Commonwealth of Virginia who resides at 203 Yoakum Parkway, Unit 817, Alexandria, Virginia, 22304.  Ms. Packer became an employee of the Commission on Security and Cooperation in Europe on May 7, 2007.  Ms. Packer is a "covered employee" under 2 U.S.C. §1301(3).

6.      The United States Commission on the Security and Cooperation in Europe is plaintiff's "employing office" under 2 U.S.C. § 1301(9)(B) and/or § 1301(9)(C).

7.      Alcee L. Hastings is a citizen of the State of Florida who resides at 5010 SW 101st Terrace, Miramar, FL 33027.  Mr. Hastings represents the 23rd Congressional District of Florida and served as the Chairman of the Commission during the 110th Congress, which was from January 3, 2007, through January 3, 2009.  In the 111th Congress, Mr. Hastings served as the Co-Chairman of the Commission, which was from January 4, 2009, through January 3, 2011.

8.      Fred Turner is a citizen of the State of Maryland who resides at 8816 Harness Trail, Potomac, Maryland, 20854.  At all times relevant to this complaint and Ms. Packer's claims, Mr. Turner served as the Staff Director of the Committee and was Ms. Packer's direct supervisor.

## Factual Allegations

9.      Ms. Packer is a highly educated and experienced professional, who has dedicated her career to policy work.  Ms. Packer holds a Bachelor of Arts in International Affairs and a Master of Public Administration.  She has extensive experience as a professional staff member—first for the Committee on Veterans' Affairs for the U.S. House of Representatives and later for

the Committee on Homeland Security for the U.S. House of Representatives.  Among her many

other professional accomplishments, she was appointed as a United States Delegate to the United

Nations Commission on the Status of Women and has worked for various policy think tanks.

10.     From 2003 through December 2006, Ms. Packer served as a Republican

Professional Staff Member for the Committee on Homeland Security.  During this time, the

Republican Party controlled the U.S. House of Representatives.  In the 2006 national election,

however, the Democrats won a majority of seats in the House of Representatives, allowing them

to gain control of that chamber of Congress.  Pursuant to the change in leadership, Ms. Packer's

position was eliminated and she became unemployed starting in January 2007.

11.     In March 2007, while walking down C Street SW in Washington, D.C., Ms.

Packer encountered Representative Alcee L. Hastings.  Ms. Packer and Mr. Hastings were

acquainted with each other through a friend of Ms. Packer who had served as a staff member in

Mr. Hastings' office for many years.  During their conversation, Mr. Hastings learned that Ms.

Packer was unemployed.  In response to this news, Mr. Hastings informed her that, as the new

Chair of the U.S. Commission on Security and Cooperation in Europe, he was in a position to

appoint her to the Commission staff.  He then recommended that she schedule an appointment to

speak with him about applying for a position.

12.     Although very interested in the work of the Commission, Ms. Packer initially

chose not to contact Mr. Hastings about the position because he was a Democrat and she was a

Republican.  However, by April 2007, Ms. Packer still had no firm employment leads, so she

scheduled a meeting with Mr. Hastings to speak further about a potential position.  Prior to

meeting with Mr. Hastings, Ms. Packer provided him with a copy of her resume, which clearly

indicated her political affiliation with the Republican Party.

13.     At the interview, Mr. Hastings did not discuss or question Ms. Packer about her qualifications for a position with the Commission or her political affiliation.  Instead, he simply explained that, as the new Chair of the Commission, he wanted to make significant staffing changes.  Despite her political affiliation, Mr. Hastings offered Ms. Packer a position during that April 2007 meeting.

14.     Ms. Packer began working at the Commission on May 7, 2007, as a Policy Advisor.  Fred Turner, the Staff Director, was, and continued to be, her supervisor at the Commission until February 14, 2010.  Prior to Mr. Hastings appointing him as Staff Director, Mr. Turner had served on Mr. Hastings' staff for over ten years.  On a number of occasions, during her first few months at the Commission, Mr. Turner indirectly questioned Ms. Packer's loyalty to Mr. Hastings because she was a Republican.  For example, Mr. Turner accused Ms. Packer of writing a better speech for a Republican member of the Commission in comparison to the speech she had written for Mr. Hastings.  On another occasion, he chastised her for including positive comments about U.S. Representative Christopher Smith, a Republican Member of Congress, in a letter of recommendation from Mr. Hastings to the President of the Organization for Security and Cooperation in Europe Parliamentary Assembly and requested that she remove those comments.  In addition to verbally assuring Mr. Turner of her loyalty, Ms. Packer worked extremely hard to produce quality work in order to demonstrate that she was dedicated to her position and loyal to Mr. Hastings.  Mr. Turner's conduct, however, made clear to Ms. Packer that, as a Republican, she was more vulnerable in her position than other staff members of the Commission.

15.     In December 2007, Mr. Turner met with Ms. Packer to inform her that Mr. Hastings wanted to appoint Ms. Packer to be the Representative of the Commission to the U.S.

Mission to the Organization for Security and Cooperation in Europe. This position was posted in Vienna, Austria, and was considered by many to be the most prestigious staff position at the Commission. Mr. Turner explained that Mr. Hastings believed her to be the most qualified staff member for the position because of the quality of her work and her international work experience. Although flattered by the offer, Ms. Packer had reservations regarding the position and expressed them in the meeting. Mr. Turner, however, strongly recommended that Ms. Packer try the position for a year and promised that, if she wished to return to her position as Policy Advisor, she could return at the end of the year. With this guarantee, Ms. Packer agreed to take the position.

16.     Ms. Packer was scheduled to assume her post in Vienna as the Representative of the Commission in February 2008. In January 2008, as Ms. Packer was preparing for departure, Mr. Hastings invited her and Mischa Thompson, a fellow staff member at the Commission, to dine with him alone. When making the invitation, Mr. Hastings expressly requested that they not inform Mr. Turner about the dinner. Ms. Packer found this request strange, but since the invitation also included Ms. Thompson, she accepted. After dinner, while Ms. Packer and Mr. Hastings walked from the restaurant, with Mischa Thompson a few paces behind, Mr. Hastings told Ms. Packer that once she had found and settled into her new apartment in Vienna, he would come to Vienna to stay with her for a week. This comment made Ms. Packer extremely uncomfortable because Mr. Hastings seemed to be inviting himself to visit her in a personal and romantic capacity, not as the Chairman of the Committee, since the Chair would never stay at a staff member's apartment in lieu of having lodging of his own. Wishing to avoid upsetting Mr. Hastings, Ms. Packer simply ignored the comment and said nothing.

17.     The next day, however, Ms. Packer did inform her officemate, Shelly Han, about the incident and expressed her concern about Mr. Hastings' advances.  Ms. Han advised her to speak with Mr. Turner about Mr. Hastings' conduct, but Ms. Packer hesitated to do so out of fear that, given her status as a Republican, such a complaint would further complicate her relationship with Mr. Hastings and Mr. Turner.

18.     Within a week of the dinner detailed in Paragraph 16, Mr. Hastings called Ms. Packer at the Commission and inquired about the progress of her preparations for departure. After only a few minutes of discussing her departure, Mr. Hastings repeated that when she was settled in Vienna, he would come and stay with her for a week.  Mr. Hastings' comment again made Ms. Packer uncomfortable because of the implication that he was pursuing a romantic relationship with her.  Ms. Packer's suspicions were further confirmed when he asked where she was currently living.  When Ms. Packer replied that she lived in Alexandria, Virginia, Mr. Hastings announced that he should come over to "check up on her."  Since Ms. Packer was not interested in hosting Mr. Hastings alone in her house, especially given his earlier statements that indicated his romantic interest in her, she responded that she would be happy to have Mr. Hastings and Mr. Turner to dinner before she left for Vienna.  Mr. Hastings responded, "That's all right," and immediately ended the phone call.

19.     Ms. Packer moved to Vienna on February 15, 2008, and immediately began working.  As a Policy Advisor, Ms. Packer's annual salary was $80,000.  In her new position, Ms. Packer received a *per diem* that raised her yearly income to $165,000.

20.     In February 2008, shortly after Ms. Packer arrived in Vienna, Mr. Hastings traveled to Vienna as a member of a congressional delegation.  Ms. Packer was sitting with several colleagues in the delegation room when she first encountered Mr. Hastings during the

7

trip.  Upon entering the room, Mr. Hastings immediately walked over to Ms. Packer on the other side of the room and handed her a small bag, which contained a music box that he had purchased for her in the Czech Republic.  Mr. Hastings did not bring gifts to any other staff member.  Ms. Packer was embarrassed by the special attention paid to her by the Chairman and was offended that he continued to pursue her romantically, since she had not responded to his earlier attempts to initiate a relationship.   Ms. Packer later gave the music box to her co-worker, Mischa Thompson, and told her that she was very uncomfortable with the fact that Mr. Hastings had given the gift and that he had done so in public.

      21.     Approximately an hour after Mr. Hastings arrived, he asked Ms. Packer to fetch him some ice.  He then followed her across the room and, once they had reached an area where they were out of earshot of others, he again told her that once she had an apartment he would come to stay with her for a week.  His continued pursuit of a romantic relationship with her upset Ms. Packer, especially since he was now making advances in professional settings.

      22.     Fifteen minutes after Mr. Hastings made the comment referenced in Paragraph 21, Ms. Packer asked Mr. Turner, who had accompanied Mr. Hastings on the congressional delegation, to speak privately.  Once they had walked to a private room, Ms. Packer detailed Mr. Hastings' recent conduct towards her.  She explained that in the last month Mr. Hastings had invited himself three times to stay with her in Vienna for a week and that he also had invited himself to visit her at her home in Alexandria, Virginia.  Mr. Turner's first response was to ask Ms. Packer if she had ever had a romantic relationship with Mr. Hastings.  Ms. Packer responded that she had never had anything but a professional relationship with Mr. Hastings, that she did not welcome his advances, and did not want to engage in a romantic relationship with him.  Mr. Turner initially looked surprised, but then assured Ms. Packer that he was glad she came to him

about the matter and that he would speak to Mr. Hastings and would ensure that he knew her feelings on the matter. Mr. Turner also instructed her to call him immediately if Mr. Hastings ever called to tell her that he was "getting on a plane to visit [her]."

23.     From March through September 2008, even though Mr. Turner had promised Ms. Packer that he would speak to Mr. Hastings about the Congressman's attentions towards her, Mr. Hastings began to call her approximately every other week under the pretense of work-related matters. However, within a minute or two of conversation, Mr. Hastings would deviate to personal matters or try to arrange a time for them to see each other. Prior to Mr. Hastings' expressions of a romantic interest in Ms. Packer, the Congressman had never called on a regular basis about either personal or work-related matters. Upon information and belief, Mr. Hastings did not call other staff members in a similar fashion.

24.     The first time Mr. Hastings called Ms. Packer was in March 2008. On the call, he informed her that he would be attending an OSCE Parliamentary Assembly Bureau meeting in Copenhagen and requested that she join him at the meeting. After his advances during his visit a few weeks before, Ms. Packer was not comfortable traveling with him to a non-mandatory meeting such as the one in Copenhagen, so she told him that she was still settling in and learning her new job responsibilities, which made her unsure if she would be able to travel to Copenhagen. After the call ended, Ms. Packer immediately called Mr. Turner and informed him of Mr. Hastings' request that she join him in Copenhagen and expressed her concern about traveling with the Congressman. Mr. Turner counseled Ms. Packer to explain to Mr. Hastings that Mr. Turner had determined that she was not needed at the meeting because she was too busy in Vienna. Ms. Packer relayed this information to Mr. Hastings and she did not attend the Copenhagen meeting.

25.     In May 2008, Mr. Hastings traveled to Vienna for another meeting.  This was the first time that Ms. Packer had been around him since the meeting in February 2008, when Mr. Turner promised to speak to Mr. Hastings about ceasing any romantic advances towards her. When Ms. Packer saw Mr. Hastings at the meeting, he immediately approached her, hugged her with both arms, pressed his body against her body and pressed his face against her face.  Prior to that instant, Mr. Hastings had never hugged her in such a manner.  Ms. Packer was uncomfortable with this intimate touching and was particularly upset it was done in front of her colleagues and after Mr. Turner had allegedly counseled him against making any romantic advances.

26.     On the same day in May 2008, as referred to in Paragraph 25, Mr. Hastings repeatedly made sexual comments to and around Ms. Packer.  First, as they rode in a car alone together to a meeting in Vienna, Mr. Hastings complained to Ms. Packer that he was having trouble sleeping.  Ms. Packer sympathized with Mr. Hastings and replied that, when she has had trouble sleeping in the past, she found exercise helpful.  Mr. Hastings replied that while exercise worked for some people, "even after sex, I continue to be wide awake."  His sexual remark made Ms. Packer uncomfortable, especially after his earlier intimate hug and his prior romantic advances.

27.     At dinner that same evening, in a conversation initiated by Mr. Hastings, he commented to Ms. Packer that the only reason he was dating Patricia Williams, the Deputy District Director, was because she had been his counsel in his bribery and impeachment trials that resulted in his impeachment and removal from the federal bench.  He also confided to her that he had been dating another staff member, Vanessa Griddine, but that she was "not worthy."

10

Ms. Packer refused to discuss Mr. Hastings' romantic involvement with other staff members and changed the topic of conversation.

28.     Later that evening, however, while Mr. Hastings, Ms. Packer, and several Commission staff members, including the Chief of Staff for Mr. Hastings' congressional office, David Goldenberg, another Commission staff member, Alex Johnson, and Ms. Thompson, were at the bar of the Marriott Hotel, Mr. Hastings remarked to Ms. Packer in front of her colleagues that Janice Helwig, Ms. Packer's predecessor in Vienna, had told other people that Ms. Packer was Mr. Hastings' girlfriend.  Mr. Hastings then put his arm around Ms. Packer's shoulder and said: "She flatters me."  Ms. Packer was embarrassed by Mr. Hastings' comment and demeanor that falsely implied that a romantic relationship existed between them.

29.     As the night progressed and Mr. Hastings consumed more alcohol, he began to make crude comments to Ms. Packer, Ms. Thompson, and Mr. Johnson.  Specifically, Mr. Hastings remarked that he did not understand how female Members of Congress could wear the same underwear from the time the House of Representatives went into session in the morning until it recessed late at night.  He then stated that for that reason he could never take a female Representative "home with him."  He then looked directly at Ms. Packer and asked her, "What kind of underwear are you wearing?"  Ms. Thompson and Mr. Johnson both clearly heard the question because they laughed in response.  Ms. Packer, however, was angry and humiliated both by his question and by his offensive comments about female Members of Congress.  That night, Ms. Packer called Mr. Turner and complained about Mr. Hastings' conduct that day, including about his vulgar questioning of her.

30.     During this trip, Mr. Hastings reiterated his desire to visit Ms. Packer's apartment. Ms. Packer attempted to avoid such a visit by explaining to him that she did not have sufficient

furniture to host guests.  Mr. Hastings, however, renewed his request the next day while they were in a van with other staff members.  Ms. Packer responded that she would be happy to take everyone in the van to visit her apartment on their way to their destination.  Mr. Hastings immediately declined her offer.

31.     For the duration of Mr. Hastings' time in Vienna on that trip, Ms. Packer experienced very high levels of stress when in the presence of Mr. Hastings and attempted to avoid interacting with him because she feared he would make additional comments and sexual advances towards her.

32.     For several months after Mr. Hastings May 2008 trip to Vienna, he continued to call Ms. Packer regularly.  Ms. Packer would often not answer the phone in order to avoid his calls.

33.     In July 2008, a congressional delegation including Mr. Hastings was scheduled to attend the annual meeting of the OSEC Parliamentary Assembly in Astana, Kazakhstan.  Ms. Packer had scheduled her arrival to follow Mr. Hastings' arrival by several hours.  Prior to the trip, however, Mr. Turner requested that Ms. Packer change her flight to arrive a day earlier than the other members of the delegation because Mr. Hastings had decided to travel independent of the other Members of Congress and, instead, would be arriving a day before the delegation. Since he was traveling independently, Mr. Hastings needed a staff member to facilitate his trip, especially one to coordinate travel and administrative matters with the U.S. Embassy or the Kazakhstani government.

34.     This request caused Ms. Packer significant stress and anxiety because she was fearful that Mr. Hastings would take advantage of their being in the country alone and again make sexual advances towards her.  She was also upset that Mr. Turner assigned her to staff Mr.

Hastings alone after her multiple complaints about his conduct towards her, especially because six other Commission staff members were scheduled to staff Mr. Hastings on that trip and Mr. Turner could easily have assigned anyone of them to staff Mr. Hastings and avoided forcing Ms. Packer to spend a day alone with Mr. Hastings.  Nevertheless, Ms. Packer complied with Mr. Turner's request.

35.     Ms. Packer arrived to Astana, Kazakhstan at 4:00 a.m. and on the way to the hotel, the mobile phone of her escort from the U.S. Embassy rang.  After he answered it, he informed her that the call was from Mr. Hastings and he had requested that she meet him immediately upon arriving.  As soon as she arrived at the hotel, Ms. Packer met the Congressman, who was alone in the delegation hospitality room.  Mr. Hastings immediately again embraced her closely with both arms, pressing his body against her body, and pressing his face against hers.  This unwelcome touching was very unpleasant for Ms. Packer and made her very uncomfortable.  Mr. Hastings then commented: "You look really good."  He followed this comment by telling her that he had always liked her and wanted to "look out for [her] career."  Mr. Hastings intention was crystal clear: he was sexually attracted to Ms. Packer, wanted a sexual relationship with her, and would help progress her career if she acquiesced to his sexual advances.  Ms. Packer responded that while she was grateful that he wanted to help her, she wanted to be taken seriously as a professional and did not think it was appropriate for her to have a personal relationship with him.  Mr. Hastings argued that no one would treat her less than professionally because they had a personal relationship and that she would continue to be taken seriously.  Ms. Packer continued to insist that she was uninterested in a personal relationship with him.  At no point in the conversation did Mr. Hastings discuss a single work-related matter

with her.  The sole purpose of the meeting was for him to reinitiate his sexual overtures, even though she had repeatedly denied his advances.

36.     Later that same morning, Mr. Hastings required Ms. Packer to shop with him in the shopping arcades in Astana.  While they shopped, Mr. Hastings repeatedly complained that Mr. Turner was cheap and only once had purchased a gift for him, which was an inexpensive tie. He contrasted Mr. Turner with Mr. Goldenberg and Mr. Johnson who he explained had given him many expensive gifts.  Mr. Hastings repeated statements made clear to Ms. Packer that he had brought her shopping so that she would purchase him a gift.  Upset and anxious about the effect that her rejection of Mr. Hastings would have on her career, Ms. Packer felt no other choice but to purchase him a shirt and tie.

37.     For the remainder of their trip in Kazakhstan, Ms. Packer suffered from severe stress and anxiety because she feared Mr. Hastings' further advances if they were alone.  During this trip, Ms. Packer's blood pressure rose so precipitously that she was forced to see a military doctor.  She explained to the doctor that her stress was caused by Mr. Hastings' unwelcome sexual advances.  He offered her vitamin B complex and a sleeping aid to help her combat the symptoms of her stress.

38.     As stated in paragraph 32, throughout the summer of 2008, Mr. Hastings was regularly calling Ms. Packer when he was not around her.  After Mr. Hastings' repeated  sexual advances in May and July and his continued telephone calls, Ms. Packer informed Mr. Turner that she was unhappy in her position and wished to return to Washington, D.C.  By this point, however, Ms. Packer had become fearful of retaliation, because in Kazakhstan Mr. Hastings directly linked her career progress with her having a personal relationship with him and because she had repeatedly complained to Mr. Turner about Mr. Hastings' conduct yet Mr. Turner had

refused to take any action to protect her.  Ms. Packer, therefore, told Mr. Turner that she wished

to return to Washington, D.C., because she felt that the other U.S. Mission representatives,

particularly the State Department officials, marginalized her and prevented her from being able

to fully perform her duties.  Although the issue of marginalization had been a reoccurring

problem during her first year in Vienna and had contributed to some of Ms. Packer's

dissatisfaction with her position during the first few months of her tenure in the position, the real

reason she requested the transfer back to Washington, D.C., was to remove Mr. Hastings'

apparent sense of entitlement for sexual favors from Ms. Packer because he had given her the

Vienna posting.  Ms. Packer hoped that returning to the Commission's office in Washington,

D.C., would minimize Mr. Hastings' unwelcome advances.  Mr. Turner responded that he would

talk with Mr. Hastings about a possible reassignment for her at a later time.

39.     Throughout the fall of 2008, Ms. Packer traveled back to Washington, D.C., for

consultations every three months and sometimes encountered Mr. Hastings at meetings and

hearings.  During these visits, upon first seeing Ms. Packer, Mr. Hastings would insist on

hugging her with both arms, pressing his body against her body and his face against her face.

Mr. Hastings did not hug others in the same manner.  Given Mr. Hastings' overt sexual

advances, Ms. Packer was made uncomfortable by this unwelcome touching.

40.     In January 2009, with the opening of the 111th Congress, Senator Benjamin

Cardin was appointed Chairman of the Committee and Mr. Hastings was appointed the Co-

Chair.  This shift in leadership meant that Mr. Cardin now led the Commission and was the

ultimate decision maker in regards to personnel issues.

41.     In February 2009, Ms. Packer had completed a full year in her position in Vienna,

the time period she had originally agreed to "try out" the position.  Since Mr. Hastings'

unwelcome sexual attention had continued, Ms. Packer still wanted to return to Washington, D.C.  Ms. Packer again asked Mr. Turner to allow her to return to her old position in Washington, D.C., as he had originally promised.  Since she continued to be concerned about retaliation, Ms. Packer again explained that her desire to return was caused by her dislike of being marginalized by the State Department officials of the U.S. Mission.  Mr. Turner, however, flatly denied her request without providing any explanation.  Since on several occasions Mr. Hastings complained to Ms. Packer that none of his staff had ever contributed to his campaign or given anything back to him, feeling extremely pressured, Ms. Packer contributed $1,000 to his campaign fund.

42.     In April 2009, Ms. Packer attended a Parliamentary Assembly Bureau meeting in Lisbon, Portugal, with Mr. Hastings and Mr. Turner.  In the afternoon of the first day of the meeting, Mr. Hastings traveled to Sintra, a city north of Lisbon, accompanied by Mr. Turner and Ms. Packer.  He went into a bar upon their arrival and Mr. Turner and Ms. Packer separated to look around the town.  After sightseeing, Ms. Packer found Mr. Hastings in the bar alone.  When she arrived, he was clearly inebriated.  Mr. Hastings again told her that he had liked her ever since they had first met and that she did not appreciate the help that he had given to her career.  Ms. Packer was very upset that he continued to pursue a sexual relationship with her and explicitly told him that she did not want an intimate relationship with him.  Mr. Turner then arrived and the conversation ended.

43.     Later that same night after a Commission-related dinner, when Ms. Packer arrived at the hotel, Mr. Hastings was sitting in the hotel lobby facing the door, apparently awaiting her arrival.  Because Mr. Hastings had left the dinner upset, Ms. Packer immediately walked over to him and inquired if he was alright.  Mr. Hastings responded by launching into a 40 minute,

profanity-laced rant, in which he told Ms. Packer that she was not "a sport" because she knew that he "liked" her and that he had helped her professionally.  He then explained to her that he had "come to [her] as a man does to a woman" and that he was very upset that she had informed Mr. Turner about his advances.

44.     He then scolded her: "How dare you complain about me!  You had better forget about being a Republican."  Ms. Packer had kept her head down during his tirade, but at this last statement she looked up at him.  In response, he snidely said: "Don't worry.  Your job is not in any danger."  Scared that she would lose her job because she rejected his advances and complained about his conduct, Ms. Packer apologized for not living up to his expectations.  In response he asked her: "Would you like to accompany me to my room?"  Ms. Packer immediately responded: "no."  He then asked whether she would like him to accompany her to her own room.  She again said: "no."  Clearly exasperated by her continued rejections of his advances, he exclaimed: "Well, what is your room number?"  The emotional distress and humiliation caused by this exchange had made Ms. Packer nauseous and she felt physically weak, but she managed to respond: "Excuse me sir.  I have to call my son."  She then rose and walked away in tears.

45.     The next morning, Ms. Packer found Mr. Turner and detailed to him the events of the prior day, both the fact that Mr. Hastings continued to make sexual advances towards her and that he had implicitly threatened her job.  Mr. Turner responded that, while he was sorry that she had to endure this treatment, there was nothing he could do about it.  Ms. Packer was devastated by the fact that Mr. Turner would not do anything to protect her from Mr. Hastings' sexual harassment.

46.     Ms. Packer next saw Mr. Hastings in May 2009 at a Commission meeting in

Washington, D.C.  At the meeting, Mr. Hastings rose from where he was sitting with the other

Members of Congress, crossed the room, approached her, and asked her to go outside in the

hallway to speak with him.  Ms. Packer felt she had no other choice but to accompany him.

Once in the hallway, Mr. Hastings opened his arms wide and told her to give him a hug.  Ms.

Packer felt humiliated by the demand, but Mr. Hastings had already implicitly threatened her job,

so she acquiesced and hugged him.  As usual, Mr. Hastings pressed the front of his body against

hers and pressed his face against hers.  Ms. Hastings' unwelcome touching caused Ms. Packer to

feel physically ill and experience significant emotional distress.  Mr. Hastings ended the

conversation by telling Ms. Packer to come by his office to see him.  Ms. Packer was so upset

that she could not respond and instead just walked away.  She did not, however, visit him in his

office as he requested.

47.     In July 2009, both Ms. Packer and Mr. Hastings attended a Parliamentary

Assembly annual meeting in Vilnius, Lithuania.  The first day of the meeting, Ms. Packer

entered the meeting hall with a colleague from the Parliamentary Assembly.  Mr. Hastings was

standing with the Secretary General of the Parliamentary Assembly.  Ms. Packer acknowledged

both officials by saying "Hello" and waving.  Mr. Hastings replied, "What do you mean 'hello?'

Come over here and give me a hug."  Ms. Packer felt that refusing would have caused an

embarrassing situation, so she walked over and allowed him to hug her.  He again embraced her

with both arms, pressed his body against her body, and pressed his face against her face.  This

unwelcome touching again caused Ms. Packer serious emotional distress.  Later, during another

meeting, Mr. Johnson approached her and informed her that Mr. Hastings wanted her to

accompany him back to his hotel in his car.  Ms. Packer explained to Mr. Johnson that she was

needed in the meeting because she was the lead staff member on the issues addressed in the meeting.  Ms. Packer was so distressed by Mr. Hastings' continued sexual harassment that she declined the opportunity to dine with the other Committee staff and Mr. Hastings.

48.     After Mr. Hastings' conduct in Lithuania, which demonstrated that Mr. Turner was not willing to protect her from Mr. Hastings, Ms. Packer reported Mr. Hastings' sexual harassment of her to Edward Joseph, who was the Deputy Staff Director of the Commission at the time and had been appointed to that position by Senator Cardin.  Ms. Packer hoped that, if Senator Cardin learned about the harassment she was being subjected to, he would act to protect her.  Mr. Joseph responded that he was shocked and sorry that she had to go through such an experience.  He asked if he could raise the matter with Senator Cardin's staff and Ms. Packer granted him permission.  Within a week, Mr. Joseph emailed Ms. Packer directing her to file a complaint with the Office of Compliance.

49.     The stress of Mr. Hastings' continued sexual advances and attention, and her fear that he would begin retaliating against her once he realized that she would not succumb to his advances, became so severe that she began to suffer from high blood pressure and evidenced symptoms of early coronary artery disease.  By August 2009, her health had degraded to a point that she began to be treated by a cardiologist in Vienna, who prescribed her medications to counter the high blood pressure and address the coronary artery disease.  She had severe side effects from one of these medications, which made her ill for weeks after she began taking it.  Since Ms. Packer's health insurance did not cover international medical care, she incurred substantial medical costs because of these health problems.

50.     By the fall of 2009, Ms. Packer's fears of retaliation were confirmed.  Mr. Turner began to assign work from her portfolio to other colleagues, and began to withhold from her

important information necessary for her to perform her job.  For example, as the Commission's

Representative at the U.S. Mission in Vienna, one of her duties was to inform her State

Department colleagues of the Commission's activities.  On a number of occasions, however, Mr.

Turner would plan certain meetings or travel plans for the Commission's members, but would

not inform Ms. Packer about the plans.  Ms. Packer, instead, learned the information from other

sources and sometimes through colleagues from the State Department, which negatively affected

her professional reputation and prevented her from adequately performing her responsibilities.

Another example of Mr. Turner not informing her of important information was when the CSCE

Commission was planning to hold a hearing involving the U.S. State and Defense Departments.

Mr. Turner assigned the hearing preparations to another Policy Advisor, who personally

contacted the Department of Defense about the hearing even though Ms. Packer was responsible

for military security issues and, as such, should have served as the liaison.  Ms. Packer only

learned about the hearing because a Defense Department colleague mentioned it to her.  When

Ms. Packer asked Mr. Turner why he had kept this information from her, he refused to explain

and instead responded by blaming her for the problems between the Commission's

Representative and the other U.S. Mission delegation, even though he had previously

acknowledged that it had been the U.S. Mission delegation that had marginalized her.

     51.     After several months of enduring Mr. Turner's retaliatory conduct, Ms. Packer

reported Mr. Hastings' sexual harassment and Mr. Turner's retaliatory harassment to Marlene

Kaufmann, the Commission's counsel.  Ms. Kaufmann responded to Ms. Packer's complaint by

explaining to her that "maybe [Mr. Turner] couldn't do anything about [Mr. Hastings' conduct]

because he had his own job to worry about."  Ms. Kaufmann did not offer Ms. Packer any

assistance or even suggest that she would investigate the issue.

52.     Seeing no end in sight to the harassment and retaliation, Ms. Packer renewed her request to Mr. Turner to allow her to return to Washington, D.C., since she was already approaching two years in her position in Vienna and had only committed to one year. Mr. Turner responded to the request by informing her that Mr. Hastings would be coming to Vienna in February 2010 and would speak to her at that time about her future. By informing Ms. Packer that the Congressman would be determining her future at the Commission, even though Senator Cardin served as the Chair and, as such, should have made such personnel decisions, Mr. Turner was implicitly threatening Ms. Packer's job.

53.     The stress of Mr. Hastings' harassment, Mr. Turner's retaliation, Ms. Kaufmann's refusal to help, and the implicit threats to her job exacerbated Ms. Packer's high blood pressure problems. At the end of December 2009, while visiting her family in Virginia, Ms. Packer collapsed and was rushed to an emergency room. While Ms. Packer recovered enough to be released from the hospital that day, the stress was becoming more than her body could handle.

54.     In November 2009, Ms. Packer signed up to serve as an election observer for the Ukrainian Presidential Election, which was to be held in January. In December 2009, however, Ms. Packer learned that Mr. Hastings had decided to observe the election as well. Upon learning this information, Ms. Packer contacted the person charged with assigning staff to specific in-country sites and requested that she be placed in a different location than Mr. Hastings. Ms. Packer was assigned to Odessa and Mr. Hastings was placed in Kiev.

55.     In January 2010, when Ms. Packer arrived in Kiev, Ukraine, en route to Odessa, Ukraine, Mr. Johnson informed her that Mr. Hastings was insisting that all Commission staff, except one person, remain in Kiev, allegedly for safety reasons. Mr. Johnson then informed her that he had canceled her hotel reservation in Odessa. Ms. Packer became very upset about the

prospect of having to be around Mr. Hastings and eventually broke down to Orest

Deychakiwsky, a Commission staff member.  She informed him that Mr. Hastings had been

sexually harassing her for almost two years and that Mr. Turner was now retaliating against her

because she rejected Mr. Hastings and complained about his conduct.  Once she calmed down,

Ms. Packer emailed Mr. Turner to discuss how to handle the situation.  Mr. Turner advised her to

go to Odessa despite Mr. Hastings' directive and to not tell either Mr. Hastings or Mr. Johnson

that she was leaving Kiev.  Ms. Packer followed Mr. Turner's direction, but experienced further

stress stemming from her concern that she would be punished for disobeying Mr. Hastings'

directive.

      56.     Ms. Packer's stress level was so high that she experienced chest pain that first

night in Odessa.  The next day, Ms. Packer emailed Mr. Turner asking if she could call him to

speak about her concerns and illness, but he did not reply.  When she returned to Vienna, Ms.

Packer continued to experience chest pains and emailed Mr. Turner and Ms. Kaufmann about her

medical problem and asked to speak with Mr. Turner that day.  Mr. Turner responded that he

would call her the next day.  The next morning, however, before Ms. Packer and Mr. Turner

spoke, Ms. Packer fainted in the middle of a meeting.  When she was resuscitated, the emergency

personnel informed her that her blood pressure was in the range where she could have suffered a

stroke or a heart attack.  Extremely upset by the events of that day and the day before, Ms.

Packer confided in Carol Fuller, the Charge de Affaires for the U.S. Mission to the OSCE, about

Mr. Hastings' sexual harassment and her anxieties about the retaliation she had been enduring.

Because of the episode, Ms. Packer was placed on additional medication.

      57.     That night, Mr. Turner called Ms. Packer and immediately put Mr. Hastings on

the phone, even though Ms. Parker had just survived a very dangerous health episode that was

caused by Mr. Hastings' conduct towards her.  Mr. Hastings explained that he had heard about her medical episode and wanted to assure her that her job was secure and that she should just let him know what she needed in order to address her health problems.  The phone was passed to Mr. Turner at that point and Ms. Packer told him that she was going to consult with her doctors, but that she wanted to return to Washington, D.C., in July 2010.   Mr. Turner agreed that she could return to Washington, D.C. by July 31, 2010.  Mr. Turner also agreed to have a telephone conference with Ms. Packer and Ms. Kaufmann to discuss the harassment issues.

58.     Over the next several days in January 2010, Ms. Packer, Mr. Turner, and Ms. Kaufmann had several conferences about the harassment and they agreed to take the matter seriously.  They  assured Ms. Packer that they had counseled Mr. Hastings to stop making unwelcome advances towards her and, in particular, to refrain from hugging her.

59.     In January 2010, after the trip to Ukraine, Ms. Packer also called Christopher Lynch, the Chief of Staff for Senator Cardin's personal office, because she could not trust that Mr. Turner was actually communicating the harassment problem to the Senator.  Ms. Packer detailed the harassment that she had suffered at the hands of Mr. Hastings.  Mr. Lynch assured Ms. Packer that Senator Cardin was committed to the Committee maintaining a harassment-free environment and that Ms. Packer would not lose her job because she rejected Mr. Hastings' advances and complained about his harassing conduct.  Mr. Lynch, however, did not indicate that the Senator would take any action to assist Ms. Packer.

60.     Shortly after Ms. Packer spoke to Mr. Lynch, Ms. Kaufmann confronted her over the telephone.  Ms. Kaufmann told her that Senate Legal Counsel had called her telling her that an employee in Vienna was asserting that she had been subjected to harassment and retaliation.  Ms. Kaufman accused Ms. Packer of contacting the Senate Legal Counsel and then exclaimed

angrily to Ms. Packer: "No one is retaliating against you!"  Ms. Packer explained that she did not call Senate Legal Counsel, but had contacted Mr. Lynch and informed him of the harassment and retaliation.  Ms. Kaufmann kept arguing that no one was retaliating against her and that her job was secure.  Ms. Kaufmann ended the conversation by insisting that they set up another telephone conference between Ms. Packer, Mr. Turner, and her to discuss the matter.

61.     A few days later, a telephone conference took place between Ms. Packer, Mr. Turner, and Ms. Kaufmann.  Mr. Turner and Ms. Kaufmann again assured Ms. Packer that they had spoken to Mr. Hastings and that she no longer had to worry about Mr. Hastings acting inappropriately towards her.  In response, Ms. Packer again requested that she be permitted to return to Washington, D.C.

62.     On or around February 4, 2010, during a meeting with Mr. Turner, Ms. Kaufman, and Ms. Packer, Mr. Turner informed Ms. Packer that he had Mr. Hastings' District Director, who was a longtime friend of Mr. Hastings, speak to Mr. Hastings about his conduct towards Ms. Packer.  Mr. Turner then counseled her that it was not in her interest or Mr. Hastings' interest for her to go public with a complaint and that she should allow him to handle the situation.  Mr. Turner's comment was clearly intended to be an implicit threat to Ms. Packer, which just further heightened her stress levels and further jeopardized her health.

63.     On February 5, 2010, Ms. Kaufmann wrote to Ms. Packer informing her that Mr. Turner had spoken to Mr. Hastings about her harassment complaint and that Mr. Hastings had promised to be "sensitive to [her] concerns and [to] proceed accordingly."  Ms. Kaufmann also informed Ms. Packer that both Mr. Turner and Mr. Hastings were "satisfied with [Ms. Packer's] job performance."  She then confirmed that Ms. Packer would be allowed to return to Washington, D.C., before the end of the year, likely in July.

64.     During the beginning of February 2010, while Ms. Packer was in Washington, D.C., for medical treatment, she had Mr. Joseph over for dinner because he was leaving the Commission.  Mr. Joseph inquired about whether the sexual harassment and retaliation continued, to which Ms. Packer informed him that it did and updated him on Ms. Hastings' and Mr. Turner's misconduct since July 2009.  Mr. Joseph then informed her that in July 2009, he had reported the sexual harassment and retaliation to Mr. Lynch, who had recommended that Ms. Packer contact the Office of Compliance.  Mr. Joseph explained that Senator Cardin needed to get along with Mr. Hastings and that Mr. Turner was protected by Mr. Hastings.

65.     On February 18, 2010, Mr. Hastings returned to Vienna for the winter meeting of the OSCE Commission.  As soon as Mr. Hastings saw Ms. Packer, he approached her and again pressed his face against hers.  This conduct confirmed for Ms. Packer that Mr. Hastings would not change his conduct towards her, even after being counseled by multiple people not to make sexual advances towards her and not to hug her.

66.     Mr. Hastings upset Ms. Packer again the next day, February 19, 2010.  In front of the entire congressional delegation in attendance for the meeting in Vienna, Mr. Hastings demanded that Ms. Packer have her photograph taken with him in "[their] favorite pose."  In order to not make a scene, Ms. Packer agreed to take the photograph with him, even though it required her to place one of her arms around him and to allow him to do the same to her.  Ms. Packer was particularly distressed by this conduct because she felt that Mr. Hastings was attempting to create an impression of intimacy between them amongst the members of the delegation.  Additionally, Mr. Hastings had been counseled that she did not want to be touched by him, yet he still insisted on using his control over her to force her to pose in a way that

required they touch.  After two years of unwelcome sexual advances and touching, this additional unwelcome touching caused her extreme emotional distress.

67.     That evening, Ms. Packer complained in writing to Mr. Turner and Ms. Kaufmann about Mr. Hastings' conduct earlier that day and the day before.  Ms. Packer informed them that if Mr. Hastings continued to touch her, she would pursue legal action against him.  Mr. Turner responded that he would speak with her about the issue in the morning, but that Mr. Hastings would be leaving early the next morning, so she did not need to worry about encountering him again.

68.     The following week, Ms. Packer contacted the Office of Representative Christopher Smith, the Ranking Republican Member of the Commission, to request Mr. Smith's assistance in addressing Mr. Hastings' sexual harassment.  Ms. Packer explained in detail to Mr. Smith's Chief of Staff, Mary McDermott, that she had been suffering harassment at the hands of Mr. Hastings and now was suffering retaliation.  Ms. McDermott advised her to contact the Office of Compliance about Mr. Hastings' and Mr. Turner's conduct.

69.     Since it was clear to Ms. Packer that Mr. Turner and Ms. Kaufmann were unwilling or unable to stop Mr. Hastings from sexually harassing her, Ms. Packer contacted the Office of Compliance from Vienna.  She explained to Jennifer McCuiston, the Office of Compliance Representative on the phone, that she was an employee with the Commission and was being sexually harassed by Mr. Hastings and retaliated against by her Staff Director.  Ms. McCuiston informed her that she had 180 days to file a Request for Counseling based upon this sexual harassment and retaliation.

70.     In March 2010, Mr. Turner again began to retaliate against Ms. Packer.  Ms. Packer informed Mr. Turner that she intended to submit several travel requests for meetings.  Mr.

Turner responded by informing her that she would have to work very hard to convince Senator Cardin that she should be able to travel since she had decided to return to Washington, D.C., in July, even though the Commission staff manual required that all staff travel as part of their fulfillment of their portfolio duties. Ms. Packer responded that Mr. Lynch had promised her that she would not face any adverse consequences if she chose to return to her position in Washington, D.C. Mr. Turner refused to respond and the conversation ended.

71.     Because of this retaliatory conduct, on April 11, 2010, Ms. Packer complained in writing to Mr. Lynch about Mr. Turner's conduct, detailing both his attempt to prevent her from traveling and his earlier retaliation of excluding her from Commission correspondence. Mr. Lynch reiterated that Senator Cardin was committed to ensure she did not face retaliatory action because of her complaints. The next staff meeting after she complained to Mr. Lynch, Mr. Turner indicated that her travel requests had now been approved.

72.     As Ms. Packer awaited her return to Washington, D.C. in July, she continued to have chest pains and on June 15, 2010, was treated at the hospital. Her physician informed her that the chest pains were caused by stress.

73.     Ms. Packer returned to Washington, D.C., and resumed her position as a Policy Advisor for the Committee at the end of July 2010.

74.     On August 9, 2010, Ms. Packer filed a complaint with the Office of Compliance asserting claims of sexual harassment and retaliation.

75.     On September 8, 2010, Ms. Packer's counseling period ended.

76.     On September 17, 2010, Ms. Packer requested mediation. On December 8, 2010, her mediation period ended.

**COUNT ONE --**  **DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT, 2 U.S.C. §1311 ET SEQ. AGAINST DEFENDANT THE UNITED STATES COMMISSION ON SECURITY AND COOPERATION IN EUROPE.**

77.     Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 76 above.

78.     The Congressional Accountability Act ("CAA") prohibits discrimination against an employee on the basis of sex in the enjoyment of all benefits, privileges, terms, and conditions of employment.

79.     At all times relevant to this Complaint, Plaintiff, as an employee of the United States Commission on Security and Cooperation in Europe, was an "employee" within the meaning of the CAA.

80.     Mr. Hastings regularly subjected Ms. Packer to unwelcome sexual advances, sexually explicit remarks, and unwelcome touching.  Even though Ms. Packer repeatedly rejected his advances and complained to her direct supervisor about Mr. Hastings' conduct, Mr. Hastings refused to stop making sexual advances towards her and touching her.  Instead, Mr. Hastings and his Staff Director, Mr. Turner, repeatedly threatened her job.  Mr. Hastings' sexual conduct towards Ms. Packer and the later retaliatory threats by Mr. Turner and Mr. Hastings was so severe and pervasive that it altered the conditions of Ms. Packer's employment and created a sexually hostile work environment, in violation of the CAA.

81.     As a direct and proximate result of the unlawful sexual harassment, Ms. Packer experienced insomnia, anxiety, depression, high-blood pressure, and developed symptoms of coronary artery disease.  Ms. Packer has been prescribed medication and is under the care of a physician because of the severity of her heart problems.

82.    Defendant's actions have directly and proximately caused Ms. Packer substantial damage to her future career and professional reputation, humiliation, and pain and suffering. Defendant's actions were wanton, reckless, or in willful disregard of Ms. Packer's legal rights.

**COUNT TWO --    RETALIATION IN VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT, 2 U.S.C. § 1311 ET SEQ. AGAINST DEFENDANT THE UNITED STATES COMMISSION ON SECURITY AND COOPERATION IN EUROPE.**

83.    Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 82 above.

84.    The CAA prohibits retaliation against any employee for engaging in opposition to what she reasonably in good faith believes constitutes unlawful discrimination under the CAA, including the rejection of sexual advances and other forms of sexual harassment.

85.    Ms. Packer repeatedly engaged in protected activity by opposing treatment she reasonably believed constituted unlawful discrimination, including repeatedly rejecting Mr. Hastings' unwelcomed sexual advances and reporting Mr. Hastings' harassing behavior to Mr. Turner, the Commission Staff Director and her immediate supervisor; Mr. Joseph, the Commission Deputy Staff Director; Ms. Kaufmann, the Commission Legal Counsel; Mr. Lynch, the Chief of Staff for the then Chairman of the Commission Senator Cardin; and Ms. McDermott, the Chief of Staff for the then Ranking Member for the Commission Representative Smith.

86.    Defendant took adverse retaliatory actions against Ms. Packer by repeatedly threatening her job at the Commission, by refusing to allow her to return to her position as Policy Advisor in Washington, D.C., and by intentionally marginalizing her from the rest of the U.S.

Mission to the OSCE.  Defendant's retaliatory actions were so adverse that they would have dissuaded a reasonable employee from making or supporting a charge of discrimination.

87.     Defendant's retaliatory actions were causally connected to Ms. Packer's protected activity.

88.     As a direct and proximate result of the unlawful retaliation, Ms. Packer experienced insomnia, anxiety, depression, high-blood pressure, and developed symptoms of coronary artery disease, for which she has been prescribed medication.  Ms. Packer remains under the care of a physician.

89.     Defendant's actions have directly and proximately caused Ms. Packer substantial damage to her career and professional reputation, humiliation, and pain and suffering. Defendant' actions were wanton, reckless, or in willful indifference to Ms. Packer's legal rights.

**COUNT THREE -- SEXUAL HARASSMENT IN VIOLATION OF THE FIFTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES AGAINST DEFENDANT ALCEE L. HASTINGS.**

90.     Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 89 above.

91.     The guarantee to equal protection of the law embodied in the Fifth Amendment to the Constitution of the United States prohibits discrimination in employment based upon a person's sex, which includes sexual harassment and the creation of a sexually hostile work environment.

92.     Mr. Hastings regularly subjected Ms. Packer to unwelcome sexual advances, sexually explicit remarks, and unwelcome touching.  Even though Ms. Packer repeatedly rejected his advances and complained to her direct supervisor about Mr. Hastings' conduct, Mr. Hastings refused to stop making sexual advances towards her and touching her.  Instead, Mr.

Hastings and his Staff Director, Mr. Turner, repeatedly threatened her job.  Mr. Hastings' sexual

conduct towards Ms. Packer and the later retaliatory threats by Mr. Turner and Mr. Hastings

were so severe and pervasive that they altered the conditions of Ms. Packer's employment and

created a sexually hostile work environment.  Defendant did not subject male employees to the

same work environment.

93.     As a direct and proximate result of the unlawful sexual harassment, Ms. Packer

experienced insomnia, anxiety, depression, high-blood pressure, and developed symptoms of

coronary artery disease.  Ms. Packer has been prescribed medication and is under the care of a

physician because of the severity of her heart problems.

94.     Defendant's actions have directly and proximately caused Ms. Packer substantial

humiliation and pain and suffering.  Defendant's actions were wanton, reckless, or in willful

disregard of Ms. Packer's legal rights.

**COUNT FOUR --     RETALIATION IN VIOLATION OF THE FIRST AND
FIFTH AMENDMENTS OF THE CONSTITUTION OF THE
UNITED STATES AGAINST DEFENDANTS
ALCEE L. HASTINGS AND FRED TURNER.**

95.     Plaintiff hereby incorporates as though restated each of the factual allegations set

forth in paragraphs 1 through 94 above.

96.     The First Amendment of the Constitution of the United States prohibits the

Federal Government from infringing on a person's speech unless for a compelling interest and

provided that the restriction is both narrowly tailored to achieve that goal or interest and is the

least restrictive means for achieving that interest.  Likewise, the Fifth Amendment prohibits

retaliation against an employee for reporting or otherwise opposing unlawful sexual harassment.

97.     Ms. Packer repeatedly engaged in speech acts that opposed unlawful sexual

harassment by repeatedly rejecting Mr. Hastings' unwelcomed sexual advances and reporting

Mr. Hastings' harassing behavior to Mr. Turner, the Commission Staff Director and her immediate supervisor; Mr. Joseph, the Commission Deputy Staff Director; Ms. Kaufmann, the Commission Legal Counsel; Mr. Lynch, the Chief of Staff for the then Chairman of the Commission Senator Cardin; and Ms. McDermott, the Chief of Staff for the then Ranking Member for the Commission Representative Smith.

98.    Defendants took adverse retaliatory actions against Ms. Packer by creating a hostile work environment by repeatedly threatening her job at the Commission, by refusing to allow her to return to her position as Policy Advisor in Washington, D.C., and by intentionally marginalizing her from the rest of the U.S. Mission to the OSCE.

99.    As a direct and proximate result of the unlawful retaliation, Ms. Packer experienced insomnia, anxiety, depression, high-blood pressure, and developed symptoms of coronary artery disease, for which she has been prescribed medication.  Ms. Packer remains under the care of a physician.

100.    Defendants' actions have directly and proximately caused Ms. Packer substantial humiliation, and pain and suffering.  Defendants' actions were wanton, reckless, or in willful indifference to Ms. Packer's legal rights.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays this Court for the following relief:

1.    Enter a judgment in Plaintiff's favor and against the United States Commission on Security and Cooperation in Europe for discrimination on the basis of sex in violation of the Congressional Accountability Act, 2 U.S.C. § 1311 *et seq.*;

2.      Enter a judgment in Plaintiff's favor and against the United States Commission on Security and Cooperation in Europe for retaliation in violation of the Congressional Accountability Act, 2 U.S.C. § 1311 *et seq.*;

3.      Enter a judgment in Plaintiff's favor and against Defendant Alcee L. Hastings for discrimination on the basis of sex in violation of the Fifth Amendment of the Constitution of the United States;

4.      Enter a judgment in Plaintiff's favor and against Defendant Alcee L. Hastings for retaliation in violation of the First and Fifth Amendments of the Constitution of the United States;

5.      Enter judgment in Plaintiff's favor and against Defendant Fred Turner for retaliation in violation of the First and Fifth Amendments of the Constitution of the United States;

6.      An award to Plaintiff of back pay in an amount to be proven at trial;

7.      An award to Plaintiff of compensatory damages in an amount to be proven at trial;

8.      An award to Plaintiff of punitive damages in an amount to be proven at trial;

9.      An award of reasonable attorneys' fees and costs; and

10.     All other relief the court deems just.

Dated:  March 7, 2011                    Respectfully submitted,

                                         JUDICIAL WATCH, INC.


                                         _____
                                         Paul J. Orfanedes (D.C. Bar No. 429716)


                                         _____
                                         James F. Peterson (D.C. Bar No. 450171)
                                         425 Third Street, S.W., Suite 800
                                         Washington, D.C. 20024
                                         (202) 646-5172
                                         (202) 646-5199 (fax)

                                         Attorneys for Plaintiff Winsome A. Packer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**WINSOME PACKER,**                           )
203 Yoakum Parkway                            )
Unit 817                                      )
Alexandria, VA 22304                          )
                                              )
                    **Plaintiff,**            )
                                              )
            **v.**                            )
                                              )
**THE UNITED STATES**                         )     Civil Action No. _____
**COMMISSION ON SECURITY**                    )
**AND COOPERATION IN EUROPE**                 )
234 Ford House Office Building                )
Washington, DC 20515                          )
                                              )
and                                           )
                                              )
**ALCEE L. HASTINGS**                         )
5010 SW 101st Terrace                         )
Miramar, FL 33027                             )
                                              )
and                                           )
                                              )
**FRED TURNER**                               )
8816 Harness Trail                            )
Potomac, MD 20854                             )
                    **Defendants.**           )
                                              )
_____)


## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.

Dated:   March 7, 2011                Respectfully submitted,

                                      JUDICIAL WATCH, INC.


                                      _____
                                      Paul J. Orfanedes (D.C. Bar No. 429716)


                                      _____
                                      James F. Peterson (D.C. Bar No. 450171)
                                      425 Third Street, S.W., Suite 800
                                      Washington, D.C. 20024
                                      (202) 646-5172
                                      (202) 646-5199 (fax)

                                      Attorneys for Plaintiff Winsome A. Packer