**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WINSOME PACKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE U.S. COMMISSION ON SECURITY | ) | No. 11-cv-0485 (RMC) |
| AND COOPERATION IN EUROPE, *et al.* | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MOTION OF DEFENDANT ALCEE L. HASTINGS TO DISMISS COUNTS III AND IV OF PLAINTIFF'S COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Alcee L. Hastings, by his undersigned counsel, respectfully moves this Court to dismiss, with prejudice, all claims against him for failure to state a claim upon which relief may be granted. The grounds for the Motion are set forth in the accompanying memorandum of points and authorities. A proposed order is attached hereto. Mr. Hastings respectfully requests the opportunity for oral argument in support of the Motion, and he requests that the Motion be granted.

Respectfully submitted,

/s/ *Tonya Robinson*
Tonya Robinson (DC Bar #468506)
Thomas F. Connell (DC Bar #289579)
WILMER CUTLER PICKERING HALE
 AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
 (202) 663-6000

*Attorneys for Defendant Alcee L. Hastings*

Dated:  July 9, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                               )
WINSOME PACKER,                    )
                               )
          Plaintiff,              )
                               )
            v.                )
                               )
THE U.S. COMMISSION ON SECURITY )       No. 11-cv-0485 (RMC)
AND COOPERATION IN EUROPE, *et al.* )
                               )       ORAL ARGUMENT REQUESTED
                               )
         Defendants.         )
                               )
_____ )

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT ALCEE L. HASTINGS' MOTION TO DISMISS
COUNTS III AND IV OF PLAINTIFF'S COMPLAINT</u>**

Tonya Robinson (DC Bar #468506)
Thomas F. Connell (DC Bar #289579)
WILMER CUTLER PICKERING HALE
 AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
 (202) 663-6000

July 9, 2011               *Attorneys for Defendant Alcee L. Hastings*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 3

    I.      Plaintiff's Employment At The Commission And Her Alleged Claims ................. 3

    II.     Plaintiff's Pursuit Of Administrative And Judicial Remedies Under The
          CAA ....................................................................................................................... 6

LEGAL STANDARD .............................................................................................................. 10

ARGUMENT .......................................................................................................................... 11

    I.      THE CONGRESSIONAL ACCOUNTABILITY ACT PROHIBITS
         PLAINTIFF'S *BIVENS* CLAIMS ......................................................................... 11

         A.     The Congressional Accountability Act Is The Exclusive Remedy
             By Which Plaintiff May Challenge The Alleged Discrimination
             And Retaliation .......................................................................................... 11

               1.     The Statutory Text And Legislative History Of The CAA
                    Confirm That The Statute Is The Exclusive Remedy
                    Available To Plaintiff ................................................................. 12

               2.     The Exclusive, Preemptive Nature Of Title VII Serves As
                    Further Proof That The CAA Is Plaintiff's Exclusive
                    Avenue Of Redress ..................................................................... 15

         B.     The CAA Constitutes A Comprehensive Remedial Scheme That
             Precludes Plaintiff's *Bivens* Claims Against Mr. Hastings ........................ 18

               1.     The CAA Establishes A Comprehensive Remedial System
                    Governing Administrative And Judicial Review Of Claims
                    Of Discrimination In Congressional Employment ....................... 19

               2.     The CAA Constitutes A Comprehensive Remedial Scheme
                    That Precludes Plaintiff's Constitutional Claims .......................... 23

               3.     Title VII's Preemption Of Employment Discrimination
                    Claims By Federal Agency Employees Offers Further
                    Proof Of The CAA's Comprehensive Nature ............................... 30

Page

II.    THE COMPLAINT FAILS TO STATE CLAIMS BASED ON
       VIOLATIONS OF THE FIRST AND FIFTH AMENDMENTS.........................31

       A.    Plaintiff's Allegations Of Offhand Remarks And Isolated Incidents
             Fail To State A Claim Of Sexual Harassment Under The Fifth
             Amendment................................................................................................32

       B.    Plaintiff's Allegations Fail To State A Claim Of Retaliation Under
             The First Amendment ...............................................................................35

             1.    Plaintiff Has Failed To Allege A Cognizable Violation Of
                   The First Amendment Because Her Speech Did Not
                   Involve A Matter Of Public Concern.............................................35

             2.    Plaintiff's Complaint Fails To Allege That Mr. Hastings
                   Took Any Retaliatory Action.........................................................38

       C.    Mr. Hastings Is Entitled To Qualified Immunity......................................40

CONCLUSION.....................................................................................................................41

# TABLE OF AUTHORITIES

Page

## Federal Cases

*Adams v. U.S. Capitol Police Bd.,*
  564 F. Supp. 2d 37 (D.D.C. 2008) ............................................................................. 12, 13

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ....................................................................................................... 32, 38

*Akonji v. Unity Healthcare, Inc.,*
  517 F. Supp. 2d 83 (D.D.C. 2007) ........................................................................................ 34

*Ashcroft v. Iqbal,*
  556 U.S. ---, 129 S. Ct. 1937 (2009) ................................................................................ *passim*

*Barry v. U.S. Capitol Guide Board,*
  No. 04-0168, 2005 U.S. Dist. LEXIS 8382 (D.D.C. April 20, 2005) ..................................... 28

*Bernheim v. Litt,*
  79 F.3d 318 (2d Cir. 1996) ........................................................................................................ 37

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,*
  403 U.S. 388 (1971) ................................................................................................... *passim*

*Blackmon-Malloy v. U.S. Capitol Police Bd.,*
  575 F.3d 699 (D.C. Cir. 2009) .................................................................................. 23, 26, 30

*Brantley v. Kempthorne,*
  No. 06-1137, 2008 U.S. Dist. LEXIS 38406, (D.D.C. May 13, 2008) ............................. 34, 35

*Brown v. Gen. Serv. Admin.,*
  425 U.S. 820 (1976) ................................................................................................... *passim*

*Bush v. Lucas,*
  462 U.S. 367 (1983) ................................................................................................... *passim*

*Carlson v. Green*, 446 U.S. 14 (1980) ........................................................................................ 15

*Connick v. Myers,*
  461 U.S. 138 (1983) .................................................................................................................. 36

*Crawford-El v. Britton,*
  523 U.S. 574 (1988) .................................................................................................................. 41

*Cross v. Samper*,
    501 F. Supp. 2d 59 (D.D.C. 2007) ................................................................. 29

*Davis v. Passman*,
    442 U.S. 228 (1979) ....................................................................................... 15

*Doerr v. Colo. Div. of Youth Servs.*,
    95 Fed. App'x 295 (10th Cir. 2004) ............................................................. 36

*Dotson v. Griesa*,
    398 F.3d 156 (2d Cir. 2005) ..................................................................... 24, 29

*Elam v. Univ. of Dist. Columbia*,
    530 F. Supp. 2d 4 (D.D.C. 2007) ................................................................. 32

*Ethnic Employees of Library of Congress v. Boorstin*,
    751 F.2d 1405 (D.C. Cir. 1985) ............................................................... 16, 31

*United States v. Fausto*,
    484 U.S. 439 (1988) ....................................................................................... 29

*Fields v. Office of Eddie Bernice Johnson*,
    459 F.3d 1 (D.C. Cir. 2006) (en banc) ........................................................... 6

*Gordon v. Office of the Architect of the Capitol*,
    750 F. Supp. 2d 82 (D.D.C. 2010) ............................................................... 15

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ....................................................................................... 40

*Harris v. Forklift Sys.*,
    510 U.S. 17 (1993) ......................................................................................... 32

*Hatfill v. Gonzales*,
    519 F. Supp. 2d 13 (D.D.C. 2007) ............................................................... 11

*Hinck v. United States*,
    550 U.S. 501 (2007) ................................................................................. 18, 31

*Hollingsworth v. Duff*,
    444 F. Supp. 2d 61 (D.D.C. 2006) ............................................................... 24

*Johnson v. Gov't of Dist. of Columbia*,
    --- F. Supp. 2d ----, 2011 WL 1517106 (D.D.C. Apr. 21, 2011) ............... 39

*Kittner v. Gates*, 708 F. Supp. 2d 47 (D.D.C. 2010) ..................................... 16

*Lefande v. Dist. of Columbia*,
    613 F.3d 1155 (D.C. Cir. 2010) ............................................................... 36-37

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985).................................................................................. 40

*\*Payne v. Meeks*, 200 F. Supp. 2d 200 (E.D.N.Y. 2002) ......................................... 27, 28, 29, 36

*Pearson v. Callahan*,
    555 U.S. 223, 129 S. Ct. 808 (2009)................................................................... 40, 41

*Pollock v. Ridge*,
    310 F. Supp. 2d 519 (W.D.N.Y. 2004)...................................................................... 31

*Ratliff v. DeKalb County*,
    Ga., 62 F.3d 338 (11th Cir. 1995)....................................................................... 37

*Saucier v. Katz*,
    533 U.S. 194 (2001)........................................................................................ 40

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988)........................................................................................ 15

*Simpkins v. Dist. of Columbia Gov't*,
    108 F.3d 366 (D.C. Cir. 1997)............................................................................ 38

*Singh v. U.S. House of Representatives*,
    300 F. Supp. 2d 48 (D.D.C. 2004)........................................................................ 6, 18

*Smith v. AMTRAK*,
    25 F. Supp. 2d 578 (E.D. Pa. 1998) ..................................................................... 32

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) (en banc)................................................................ 15, 26

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994)............................................................................. 36, 37

*\*Taylor v. Chao*,
    516 F. Supp. 2d 128 (D.D.C. 2007)...................................................................... 32, 33

*Wilburn v. Robinson*,
    480 F.3d 1140 (D.C. Cir. 2007)........................................................................... 35

*Wilson v. Dep't of Transportation*, 759 F. Supp. 2d 55 (D.D.C. 2011)............................ 13, 24, 33

*\*Wilson v. Libby*,
    535 F.3d 697 (D.C. Cir. 2008)..................................................................... *passim*

*Zweibon v. Mitchell*,
    720 F.2d 162 (D.C. Cir. 1983)............................................................................ 41

**Federal Statutes**

Congressional Accountability Act, 2 U.S.C. §§ 1301-1438 .................................................. *passim*

22 U.S.C. § 3002 ....................................................................................................... 4

22 U.S.C. § 3003 .................................................................................................... 4, 5

22 U.S.C. § 3006 ....................................................................................................... 4

22 U.S.C. § 3008 ....................................................................................................... 5

42 U.S.C. § 2000e-16 ..................................................................................... 16, 17, 23

5 U.S.C. § 2101 ....................................................................................................... 29

5 U.S.C. § 2103 ....................................................................................................... 29

5 U.S.C. § 2105 ....................................................................................................... 29

5 U.S.C. § 2301 ....................................................................................................... 29

5 U.S.C. § 2302 ....................................................................................................... 29

**Legislative History**

140 Cong. Rec. 10278 (1994) (statement of Sen. Nighthorse-Campbell) .................................... 17

140 Cong. Rec. 207291 (1994) (statement of Rep. Goodling) .................................... 14

141 Cong. Rec. 866 (1995) (statement of Sen. Grassley) ........................................... 17

141 Cong. Rec. 877 (1995) (statement of Sen. Glenn) .............................................. 17

141 Cong. Rec. 957 (1995) (statement of Sen. Lieberman) ........................................ 17

141 Cong. Rec. S635 (1995) (statement of Sen. Glenn) ............................................ 14

H.R. Rep. No. 103-413, Part 1, 103d Cong., 1st Sess. .............................................. 14

H.R. Rep. No. 103-650, Part 1, 103d Cong., 2d Sess. .............................................. 13

H.R. Rep. No. 103-650, Part 2, 103d Cong., 2d Sess. .............................................. 13

S. Hearing 103-1047, Part 1, 103d Cong., 1st Sess. ................................................ 28

## PRELIMINARY STATEMENT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Alcee L. Hastings submits this Memorandum of Points and Authorities in support of his Motion to Dismiss Counts Three and Four of the complaint filed by Plaintiff Winsome Packer.

Plaintiff, a congressional employee of the U.S. Commission on Security and Cooperation in Europe (the "Commission"), alleges that she was subjected to sexual harassment and retaliation and has brought an action against the Commission, Mr. Hastings, and Mr. Fred Turner, the staff director at the Commission during the relevant time period.  Plaintiff acknowledges that her claims are governed by the Congressional Accountability Act, 2 U.S.C. §§ 1301-1438 (the "CAA") – a comprehensive statutory scheme that provides administrative and judicial remedies to congressional employees in order to redress the very employment practices about which Plaintiff complains.  As such, Plaintiff has brought two causes of action under the CAA:  Count One alleges discrimination on the basis of sex in violation of the CAA; and Count Two alleges retaliation in violation of the CAA.  Consistent with the requirements of the CAA, before filing her complaint, Plaintiff participated in the CAA's administrative counseling and mediation procedures – the exhaustion of which was a precondition for her prosecution of the CAA claims in this action.

In short, Plaintiff admits that she is covered by the CAA and asserts that the harassment and retaliation she alleges are prohibited by the CAA; and she has pursued, and continues to pursue, the remedies that the CAA provides for the claims she has alleged.  Nevertheless, relying on exactly the same allegations of harassment and retaliation that form the basis of her CAA claims, Plaintiff also asserts causes of action directly under the First and Fifth Amendments to the United States Constitution against Mr. Hastings and Mr. Turner in their individual capacities

– so-called *Bivens* actions.[1]  These *Bivens* claims (Counts Three and Four) fail on a number of independent grounds.

*First*, it is settled that the CAA provides the exclusive remedy by which congressional employees may challenge alleged employment discrimination and retaliation.  The CAA's statutory text, its legislative history and the case law of this District interpreting the CAA all confirm that the CAA is the exclusive avenue for claims of employment discrimination by congressional employees.

*Second*, even if the CAA were not an exclusive, preemptive remedy, the CAA is nevertheless a "special factor" precluding the creation of a *Bivens* cause of action against Mr. Hastings.  *Bivens* and its progeny have emphasized that the judiciary has limited powers in fashioning remedies for constitutional violations, and no private right of action directly under the Constitution should be created where there are "special factors counselling hesitation."  One such "special factor" is the existence of a comprehensive remedial scheme already in place to address the alleged violation.  Here, there is ample evidence that Congress created in the CAA a comprehensive statutory scheme to address the very subject matter of Plaintiff's constitutional claims against Mr. Hastings – namely, alleged sexual harassment and retaliation.  Under these circumstances, courts are not at liberty to create a remedy for an alleged constitutional violation.

*Third*, even if, against the weight of authority, a *Bivens* action could apply to Plaintiff's claims, neither of Plaintiff's constitutional claims alleges a violation of a constitutional right.  Count Three (sexual harassment) does not state a claim for a cognizable Fifth Amendment violation because it does not allege that Mr. Hastings engaged in the type of severe and pervasive conduct required to create a sexually hostile work environment.  In addition, Count Four

---

[1]      *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

(retaliation) fails for multiple reasons.  As an initial matter, Plaintiff's retaliation count fails to state a cognizable First Amendment violation as it does not allege that Plaintiff's speech involved a matter of public concern.  Rather, Plaintiff's speech involved the type of individual personnel dispute that repeatedly has been held not to warrant First Amendment protection. Moreover, while Plaintiff alternatively pleads her constitutional retaliation claim as a violation of the Fifth Amendment, the Fifth Amendment includes no such protection; there is no claim for workplace retaliation under the Fifth Amendment.  That said, even assuming *arguendo* that the Plaintiff's constitutional retaliation claim could rest on the First or Fifth Amendments, Plaintiff has failed to allege that Mr. Hastings was personally involved in any of the conduct that constitutes the unlawful retaliation, which is required to overcome the defense of qualified immunity at the pleading stage.

*Finally*, even if Plaintiff had pled a violation of a constitutional right – which she has not done – Mr. Hastings is nevertheless entitled to qualified immunity if that right was not clearly established at the time of the alleged violation.  To the extent that the law regarding the existence of the constitutional right was unsettled, or doubt existed as to whether the conduct at issue violated that right, qualified immunity protects Mr. Hastings from individual liability.

## FACTUAL BACKGROUND[2]

Plaintiff's complaint, detailed though it is, does not include any allegations that, as a matter of law, are actionable against Mr. Hastings.

### I.      Plaintiff's Employment At The Commission And Her Alleged Claims

As alleged in her complaint, during the relevant time period, Plaintiff was, and continues to be, an employee of the Commission.  Compl. ¶ 5.  The Commission is an entity created by

---

[2]      For purposes of this motion only, insofar as it is made pursuant to Fed. R. Civ. P. 12(b)(6), this Court must assume the truth of Plaintiff's well-pleaded factual allegations.  That said, Mr. Hastings does not concede the truth of Plaintiff's allegations.

statute in 1976 to encourage cooperation among the thirty-five Western and European nations that signed the Helsinki Accords in 1975, by which they pledged to improve relations with the then-Communist bloc. *See* 22 U.S.C. § 3002. The Commission monitors these efforts and reports to Congress about them. 22 U.S.C. § 3006. Plaintiff began her employment at the Commission in Washington, D.C., as a Policy Advisor on May 7, 2007. Compl. ¶ 14. In December 2007, she was asked to serve as the Representative of the Commission to the U.S. Mission to the Organization for Security and Cooperation in Europe ("OSCE")[3] – a position that required her to relocate from the Washington, D.C. area to Vienna, Austria. *Id.* ¶ 15. Plaintiff accepted the new position and moved to Austria on February 15, 2008. *Id.* ¶ 19. She lived and worked in Austria for nearly two and one-half years, until July 2010, when, at her own request, she returned to Washington, D.C., to resume her position as a Policy Advisor on the Commission. *Id.* ¶ 73.

Mr. Hastings, who represents the 23rd Congressional District of Florida in the U.S. House of Representatives, served as Chairman of the Commission during the 110th Congress (from January 3, 2007 to January 3, 2009) and Co-Chairman during the 111th Congress (from January 4, 2009 to January 3, 2011). *Id.* ¶ 7. According to the statute establishing the Commission, the positions of Chairman and Co-Chairman are shared by the House and Senate and rotate every two years, when a new Congress convenes. 22 U.S.C. § 3003(c), (d). Specifically, at the beginning of each odd-numbered Congress, a Member of the Senate is selected by the Senate President, on the recommendation of the majority leader, to serve as

---

[3]     The OSCE is the international security and cooperation organization consisting of now fifty-six participating countries that are signatories to the Helsinki Accords (also referred to as the Helsinki Final Act or the Final Act of the Conference on Security and Co-operation in Europe). Originally called the Conference on Security and Co-operation in Europe ("CSCE"), the organization changed its name to the OSCE in 1994.

Chairman of the Commission, 22 U.S.C. § 3003(c), and the Speaker of the House of Representatives designates one House Member to serve as the Commission's Co-Chairman. 22 U.S.C. § 3003(d). The process is reversed at the beginning of each even-numbered Congress, such that the Speaker of the House designates one House Member as Chairman, 22 U.S.C. § 3003(c), and the President of the Senate, on the recommendation of the majority leader, designates one Senate Member as Co-Chairman. 22 U.S.C. § 3003(d). The statute provides that all Commission hiring decisions are made by a majority vote of a four-person Personnel Committee consisting of the Chairman, the Co-Chairman, and the ranking minority Members of Congress from the House and Senate, except that the Chairman is entitled to appoint and fix the pay of the Staff Director and the Co-Chairman is entitled to appoint and fix the pay of his senior staff person. 22 U.S.C. § 3008(a), (b).

Plaintiff alleges in her complaint that between January 2008 and March 2010, Mr. Hastings made comments and gestures that Plaintiff interpreted as romantic advances or sexual in nature. *Id.* ¶¶ 16, 18, 20-21, 23, 25-30, 35-36, 39, 42-44, 46-47, 65-66. Plaintiff further alleges that she discussed Mr. Hastings' unwelcome advances with her supervisor, then-Commission Staff Director Fred Turner, as well as other Commission staff, on multiple occasions between February 2008 and March 2010. *Id.* ¶¶ 8, 22, 24, 38, 45, 48, 51-52, 55-58, 61-63, 67-68. According to Plaintiff, in retaliation for her complaints regarding Mr. Hastings' apparent advances, Mr. Turner began to re-assign work from her portfolio and to withhold information that she deemed important to perform her job and, once Plaintiff decided to return to Washington, DC, suggested that it may be more difficult for her to justify work travel. *Id.* ¶¶ 50,

70. Plaintiff also claims that Mr. Turner and Mr. Hastings retaliated against her by threatening her job, *see id.* ¶ 92, while also reassuring her repeatedly that her job was secure. *Id.* ¶¶ 44, 57.[4]

## II.     Plaintiff's Pursuit Of Administrative And Judicial Remedies Under The CAA

In February or March 2010, Plaintiff contacted the U.S. Congress Office of Compliance ("OOC") regarding the alleged sexual harassment and retaliation. *Id.* ¶ 69. The OOC is "an independent office within the legislative branch" created by the CAA. 2 U.S.C. § 1381(a). The CAA, adopted after considerable debate, extended the protections of eleven federal employment laws, including Title VII of the Civil Rights Act of 1964, to the legislative branch of the federal government. 2 U.S.C. §§ 1302, 1311. Prior to the CAA's enactment, offices and other entities in the legislative branch had been exempt from these laws, and tens of thousands of legislative employees were without the employment protections that were afforded to workers in other parts of the federal government and in the private sector.[5] Now, legislative employees receive the

---

[4]     Despite the length and detail of the complaint, its allegations of sexual harassment and retaliation are notable for what they do not include. The complaint does not allege any instances of Mr. Hastings (i) touching Plaintiff in a sexual manner, (ii) offering her career advancement or threatening her with punishment depending on whether she engaged in sexual activity with him, or (iii) engaging in sexual activity of any nature with her. Indeed, there are no allegations that Mr. Hastings ever spent time alone, out of the public view, with Plaintiff. Likewise, there are no allegations that Plaintiff suffered economic loss of any nature, or any other form of economic-related harm (*e.g.*, lack of promotion, demotion, or unfavorable work evaluations or the like), as a result of the alleged "retaliation." To the contrary, at Mr. Hastings' suggestion, Plaintiff was assigned to a senior position in Vienna, Austria – thousands of miles from the alleged harasser – and at a rate of compensation (a portion of which was *per diem*) that far exceeded the salary that she earned while in Washington, D.C. Compl. ¶¶ 15, 19. Throughout most of the relevant period (27 months of her employment), Plaintiff remained at her position in Austria, while Mr. Hastings continued to live and work in the Washington, D.C. area. At Plaintiff's request, she subsequently was transferred back to Washington, D.C. *Id.* ¶ 41.

[5]     *See, e.g., Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 4 (D.C. Cir. 2006) (en banc) ("The Act confers on 'covered employees' rights and remedies drawn from various labor and employment statutes not previously applicable to the legislative branch."); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 52 (D.D.C. 2004) (Collyer, J.) ("Once immune from suit for employment-related claims, Congress adopted the CAA to put itself voluntarily under the jurisdiction of the federal courts to resolve employment discrimination (and other) disputes if any administrative resolution process, which includes counseling and mediation, fails.").

benefit of employment discrimination laws previously beyond their reach, *see* 2 U.S.C. § 1302, and, of particular relevance here, the CAA prohibits discrimination against a covered employee on the basis of sex.  2 U.S.C. § 1311; *see also* Compl. ¶ 78.  The CAA also prohibits retaliation against a covered employee for opposing a practice made unlawful by the statute.  2 U.S.C. § 1317; *see also* Compl. ¶ 84.

Under the CAA, Congress delineated a comprehensive, three-step administrative process that enables a covered employee to file a complaint seeking administrative or judicial relief following mandatory counseling and mediation.  2 U.S.C. §§ 1401-1408.  First, the employee must request counseling by the OOC.  2 U.S.C. § 1402.  Second, the employee must participate in an administrative mediation process.  2 U.S.C. § 1403.  Third, upon completion of mediation, the employee may elect to file either a complaint with the OOC or a civil action in federal district court.  2 U.S.C. §§ 1404, 1405, 1408.  Plaintiff, who acknowledges that she is a covered employee under the CAA and that the Commission is her "employing office" under the Act (Compl. ¶¶ 5-6, 79), took full advantage of the substantive and procedural protections afforded under the statute.  Compl. ¶¶ 69, 74-76.

When Plaintiff contacted the OOC in February or March 2010, she was informed by a representative of the OOC that she had 180 days to file a Request for Counseling based upon her claims of sexual harassment and retaliation.  *Id.* ¶ 69.  The CAA provides that, to commence a proceeding, a covered employee must request counseling by the OOC, and that this request must be made not later than 180 days after the date of the alleged violation.  2 U.S.C. § 1402(a).  On August 9, 2010, Plaintiff availed herself of the CAA and the OOC counseling process and filed a request for counseling with the OOC, asserting claims of sexual harassment and retaliation.  Compl. ¶ 74.  The statute provides for a 30-day counseling period once the OOC receives a

request, and requires that the OOC notify the employee in writing when the counseling period has ended.  2 U.S.C. § 1402(b), (c).  Plaintiff's counseling period ended on September 8, 2010.  Compl. ¶ 75.

The CAA further provides that an employee alleging a violation must file a request for mediation with the OOC not later than 15 days after receiving notice of the end of the counseling period.  2 U.S.C. § 1403(a).  Plaintiff again took advantage of the process outlined in the CAA and administered by the OOC and requested mediation on September 17, 2010.  Compl. ¶ 76.  The CAA specifies that mediation "shall involve meetings with the parties separately or jointly for the purpose of resolving the dispute between the covered employee and the employing office."  2 U.S.C. § 1403(b)(2).  The CAA further provides that the Office of Compliance shall notify in writing the covered employee when the mediation period has ended.  *See* 2 U.S.C. § 1403(c).  Plaintiff's mediation period under the CAA ended on December 8, 2010.  Compl. ¶ 76.

Once the administrative requirements described above are exhausted, a claimant may elect either to file a complaint with the OOC or to file a civil action in a federal district court.  2 U.S.C. § 1404.  In either case, the CAA, by specific intent of Congress, does not provide for an action against an individual Member of Congress or individual legislative branch employee.  Rather, the CAA provides that the defendant in any administrative proceeding or civil action shall be the "employing office" alleged to have committed the violation, or in which the violation is alleged to have occurred.  2 U.S.C. §§ 1301(9), 1405(a), 1408(b).  In addition, Congress established a judgment fund to pay any monetary awards or settlements resulting from misconduct by individual Members or congressional employees.  2 U.S.C. § 1415.  Congress thereby structured the CAA in a way that deliberately shielded Members and legislative branch

employees from personal monetary liability, while still providing a remedy for any aggrieved employee/plaintiff.

On March 7, 2011, Plaintiff filed her civil action.  Plaintiff's complaint includes four counts:  Count One alleges discrimination on the basis of sex in violation of the CAA against the Commission (Compl. ¶¶ 77-82); Count Two alleges retaliation in violation of the CAA against the Commission (*id.* ¶¶ 83-89); Count Three alleges sexual harassment in violation of the Fifth Amendment against Mr. Hastings (*id.* ¶¶ 90-94); and Count Four alleges retaliation in violation of the First and Fifth Amendments against Mr. Hastings and Mr. Turner (*id.* ¶¶ 95-100).  Thus, the only two claims asserted against Mr. Hastings are Counts Three and Four, and both are based on alleged violations of the United States Constitution.  For the reasons discussed below, those claims are deficient as a matter of law and should be dismissed with prejudice.[6]

---

[6]     It is worth noting that this case involves strong political and economic motivations not normally present in a discrimination suit.  Plaintiff recently published a novel, which she has been promoting in the electronic and other media, called "*A Personal Agenda*."  According to Amazon.com, it purports to "provide[] an authentic, behind-the-scenes view of how Capitol Hill and Washington movers and shakers wheel and deal," while supposedly focusing on "the sources of intra-racial tensions among native black Americans and black immigrants to the United States, opening a window on a less well known prejudice among these groups and its insidious effects."  Amazon.com, www.amazon.com/Personal-Agenda-Winsome-Packer/dp/1449904092/ref=sr_1_1?ie=UTF8&s=books&qid=1309372540&sr=1-1 (last visited July 8, 2011).  While we must assume the veracity of Plaintiff's allegations for purposes of this motion, Mr. Hastings unequivocally has denied the charges and believes that Plaintiff's lawsuit, like her book, is a fictitious effort to promote her "personal agenda" – including to increase sales of her novel.  Likewise, it is no accident that Plaintiff is represented by Judicial Watch, a self-described conservative organization, which has targeted Democrats in general, and Mr. Hastings in particular.  This lawsuit marks Judicial Watch's fourth attempt to malign Mr. Hastings.  In 2007, Judicial Watch sued Mr. Hastings for an alleged due process violation, when Mr. Hastings and other Commissioners insisted that personnel selections be made consistent with the legislation establishing the Commission.  Ultimately, that action was voluntarily dismissed with prejudice.  Judicial Watch also has targeted Mr. Hastings in other ways:  the organization lobbied against Mr. Hastings' ascendancy to the chairmanship of the Intelligence Committee in the U.S. House of Representatives, and also called for an ethics investigation into Mr. Hastings' per diem use during international travel.  The House Ethics Committee did investigate the per diem allegations and found no violation of any law, regulation, rule, or other applicable standard of conduct.  *See* Staff of H. Comm. On Standard of Official Conduct, Report in the Matter of Allegations Relating to the Use of Per Diem on Official Trips, at 2, 111th Cong., 2d Sess. (Dec. 30, 2010), www.ethics.house.gov/Media/PDF/Per_Diem_Report.pdf (last visited July 8, 2011).

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court must assume the truth of all well-pleaded factual allegations, it need not accept as true legal conclusions set forth in the complaint. *Iqbal*, 129 S. Ct. at 1949.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.  The complaint must plead facts that are more than "merely consistent with" a defendant's liability. *Id.* at 1949.  Instead, the pleaded factual content must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A complaint does not meet this standard if it offers only "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted).  But even when the complaint contains detailed factual allegations, the complaint still must be dismissed when, as here, the allegations, taken as true, show the plaintiff is not entitled to relief. *See id.* at 1950.

## ARGUMENT

I.   **THE CONGRESSIONAL ACCOUNTABILITY ACT PROHIBITS PLAINTIFF'S *BIVENS* CLAIMS**

Plaintiff seeks monetary damages from Representative Hastings in his individual capacity based on an implied right of action directly under the Constitution.[7]   *See* Compl. ¶¶ 90-94 (Count Three), 95-100 (Count Four).   Although the Supreme Court has indicated that, in certain circumstances, there may exist an implied cause of action against federal officials for the violation of constitutional rights (a so-called "*Bivens* action"), *see Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Plaintiff's complaint does not present such a case.   Indeed, no court has allowed a *Bivens* action to stand under circumstances similar to the ones here.   That is because judicial remedies like the ones that were created in *Bivens*, and that the Plaintiff would have this Court create, are prohibited (i) where, as here, there has been a congressional determination foreclosing the action by making an alternative remedy exclusive; or (ii) where, as here, there exist "special factors counselling hesitation" such as the existence of a comprehensive remedial scheme.   *Bush v. Lucas*, 462 U.S. 367, 377-78 (1983); *Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008).

   A.   **The Congressional Accountability Act Is The Exclusive Remedy By Which Plaintiff May Challenge The Alleged Discrimination And Retaliation**

A *Bivens* action cannot be maintained where Congress has provided an exclusive, alternative remedy that forecloses claims brought directly under the Constitution.   *See Bush*, 462 U.S. at 377-78; *Wilson*, 535 F.3d at 708.   As discussed below, the CAA is such an alternative remedy, as evidenced explicitly by the statute's text and its accompanying legislative history.

---

[7]      To the extent that Plaintiff seeks declaratory or other equitable relief against Mr. Hastings, *see* Compl. ¶ 1 ("action … for declaratory and equitable relief"), her claim fails as a matter of law as "there is no basis for suing a government official for declaratory and injunctive relief in his or her individual or personal capacity."   *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 19-23 (D.D.C. 2007).

And while no further proof is required to support that conclusion where, as here, the statute's intention is expressly stated, the courts' treatment of Title VII, one of the employment laws that the CAA extended to congressional employees, further demonstrates that the CAA was intended to be, and is, Plaintiff's exclusive remedy.

> **1.      The Statutory Text And Legislative History Of The CAA Confirm That The Statute Is The Exclusive Remedy Available To Plaintiff**

The CAA's statutory text and legislative history both confirm that Congress intended the statute to be the exclusive remedial mechanism for discrimination claims brought by congressional employees.  *See Bush*, 462 U.S. at 378 (stating that congressional intent to make an alternative, statutory remedy exclusive can be shown "by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself").  *First*, Congress included in the CAA an express provision making the statute the exclusive remedy for discrimination claims arising in the context of congressional employment.  Section 1361(d)(1) of the CAA states unequivocally that "*no person* may commence an administrative or judicial proceeding to seek a remedy for the rights and protections afforded by this Act *except as provided in this Act*."  2 U.S.C. § 1361(d)(1) (emphasis added).  It is difficult to imagine a more explicit statement of Congress' intention, and, as proof, this Court has recognized that the CAA does indeed provide the *exclusive remedy* by which congressional employees can challenge employment discrimination in court.  *See, e.g., Adams v. U.S. Capitol Police Bd.*, 564 F. Supp. 2d 37, 40 (D.D.C. 2008).

For example, in *Adams*, the plaintiff filed a lawsuit against the U.S. Capitol Police Board, alleging that he had been subjected to a hostile work environment and retaliation in violation of several federal employment discrimination statutes.  *Id.* at 39.  On the defendant's motion to dismiss, the court noted that the CAA "provides the *exclusive remedy* by which legislative

12

branch employees can bring a suit challenging employment discrimination." *Id.* at 40 (emphasis added). Under these circumstances, where the CAA expressly precludes any relief other than that provided under the CAA itself, this Court should decline to create a new and additional remedy. *See, e.g., Wilson v. Dep't of Transp.* ("*Wilson II*"), 759 F. Supp. 2d 55, 62 (D.D.C. 2011) (Collyer, J.) (dismissing *Bivens* action where Congress had created remedies for the alleged discrimination and favorably citing *Bush*, which was described as holding that "*Bivens* remedies are not appropriate when Congress has precluded judicially-created remedies by itself creating a remedy or '*by declaring that existing statutes provide the exclusive mode of redress*'") (emphasis added).

*Second*, even if the statute were not as explicit as it is, the legislative history of the CAA is replete with statements showing Congress' intent to make the statute the exclusive remedy for claims of discrimination against congressional employees, and to foreclose claims directly under the Constitution based on such violations. For example, the House Committee on House Administration, reporting on a prior version of the Congressional Accountability Act that passed the House in the 103d Congress (H.R. 4822) and contained an exclusivity provision that was substantively equivalent to Section 1361(d)(1), noted that "[t]he prohibition on proceedings, except as provided in this Act, is *a jurisdictional bar* on circumvention of this Act by such methods as *implied* statutory, common law, or *Constitutional causes of action* in either the Judicial or Executive Branches." House Comm. on House Admin., Report to accompany H.R. 4822, H.R. Rep. No. 103-650 Part 2, 103d Cong., 2d Sess. at 27 (emphasis added)); *see also* House Committee on Rules, Report to accompany H.R. 4822, H.R. Rep. No. 103-650, Part 1, 103d Cong., 2d Sess. at 7, 10 ("Congressional employees are prohibited from commencing judicial proceedings except as provided by this Act."). In addition, the House Members of the

Joint Committee on the Organization of Congress[8] included a similar exclusivity provision in an earlier legislative draft and stated that its purpose was to ensure that "[n]o other administrative or judicial review is available for redress of practices violative of the Act." Final Report of the House Members of the Joint Committee on the Organization of Congress, H.R. Rep. No. 103-413, Part 1, 103d Cong., 1st Sess. at 118-19, 142.[9]

In sum, both the statutory text and legislative history contain "an explicit congressional declaration" that congressional employees alleging claims of employment discrimination must rely on the statutory remedy of the CAA. *Bivens*, 403 U.S. at 397. As a consequence, Plaintiff's First and Fifth Amendment claims (Counts Three and Four) against Mr. Hastings should be

---

[8]     Established in 1992 with the adoption of House Concurrent Resolution 192 and Senate Concurrent Resolution 57, the Joint Committee on the Organization of Congress was charged with studying the operations of Congress and making recommendations for reform. The Joint Committee held 36 hearings, took testimony from 243 witnesses, held several symposiums, and commissioned several surveys and outside studies. It issued its final report in December 1993, which included recommendations and draft legislation to bring Congress under all relevant employment and civil rights laws and to improve internal enforcement mechanisms. *See* Final Report of the House Members of the Joint Committee on the Organization of Congress, H.R. Rep. No. 103-413, Part 1, 103d Cong., 1st Sess. at 1-4, 84.

[9]     The CAA's legislative history similarly reflects a congressional intent to protect Members of Congress from personal liability for claims of discrimination. *See, e.g.,* 141 Cong. Rec. S635 (1995) (statement of Sen. Glenn) ("All settlements and judgments must be paid from funds appropriated to the legislative branch, not from a Government-wide judgment account. In other words, it will be solely administered here on Capitol Hill. Once again, concern about the separation of powers dictates that. *There will be no personal liability on the part of Members*.") (emphasis added). Indeed, Congress explicitly *rejected* versions of the CAA and amendments that would have extended personal liability to Members of Congress or required them to reimburse the government for damages payments made on their behalf. *See* 140 Cong. Rec. 207291 (1994) (statement of Rep. Goodling) (discussing how he unsuccessfully sought to amend the House bill to include provisions allowing for punitive damages and personal liability); S. 29, 103d Cong., § 2(a)(4) (1993) (bill introduced by Sen. McCain that would have required Members to reimburse the federal government within sixty days for any damage payments made on their behalf, but failed to pass).

dismissed.[10]  *See Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C. Cir. 1988) (en banc) (noting that, "where there is an 'explicit congressional declaration' that injured parties should be 'remitted to another remedy, equally effective in the view of Congress,'" the judiciary should decline to create new judicial remedies against federal officials).  Mr. Hastings' argument for dismissal could end here, as the statutory text is clear and the governing authority is well-established and compelling; but in fact there is considerable additional support for dismissal in this case.

### 2. The Exclusive, Preemptive Nature Of Title VII Serves As Further Proof That The CAA Is Plaintiff's Exclusive Avenue Of Redress

As further evidence of Congress' intent that the CAA serve as the exclusive judicial remedy for congressional employees claiming employment discrimination, one need look no further than the CAA's antecedent statute, Title VII.  *See Gordon v. Office of the Architect of the Capitol*, 750 F. Supp. 2d 82, 90 (D.D.C. 2010) ("Although not necessarily binding precedent, courts when construing the CAA often consider as persuasive case law interpreting Title VII.").  In cases of employment discrimination involving federal *agency* employees, who have long been

---

[10]     The only decision recognizing a *Bivens* remedy that remotely resembles the one at bar is *Davis v. Passman*, 442 U.S. 228 (1979).  The Court there permitted the plaintiff, a former deputy administrative assistant to a Member of Congress, to bring a Fifth Amendment claim with respect to her alleged dismissal based on sex discrimination, but that case was decided in 1979, well before Congress adopted the CAA in 1995.  *Id.* at 230-31.  Also notably, in *Davis*, the Court emphasized that no other alternative form of judicial relief was available; it was "damages [via the *Bivens* action] or nothing."  *Id.* at 245.  The court noted the absence of any "explicit congressional declaration that persons in petitioner's position … may not recover money damages from those responsible for the[ir] injury."  *Id.* at 247 (citing *Bivens*, 403 U.S. at 397).  Of course, with the passage of the CAA, there now exists such an "explicit congressional declaration."  Moreover, the Court in *Davis* found "no special factors counselling hesitation in the absence of affirmative action by Congress."  *Id.* at 245.  Here, by comparison, the CAA constitutes a special factor precluding the recognition of a *Bivens* remedy.  Similarly, in *Carlson v. Green*, where the Court allowed a federal prisoner to pursue a *Bivens* action in addition to a claim under the Federal Tort Claims Act ("FTCA"), the Court noted that there were no "special factors counselling hesitation," and there was nothing "in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations." 446 U.S. 14, 18-19 & n.5 (1980).  Again, both of these conditions – each of which standing alone precludes a *Bivens* action – are present here.  Following these early decisions, the Supreme Court has exercised even greater caution in considering whether *Bivens* remedies should be recognized.  *See, e.g.*, *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988) ("Our more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts.").

covered by Title VII, Title VII "provides the exclusive judicial remedy for claims of discrimination." *Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 835 (1976); *see also Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985) ("[T]his circuit has repeatedly held that federal employees may not bring suit under the Constitution for employment discrimination that is actionable under Title VII").  For example, in *Kittner v. Gates*, an employee of the Defense Intelligence Agency alleged that she was sexually harassed and subjected to discrimination, and then retaliated against for reporting the alleged wrongdoing. 708 F. Supp. 2d 47, 48-51 (D.D.C. 2010).  Although the plaintiff asserted both Title VII claims against the agency and *Bivens* claims against a number of individual employees, *see id.* at 47-48, this court dismissed her *Bivens* claims on the basis that they "challenge the same acts of harassment, discrimination, and retaliation" that form the basis of her Title VII claims. *Id.* at 54. The court observed:  "[W]hen a plaintiff alleges facts that are actionable under Title VII and for which Title VII provides a remedy, Title VII preempts virtually all other federal causes of action." *Id.* at 52.

Because Congress was aware of, and guided by, the body of law developed over many years under Title VII when it extended the protections of Title VII to congressional employees, *see* 2 U.S.C. §§ 1302(a)(2), 1311, and because courts rightly have concluded that the multitude of cases interpreting Title VII are relevant when construing the CAA, it is reasonable to infer that Congress intended the CAA similarly to be the exclusive remedy for allegations of employment discrimination involving congressional employees.  Indeed, the case for preemption of a congressional employee's *Bivens* claims by the CAA is much stronger than for preemption of an agency employee's claims by Title VII.  Unlike the CAA, the statute that applied Title VII to certain federal employees – Section 717 of the Civil Rights Act of 1964, as added by the Equal

Employment Opportunity Act of 1972, *see* 42 U.S.C. § 2000e-16 – does not itself state that it constitutes the exclusive remedy for claims of discrimination by federal agency employees. *See Brown*, 425 U.S. at 825. Rather, the Supreme Court in *Brown* examined the legislative history of Section 717 – cobbling together circuitous passages from the legislative record – to conclude that "the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Id.* at 829; *see also id.* at 827-28 (examining legislative history). As discussed, not only does the legislative history of the CAA include an "*explicit* congressional declaration" that the statute is the exclusive judicial remedy for discrimination claims brought by congressional employees, *see Bush*, 462 U.S. at 377 (emphasis added), but that congressional determination also is contained specifically in the statutory text. *See* 2 U.S.C. § 1361(d)(1)).

In any event, in addition to Congress' explicit statements of its intent, the fact that there was no effective remedy for employees covered by either Title VII or the CAA before the statutes' passage is further support for the conclusion that Congress intended to create an exclusive, preemptive remedy in the CAA.[11] When faced with that sort of remedial vacuum, courts interpreting Title VII as applied to federal agency employees have concluded that the

---

[11]     On this score, the legislative histories of the CAA and Section 717 are remarkably similar. *Compare Brown*, 425 U.S. at 827-28 (collecting from the legislative history of Section 717 statements regarding the concern "evinced during the hearings before the committees of both Houses over the apparent inability of federal employees to engage the judicial machinery in cases of alleged employment discrimination") *with* 140 Cong. Rec. 10278 (1994) (statement of CAA co-sponsor Senator Ben Nighthorse Campbell) ("it is unacceptable for Congress to exempt itself from those laws covering the executive branch and the private sector") *and* 141 Cong. Rec. 866 (1995) (statement of CAA co-sponsor Senator Grassley) (decrying the unfairness of having "one set of laws for . . . individual Senators and Congressmen and women … and another set of laws for every other employer in America") *and* 141 Cong. Rec. 957 (1995) (statement of co-sponsor Sen. Lieberman) (observing that legislation was needed to avoid Congress "insulating those in power from the rule of law") *and* 141 Cong. Rec. 877 (1995) (statement of Sen. Glenn) ("We insist on giving [rights] to everybody else in this country and yet we say we do not want to give [congressional] employees that same coverage? We do not want to deal fairly with our own employees here on Capitol Hill? That is just flat not right.").

enacted statute constitutes the exclusive remedy.  In *Brown*, for example, the Supreme Court found that the legislative history of Section 717 revealed an "unambiguous congressional perception" that congressional employees "who were treated discriminatorily had no effective judicial remedy."  425 U.S. at 828-29.  It was this finding, coupled with the principle that "when Congress enacts a specific remedy when no remedy was previously recognized, or when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive," *Hinck v. United States*, 550 U.S. 501, 506 (2007) (citing *Brown*, 425 U.S. at 826-29), that led the Supreme Court to conclude that the congressional intent was "to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown*, 425 U.S. at 828-29.  Similarly, the perception among Members of Congress before the CAA extended certain Title VII protections to congressional employees uniformly suggested an absence of such protections,[12] and Congress' intentional effort to fill that void further demonstrates that Congress intended to create an exclusive remedy for the redress of such claims.

**B.     The CAA Constitutes A Comprehensive Remedial Scheme That Precludes Plaintiff's *Bivens* Claims Against Mr. Hastings**

As explained above, the fact that Congress enacted the CAA as the exclusive remedy for employment claims like those alleged by Plaintiff by itself warrants dismissal of Plaintiff's claims against Mr. Hastings.  In addition, and as a separate and independent ground for dismissal, Plaintiff's constitutional claims are also precluded where there are "special factors counselling hesitation."  *Bush*, 462 U.S. at 377-78.  One such "special factor" is "the existence of

---

[12]      *See supra* n.11; *see also Singh*, 300 F. Supp. 2d at 52 ("Once immune from suit for employment-related claims, Congress adopted the CAA to put itself voluntarily under the jurisdiction of the federal courts to resolve employment discrimination (and other) disputes if any administrative resolution process, which includes counseling and mediation, fails.").

a comprehensive remedial scheme." *Wilson*, 535 F.3d at 705; *see also Bush*, 462 U.S. at 368,

390 (dismissing the plaintiff's constitutional claim against government official where his claim

arose "out of an employment relationship that is governed by comprehensive procedural and

substantive provisions giving meaningful remedies against the United States").  Where a

comprehensive scheme exists, "the design of [the] Government program suggests that Congress

has provided what it considers adequate remedial mechanisms for constitutional violations[.]"

*Wilson*, 535 F.3d at 705.  Under that circumstance, a court should defer to Congress' judgment

by declining to create a *Bivens* remedy.  *See Wilson*, 535 F.3d at 705 ("Congress is in a better

position [than a court] to decide whether or not the public interest would be served by the

addition of legal liability" under a *Bivens* theory).

> **1.     The CAA Establishes A Comprehensive Remedial System Governing Administrative And Judicial Review Of Claims Of Discrimination In Congressional Employment**

Title II of the CAA prohibits various forms of discrimination, including sexual

harassment and other forms of employment discrimination based on gender, *see* 2 U.S.C. § 1311,

as well as retaliation against an employee because the employee opposed a practice made

unlawful by the statute.  *See* 2 U.S.C. § 1317.  To effectuate these and other substantive rights

extended by the statute, the CAA sets forth a comprehensive, three-step procedure that an

employee must follow when alleging a violation of the statute.  *See* 2 U.S.C. §§ 1401-1416; *see

also* Procedural Rules of the Office of Compliance (as amended June 2004) ("OOC Rules").[13]

*First*, the employee must request counseling by the OOC – an independent office created

by the CAA and charged with administering certain aspects of the statute, *see* 2 U.S.C. § 1381(a)

– within 180 days of the alleged discriminatory act.  *See* 2 U.S.C. § 1402; OOC Rule § 2.03(a)-

---

[13]     The OOC Rules are publicly available on the OOC website.  *See* OOC Rules, www.compliance.gov/procedures/rulesofprocedure.pdf (last visited July 8, 2011).

(c).  The counseling period lasts 30 days, during which time the OOC provides the employee with all relevant information with respect to his or her rights.  *See* 2 U.S.C. § 1402(a), (b); *see also* OOC Rule § 2.03(d) ("The purpose of the counseling period shall be:  to discuss the employee's concerns and elicit information regarding the matter(s) which the employee believes constitute a violation(s) of the Act; to advise the employee of his or her rights and responsibilities under the Act and the procedures of the Office under these rules; to evaluate the matter; and to assist the employee in achieving an early resolution of the matter, if possible.").  The OOC is further required to notify the employee in writing when the counseling period has ended.  *See* 2 U.S.C. § 1402(c); OOC Rule § 2.03(l).[14]

*Second*, if the employee decides to proceed with the claims after the counseling stage, the employee must file a request for mediation with the OOC no later than 15 days after the employee receives notice of the end of the counseling period.  *See* 2 U.S.C. § 1403(a) ; *see also* OOC Rule § 2.04(b) (describing requirements of request for mediation).  The CAA specifies that mediation "shall involve meetings with the parties separately or jointly for the purpose of resolving the dispute between the covered employee and the employing office."  2 U.S.C. § 1403(b)(2); *see also* OOC Rule § 2.04(a) (describing CAA mediation as a non-binding, confidential process in which "employees, employing offices and their representatives, if any, meet separately and/or jointly with a neutral trained to assist them" to "discuss alternatives to continuing their dispute, including the possibility of reaching a voluntary, mutually satisfactory

---

[14]     In addition to the OOC Rules, the OOC makes publicly available on its website a variety of resources describing both the substantive rights afforded congressional employees by the statute, and the extensive counseling, mediation and administrative and judicial review procedures available to congressional employees.  *See, e.g., Workplace Rights for Congressional Employees*, www.compliance.gov/wp-content/uploads/2011/04/Workplace-Rights-Brochure.pdf (last visited July 8, 2011); *Dispute Resolution: Asserting Workplace Rights in the Legislative Branch*, www.compliance.gov/wp-content/uploads/2011/04/Dispute-Resolution-Brochure.pdf (last visited July 8, 2011); *CAA Handbook*, www.compliance.gov/wp-content/uploads/2010/04/eHandbook.pdf (last visited July 8, 2011).

resolution"). The OOC Rules further provide for the selection and disqualification of a mediator, *see* OOC Rule § 2.04(d), restrictions on the parties who may participate in the mediation, *see* OOC Rule § 2.04(g), and procedures for the mediator and the parties to follow in the mediation process, *see* OOC Rule § 2.04(f). The CAA provides that the mediation period shall last 30 days, beginning on the day the OOC receives the request for mediation, unless extended by request. *See* 2 U.S.C. § 1403(c); OOC Rule § 2.04(e). The OOC is directed to "notify in writing the covered employee and the employing office when the mediation period has ended." 2 U.S.C. § 1403(c); OOC Rule § 2.04(i).

*Third*, if the employee intends to pursue his or her allegations beyond the mediation stage, the employee may elect to file either (i) a complaint with the OOC for resolution by an independent hearing officer or (ii) a civil action in a United States district court. *See* 2 U.S.C. § 1404; OOC Rule § 2.05. If the employee elects to file a complaint with the OOC, she must name as respondent the relevant employing office. *See* 2 U.S.C. § 1405(a); *see also* OOC Rule § 5.01 (describing timing and requisite contents of an administrative complaint, as well as process for serving, amending and answering the complaint). A complaint filed with the OOC is reviewed by an independent hearing officer, who may dismiss it if she finds that it is frivolous or fails to state a claim. *See* 2 U.S.C. § 1405; OOC Rule § 5.03(a)-(b); *id.* §§ 7.01-7.02 (enumerating the authority of hearing officers).[15] The hearing officer may order appropriate pre-hearing discovery and has the power to issue subpoenas. *See* 2 U.S.C. § 1405(e), (f); OOC Rule §§ 6.01(c), 6.02; *see also* §§6.03-6.06 (describing procedures for service of, motion to quash, and enforcement of

---

[15] To ensure that the mediation process remains independent and neutral, no mediator may participate in an administrative proceeding under Section 1405 with respect to the same matter, nor may a mediator be subject to subpoena or any other compulsory process with respect to the same matter. *See* OOC Rule § 2.04(j). Similarly, the OOC Rules further provide that the hearing officer may be neither the neutral who mediated, nor the counselor involved in, the matter. *See* OOC Rule § 5.02.

subpoenas).  The hearing officer is further empowered to award summary judgment after

providing the parties notice and an opportunity to address the question of summary judgment.

OOC Rule § 5.03(d).  If a complaint is not dismissed before a hearing, the statute provides for a

closed hearing on the record within 90 days after the filing of the complaint.  *See* 2 U.S.C. §

1405(d).  The OOC Rules further establish procedures for pre-hearing motions and conferences

(*id.* §7.04), the scheduling of the hearing (§7.05), consolidation and joinder with other cases

(§7.06), the conduct of the hearing (§7.07), the electronic or stenographic record (§7.08), the

admissibility of evidence (§7.09), stipulations (§7.10), interlocutory review (§7.13), and post-

hearing briefing (§7.14).  The statute requires a decision by the hearing officer within 90 days of

the conclusion of the hearing.  *See* 2 U.S.C. § 1405(g); *see also* OOC Rule § 7.16.  A party

aggrieved by the decision of a hearing officer may appeal the decision to the Board of Directors

of the OOC, provided the petition for review is filed not later than 30 days after entry of the

decision.  *See* 2 U.S.C. § 1406; OOC Rule § 8.01.  A party may seek reconsideration of the

Board's decision where appropriate, *see* OOC Rule § 8.01; and, in any event, may appeal a final

decision of the Board to the U.S. Court of Appeals for the Federal Circuit.  *See* 2 U.S.C. § 1407;

OOC Rule § 8.04.

If an employee instead elects to file an action in federal court rather than file a complaint

with the OOC, the CAA permits the employee to bring suit only against "the employing office

alleged to have committed the violation, or in which the violation is alleged to have occurred."  2

U.S.C. § 1408(b).  Moreover, the CAA provides that the court does not have jurisdiction over a

civil action for a violation of the statute unless the plaintiff has completed the requisite

administrative counseling and mediation for that violation.  *See* 2 U.S.C. § 1408(a).

With respect to remedies, the statute requires administrative exhaustion as a precondition to the grant of any remedy, *see* 2 U.S.C. § 1361(e), and expressly excludes any punitive damages. *See* 2 U.S.C. § 1361(c). The Act grants the OOC final settlement authority. *See* 2 U.S.C. § 1414. Finally, and perhaps most importantly, the only relief allowed under the statute is against the employing office, not against individuals working in that employing office.[16] *See* 2 U.S.C. §§ 1405(a), 1408(b).

### 2.     The CAA Constitutes A Comprehensive Remedial Scheme That Precludes Plaintiff's Constitutional Claims

As the detailed process described above makes clear, the CAA creates an "elaborate, comprehensive scheme that encompasses substantive provisions forbidding [employment discrimination] and procedures – administrative and judicial – by which improper action may be redressed." *Bush*, 462 U.S. at 385 (finding *Bivens* action precluded by comprehensive nature of the Civil Service Reform Act ("CSRA")). Indeed, the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") examined the structure of the CAA, including the statute's counseling and mediation requirements, and concluded that the statute "establishes its own *comprehensive* administrative regime." *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 702-03, 706 (D.C. Cir. 2009) (emphasis added). Under these circumstances, where Plaintiff's claims "arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions," *Bush*, 462 U.S. at 368, it would be inappropriate for this Court to create a new judicial remedy and allow Plaintiff's constitutional claims.

As the discussion in section I.B.1 above demonstrates, the CAA reflects Congress' considered judgment regarding "the type and magnitude of relief," *Wilson*, 535 F.3d at 705, that

---

[16]     This is fully consistent with Title VII of the Civil Rights Act, which also limits an aggrieved party's remedies to ones against the employing agency, not against the individual employees who allegedly committed the wrongdoing. *See* 42 U.S.C. § 2000e-16(c).

would be available to, and appropriate for, congressional employees. As a result, congressional

employees are now protected by a comprehensive system that incorporates substantive

provisions forbidding employment discrimination, as well as administrative and judicial

procedures by which improper action may be redressed.[17]  Plaintiff's claims in particular are all

claims alleging harms subject to the CAA's protections. In Count Three, Plaintiff alleges that

she was subjected to sexual harassment and a hostile work environment (Compl. ¶¶ 91, 92); and

Section 1311 of the CAA requires that all personnel actions be free from discrimination based on

sex and similarly prohibits sexual harassment in the workplace. 2 U.S.C. § 1311. In Count Four,

Plaintiff alleges that she suffered retaliation because she reported the alleged sexual harassment

(Compl. ¶¶ 96, 97, 98); and, here too, the CAA includes a prohibition on retaliation against an

employee who opposes a practice made unlawful by the CAA. 2 U.S.C. § 1317. Each of

Plaintiff's constitutional claims alleges injuries that are fully cognizable within the extensive

system established under the CAA and, as such, should be precluded. *See Wilson*, 535 F.3d at

707 (concluding that the Privacy Act is a comprehensive remedial scheme precluding creation of

*Bivens* remedies, where the plaintiffs' claims were "all claims alleging harm from the improper

disclosure of information subject to the Privacy Act's protections"); *Wilson II*, 759 F. Supp. 2d at

62 (stating that "a *Bivens* remedy is only appropriate where the petitioner has no other means of

obtaining redress and there are no other 'factors counselling hesitation'").

---

[17]     This Court has described the "judiciary's own … review procedures for adverse employment
actions" brought by Judicial Branch employees as "comprehensive" and consisting of "detailed and multi-
layered levels of administrative review." *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 66 (D.D.C. 2006)
(Collyer, J.) (quoting *Dotson v. Griesa*, 398 F.3d 156, 176 (2d Cir. 2005)). Those procedures for review
of employment claims involving Judicial Branch employees were drawn in large measure from the review
procedures adopted in the CAA. *See Dotson*, 398 F.3d at 174-75 & n.12 ("mindful of the new remedial
scheme established in the CAA for congressional employees, the [United States Judicial] Conference
proposed to review and revise its Model EEO Plan to afford judicial employees review procedures similar
to those adopted by Congress in establishing its internal Office of Compliance").

The Supreme Court's decision in *Bush v. Lucas* is especially instructive.  While the CAA was not at issue in that case, the Court addressed the appropriateness of creating a *Bivens* remedy where Congress affirmatively had created a system that provided administrative and judicial remedies for employee grievances similar to those asserted by Plaintiff.  In *Bush*, the plaintiff, an employee of the National Aeronautics and Space Administration, claimed that he had been demoted for making public statements critical of the agency, allegedly in violation of the First Amendment.  A unanimous Court declined to create a *Bivens* remedy for a claim "aris[ing] out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States."  *Bush*, 462 U.S. at 368. There, the Civil Service Reform Act ("CSRA") was at issue, and the Court examined the statutory provisions allowing the NASA employee the right to challenge a personnel action he alleged was violative of the First Amendment, initially through an administrative proceeding and subsequently through an administrative appeal or by judicial review of an adverse decision in federal court.  *Id.* at 386-88.  The Court refused to disturb the administrative system that reflected Congress' "balancing [of] governmental efficiency and the rights of employees."  462 U.S. at 389.

The Court's ruling in *Bush* provides important guidance in this case, since the substantive and procedural scheme for protecting the rights of employees under the CAA is at least as comprehensive as the civil service system considered in *Bush*.  Indeed, Plaintiff initially pursued her claims of harassment and retaliation by contacting the OOC (Compl. ¶ 69), the independent office within the legislative branch that was created to administer the CAA.  At that time, Plaintiff was informed by an OOC representative that she had 180 days to file a Request for Counseling based upon her claims of sexual harassment and retaliation.  *Id.* ¶ 69; *accord* 2

U.S.C. § 1402(a) (providing that, to commence a proceeding under the CAA, a covered

employee must request counseling by the OOC not later than 180 days after the date of the

alleged violation).  In accordance with the time limitations of which she was informed by the

OOC staff, Plaintiff filed a request for counseling and thereby availed herself of the

administrative counseling process established by the OOC.  Compl. ¶ 74.  Following a

statutorily-mandated 30-day counseling period, *see* 2 U.S.C. § 1402(b), Plaintiff requested

mediation and thereby again took advantage of the administrative review procedures created

under the CAA and administered by the OOC.  Compl. ¶¶ 75, 76.  When Plaintiff's mediation

period under the CAA ended on December 8, 2010 (Compl. ¶ 76), she had the statutory right to

elect either to initiate a formal administrative proceeding by filing a complaint with the OOC or

to file a civil action in a federal district court.  *See* 2 U.S.C. § 1404.  In sum, Plaintiff, by

initiating the administrative and judicial process established by the CAA, accessed a

comprehensive remedial system designed to address the very claims that she now asserts.

Moreover, the CAA, like the CSRA, is the product of a careful weighing of the public

interest by Congress, the "body charged with making the inevitable compromises required in the

design of a massive and complex … program."  *Spagnola*, 859 F.2d at 228.  As the D.C. Circuit

observed in *Blackmon-Malloy*, when Congress designed the CAA's remedial regime, including

the creation of the independent OOC to oversee claims and the statute's mandatory mediation

period, it "struck a balance between affording its employees the protections enjoyed by other

federal employees" and "offering employing offices … an opportunity to settle claims prior to

commencement of formal administrative or judicial proceedings."  *Blackmon-Malloy*, 575 F.3d

at 706.  Such evidence of congressional balancing manifests the type of "elaborate remedial

system that has been constructed step by step, with careful attention to conflicting policy considerations," which precludes a *Bivens* action.  *Bush*, 462 U.S. at 388.

For these reasons, courts have found that the CAA constitutes a comprehensive remedial scheme that precludes a *Bivens* claim by a congressional employee.  For example, in *Payne v. Meeks*, an employee of Representative Gregory Meeks of New York brought a *Bivens* claim against the Congressman, alleging that he had retaliated against the plaintiff in response to a lawsuit that she had filed against a business owned by one of the Congressman's campaign contributors, in violation of the plaintiff's rights under the CAA and the First Amendment.  200 F. Supp. 2d 200, 201-02 (E.D.N.Y. 2002).  Following the plaintiff's completion of the CAA's mandatory counseling and mediation, she filed a federal court action, asserting one count against her employing office under the CAA and one count against the Congressman in his individual capacity pursuant to *Bivens*.  *Id.* at 202.  The district court noted that the CSRA "grants congressional employees certain employment benefits" and the CAA "extends additional benefits and protections to congressional employees by making 11 employment laws applicable to the legislative branch, and by establishing administrative and judicial procedures for the resolution of disputes arising under the Act."  *Id.* at 205.  The court concluded that this "comprehensive statutory scheme established by Congress to govern the rights of congressional employees clearly precludes [plaintiff]'s *Bivens* claim for unconstitutional discharge."  *Id.* at 205.[18]

---

[18]     Indeed, even though the CAA did *not* afford the plaintiff in *Payne* the right to review of the personnel action that formed the basis of the plaintiff's constitutional claim, the court nevertheless held that Congress' decision to *withhold* such a remedy from congressional employees confirmed that plaintiff was precluded from bringing her *Bivens* action.  *Id.* at 205-06.  Although "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention," *Wilson*, 535 F.3d at 706, the CAA does in fact extend adequate remedies to a congressional employee who has suffered employment discrimination.  In that sense, the statutory scheme

Similarly, in *Barry v. U.S. Capitol Guide Board,* the U.S. District Court for the District of Columbia held that a plaintiff employed by the U.S. Capitol Guide Board could not amend his complaint to add constitutional claims against the Guide Board because his existing CAA claims constituted his sole judicial remedy.  *See Barry v. U.S. Capitol Guide Board*, No. 04-0168, 2005 U.S. Dist. LEXIS 8382 (D.D.C. April 20, 2005).  The plaintiff claimed that the Guide Board terminated him for alleged "inappropriate conduct," including "purported ethnic and sexual comments," without first affording him an opportunity to refute the charges, in violation of his Fifth Amendment rights.  *Id.* at *5.  He further maintained that the termination was a ruse in retaliation for his earlier complaint regarding the Guide Board's failure to promote him.  *Id.*  The plaintiff attempted to amend his complaint to include these additional allegations, but, relying on the *Payne* decision, the court in *Barry* denied the plaintiff's request after finding that the amendment "would be futile because the CAA precludes such claims."  *Id.* at *7.  The court noted that "Congress has spoken directly and created a comprehensive statutory scheme under which the plaintiff can challenge an employment decision."  *Id.* at *15.  It further reasoned that the statutory remedy "has been found to be sufficient to provide relief for purported *First Amendment* violations and this Court can fathom no reason … why the CAA does not also provide a sufficient remedy for the purported *Fifth Amendment* violations."  *Id.* at 15.[19]  The court continued:

---

under the CAA, as it applies in this case, is both more comprehensive, and more adequate, than it was in *Payne*.

[19]     Moreover, the relevant legislative history confirms that Congress considered the CAA to be a comprehensive remedial regime to redress employment discrimination.  The legislation's co-sponsors made that clear.  *See, e.g.*, Hearing Before Senate Committee on Governmental Affairs, S. Hearing 103-1047, Part 1, 103d Cong., 1st Sess. at 9 (statement of Sen. Grassley) ("It is important that any laws concerning congressional coverage should be enacted at one time, to avoid conflicting rules and a patchwork of confusing coverage.").

> Thus, the plaintiff, as a "covered" congressional employee, is precluded from bringing a constitutional claim against the Guide Board, a "covered" employer, under the CAA.  This result is mandated because the plaintiff's claim arises out of his employment relationship with the Guide Board, which is governed by the comprehensive provisions of the CAA.

*Id.* at *15 (citing *Payne*, 200 F. Supp. 2d at 206, which it described as "recognizing that Congress' enactment of the CAA precludes federal employees from bringing *Bivens* actions for work-related grievances").

In sum, even if Congress had not affirmatively stated that the CAA is the exclusive remedy by which legislative branch employees can bring a suit alleging employment discrimination,[20] the comprehensive, remedial scheme established by the CAA nevertheless precludes Plaintiff's *Bivens* claims.[21]

---

[20]     *See supra* section 1.A.

[21]     Even if it were assumed, contrary to fact, that the existence of the CAA did not bar Plaintiff's constitutional claims, those claims would be precluded by the CSRA.  The Supreme Court has repeatedly held that the CSRA, which overhauled the civil service system and created an elaborate new framework for evaluating adverse personnel actions against federal employees, constitutes a comprehensive statutory scheme that precludes *Bivens* actions by federal employees.  This is true even where Congress' considered judgment was to deny a particular class of federal employees the right to administrative and judicial review of the adverse personnel actions that form the basis of the relevant *Bivens* claim.  *See, e.g., Dotson v. Griesa*, 398 F.3d 156, 166-69 (2d Cir. 2005) (holding CSRA precludes probation officer's claim for racial discrimination where statute provided plaintiff "with *no* administrative or judicial review of the challenged employment action") (emphasis in original).  Plaintiff, who alleges she was appointed to her position by a Member of Congress (Compl. ¶¶ 13, 15), is a civil service "employee" in the "excepted service" under the CSRA.  *See* 5 U.S.C. §§ 2101(1), 2103(a), 2105(a)(1)(B).  Nevertheless, because she is a congressional rather than agency employee, Congress chose to deny her the protections of Chapter 23 of the CSRA, *see* 5 U.S.C. § 2302(a)(2)(A), including its prohibition of personnel practices that discriminate on the basis of sex or violate an employee's constitutional rights.  *See* 5 U.S.C. §§ 2302(b)(1)(A), (b)(12); 2301(b)(2) §; *see also United States v. Fausto*, 484 U.S. 439, 446 (1988).  As this Court has noted: "Congress chose a comprehensive scheme to regulate the federal workplace in the CSRA, Title VII and other similar statutes.  These alternative schemes bar the constitutional claims here, even if it is assumed that there was a constitutional violation which would not otherwise be fully remedied."  *Cross v. Samper*, 501 F. Supp. 2d 59, 63 (D.D.C. 2007) (Collyer, J.) (holding CSRA precludes *Bivens* action alleging retaliation for engaging in protected activity in violation of First and Fifth Amendments even though plaintiff could not file complaint under CSRA because he was a probationary employee).

### 3. *Title VII's Preemption Of Employment Discrimination Claims By Federal Agency Employees Offers Further Proof Of The CAA's Comprehensive Nature*

Finally, Title VII's preemption of *Bivens* claims involving discrimination against federal agency employees is again instructive. In *Brown*, in addition to examining the legislative history of Section 717, the Supreme Court also reviewed the "structure of [Section 717]" and found that it "fully confirms the conclusion that Congress intended [Section 717] to be exclusive and pre-emptive," and did not intend that plaintiffs be permitted to circumvent the statute's careful design with "artful pleading." *Brown*, 425 U.S. at 829, 833. Like the administrative and judicial review procedures established under the CAA, Section 717's provisions established "complimentary administrative and judicial enforcement mechanisms." *Brown*, 425 U.S. at 831. Indeed, both Section 717 and the CAA describe the authority and responsibility of the relevant entity to administer the statute's protections (the Civil Service Commission under Section 717 and the OOC in the case of the CAA); the administrative hearing procedures an aggrieved party may pursue; and the availability of and procedure for judicial actions. *Compare Brown*, 425 U.S. at 831-32 *with* 2 U.S.C. §§ 1401-1416. Moreover, just as Section 717 attached "certain preconditions" to the right of "an aggrieved employee to file a civil action in a federal district court to review his claim of employment discrimination," *see Brown*, 425 U.S. at 832, the CAA requires counseling and mediation before an aggrieved congressional employee may file a civil action in federal district court. *See* 2 U.S.C. § 1408(a); *see also Blackmon-Malloy*, 575 F.3d at 705 (explaining that the CAA's exhaustion requirements require that a complainant participate in counseling and mediation before the federal court has jurisdiction to consider a civil action).

For these reasons, the finding in *Brown* that the "balance, completeness, and structural integrity of [the statute] are inconsistent with the … contention that the judicial remedy afforded by [the statute] was designed merely to supplement other putative judicial relief" is equally

applicable to the CAA.  425 U.S. at 832.[22]  As the Court in *Brown* noted, "[i]t would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading."  *Id.* at 833.  Thus, to allow congressional employees simply to refashion their CAA claims into constitutional claims would enable circumvention of Congress' carefully crafted and robust administrative requirements and substantive remedies – a scenario that is as implausible here as it was in *Brown*.  *See Ethnic Employees of Library of Congress*, 751 F.2d at 1415 (stating that "[a]llowing federal employees to recast their Title VII claims as constitutional claims" would permit them to "evade 'the rigorous administrative exhaustion requirements and time limitations'" of the statute) (quoting *Brown*, 425 U.S. at 833); *see also Pollock v. Ridge*, 310 F. Supp. 2d 519, 529 (W.D.N.Y. 2004) ("The primary reason given for refusing to recognize a *Bivens* claim in the federal employment context is that it would vitiate the various statutory schemes that apply to federal employment[,] including … the Congressional Accountability Act ….  To allow a *Bivens* claim in these instances would, in effect, allow a dissatisfied federal employee to bypass the applicable statutory schemes and pursue a judicially created private remedy in a court of law, thereby ignoring Congressional intent altogether.").

## II.    THE COMPLAINT FAILS TO STATE CLAIMS BASED ON VIOLATIONS OF THE FIRST AND FIFTH AMENDMENTS

Even if a *Bivens* action were permitted here, which it is not, the complaint fails to allege cognizable violations of any First or Fifth Amendment right.  Moreover, Plaintiff's retaliation claim fails for the additional reason that she does not allege that Mr. Hastings personally engaged in any retaliatory action against her.  Finally, even assuming the complaint did state a claim for a

---

[22]    The *Brown* decision rested in part on the "principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies."  *Hinck v. United States*, 550 U.S. 501, 506 (2007) (quotation marks omitted).   This "well-established principle" (*id.*) applies with equal force here.

violation of a constitutional right, it still would fail, because Mr. Hastings is entitled to qualified immunity, in that Plaintiff's alleged rights were not clearly established at the time of the alleged misconduct.

### A.   Plaintiff's Allegations Of Offhand Remarks And Isolated Incidents Fail To State A Claim Of Sexual Harassment Under The Fifth Amendment

Plaintiff's sexual harassment claim under the Fifth Amendment must be dismissed as a matter of law because Plaintiff's claims, even if true, fail to allege "severe" and "pervasive" conduct constituting a hostile work environment. *See Taylor v. Chao*, 516 F. Supp. 2d 128, 134 (D.D.C. 2007) (Collyer, J.) (noting that an unlawful hostile work environment exists "when a plaintiff demonstrates that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult' and that this behavior is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'") (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).  While Plaintiff brings her sexual harassment claim under the Fifth Amendment, Title VII is the applicable standard under which such a claim should be analyzed. *See, e.g., Elam v. Univ. of Dist. Columbia*, 530 F. Supp. 2d 4, 10 (D.D.C. 2007) (applying Title VII framework to § 1983 race discrimination claim brought under the Equal Protection Clause of the Fourteenth Amendment);[23] *Smith v. AMTRAK*, 25 F. Supp. 2d 578, 580 (E.D. Pa. 1998) (applying the Title VII *quid pro quo* standard to a plaintiff's Fifth Amendment sexual harassment claim).  As such, to establish a prima facie hostile work environment claim, Plaintiff must demonstrate "(1) that she is a member of a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment occurred because of her [] gender, (4) that the harassment affected a term, condition or privilege of employment, and (5)

---

[23]     *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment").

that the employer knew or should have known of the harassment and failed to act to prevent it." *Taylor*, 516 F. Supp. 2d at 135 (internal quotations omitted).  At a minimum, Plaintiff's complaint has failed on its face to plead facts satisfying the fourth prong of the applicable standard, as the conduct alleged is not sufficiently severe or pervasive to have altered the conditions of her employment, and therefore no reasonable inference can be drawn that would support Plaintiff's hostile work environment claim.  *See Iqbal*, 129 S. Ct. at 1949.

Specifically, the incidents that Plaintiff describes in her complaint – including, for example, her claims that Mr. Hastings allegedly made sexually-related comments to her at a meeting in Austria in May 2008 (Compl. ¶¶ 26, 29), complimented her on her appearance, hugged her (Compl. ¶¶ 25, 35, 39, 46, 47), suggested they had a personal relationship (Compl. ¶¶ 28, 66), asked to stay with her and to see her home (Compl. ¶¶ 16, 18, 21, 30), and told her that he liked her and asked her to accompany him to his hotel room while attending a meeting in Portugal in April 2009 (Compl. ¶¶ 42-44) – were at most isolated incidents that allegedly occurred over a more than two-year period and, for the most part, during Mr. Hastings' occasional visits to Europe.  While these allegations, if true, may suggest offensive and unwelcome conduct, such isolated occurrences and off-the-cuff remarks do not amount to a hostile work environment as a matter of law.  *See Wilson II*, 759 F. Supp. 2d at 66 (explaining that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotations and citation omitted); *Taylor*, 516 F. Supp. 2d at 136-37 (granting motion for summary judgment on the ground that the defendant's alleged conduct, including complimenting the plaintiff on her appearance, asking suggestively if "her hair was 'red all over,'" telling the plaintiff that "he wanted to be her 'close friend,'" flirting and commenting on plaintiff's body

amounted to "the type of offhand comments and isolated incidents" that were "insufficiently severe and pervasive to constitute a hostile work environment").

Plaintiff essentially describes sporadic conduct that allegedly occurred during Mr. Hastings' periodic visits to Europe – six trips over the course of more than two years.  (Compl. ¶¶ 20, 25, 33, 42, 47, 65)  Plaintiff's allegations are largely limited to these occasional encounters; and, other than a suggestion that Mr. Hastings hugged her during her three return trips to the United States (*see* Compl. ¶¶ 39, 46), Plaintiff nowhere alleges that Mr. Hastings subjected her to a hostile work environment during the lengthy periods between trips to Europe – when she and Mr. Hastings were not even in the same country, much less the same workplace. So, for the vast majority of Plaintiff's employment, she worked in Austria, more than four thousand miles from her accused harasser and, if her complaint is to be credited, without suffering any apparent mistreatment from Mr. Hastings.  Even assuming Plaintiff was exposed to behavior that may have been offensive each and every day of Mr. Hastings' periodic trips to Europe (which even Plaintiff does not claim), the conduct that Plaintiff alleges, by definition, is not "'sufficiently continuous and concerted' to be deemed pervasive." *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97-99 (D.D.C. 2007) (granting summary judgment despite five incidents of sexual harassment over a two-year period, including physical acts such as the unconsented touching of the plaintiff's buttocks, where (i) a significant amount of time had passed between the first harassing act and the most recent incident and (ii) the plaintiff had ceased working at the same location as the accused harasser after only a few months on the job). Rather, Plaintiff describes conduct that, while it may be offensive, amounts to "a number of distinct, disparate acts" that, even if true and taken together, do not rise to the level of unlawful discrimination. *Brantley v. Kempthorne*, No. 06-1137, 2008 U.S. Dist. LEXIS 38406, at *28

(D.D.C. May 13, 2008); *see also id.* at *26 (noting that "even genuinely troublesome conduct is not sufficient when the incidents are spread out over a period of years").

For these reasons, Plaintiff's Fifth Amendment sexual harassment claim should be dismissed.

### B. Plaintiff's Allegations Fail To State A Claim Of Retaliation Under The First Amendment

Plaintiff's claim of retaliation against Mr. Hastings also must fail, since (i) the First Amendment speech that she alleges was infringed does not involve a matter of public concern, which is required to find a constitutional violation, and (ii) Plaintiff does not allege a single fact suggesting that Mr. Hastings personally engaged in any retaliatory conduct. As such, even if Plaintiff's allegations were true, her retaliation claim should be dismissed as a matter of law.

#### 1. Plaintiff Has Failed To Allege A Cognizable Violation Of The First Amendment Because Her Speech Did Not Involve A Matter Of Public Concern

Plaintiff's retaliation claim also fails to allege a constitutional violation. To prevail on a claim that her First Amendment rights to free speech were infringed by virtue of the alleged retaliation, Plaintiff must satisfy the following four-part test: (i) she was speaking "as a citizen on a matter of public concern;" (ii) the governmental interest in her speech outweighed her own personal interest; (iii) her speech was a motivating factor in prompting the retaliatory act; and (iv) she is able to refute "the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech." *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (internal citations and quotations omitted). The first prong of this test – whether the speech involved a matter of public concern – turns on an issue of law. *Id.* When, as here, the plaintiff has failed to allege facts demonstrating that she was speaking as a citizen on a matter of public concern – rather than simply addressing her own individual

35

concerns – her complaint is deficient as a matter of law and should be dismissed.  *See Connick v. Myers*, 461 U.S. 138, 147 (1983) (when a public employee does not speak upon matters of public concern, but rather speaks on matters only of personal interest, such employee does not have a First Amendment claim); *Doerr v. Colo. Div. of Youth Servs.*, 95 Fed. App'x 295 (10th Cir. 2004) (holding that plaintiff's First Amendment retaliation claims failed because his complaints about the anti-homosexual harassment he experienced did not constitute speech that touched on a matter of public concern); *Payne*, 200 F. Supp. 2d at 206 (dismissing plaintiff's lawsuit for sexual assault and stating that "[w]here the primary aim of an employee's speech is to seek redress for a personal wrong, the speech is not protected by the First Amendment merely because its subject matter 'may affect the public.'").[24]

For example, in *Payne*, the plaintiff claimed that she was terminated by Representative Gregory Meeks and his employing office in violation of the First Amendment for bringing a lawsuit against a third-party alleging sexual assault.  *Id.*  The plaintiff's lawsuit sought redress for an injury that she personally suffered.  *Id.* at 207.  The court held that such activity was not protected speech under the First Amendment, as the plaintiff was not seeking relief for "systemic

---

[24]     While there have been limited circumstances in which courts have found that certain speech-related activities by public employees were protected under the First Amendment, these cases are easily distinguishable from the case at hand.  For example, in *Lefande v. Dist. of Columbia*, the court determined that the plaintiff's lawsuit regarding "procedural irregularities that unquestionably affect an integral component of the police service are 'relevan[t] to the public's evaluation' of the" police department, and therefore involved a matter of public concern.  613 F.3d 1155, 1160-61 (D.C. Cir. 2010) (holding that plaintiff's class action lawsuit regarding the Chief of the Metropolitan Police Department's order granting the Chief power to fire reserve members without due process was protected speech under the First Amendment even though it also involved a personnel matter).  Similarly, in *Tao v. Freeh*, the plaintiff's speech alleged racial discrimination in connection with the FBI's alleged failure to promote Chinese-American language specialists around the same time that the FBI was under scrutiny by the media for alleged race discrimination.  *See* 27 F.3d 635, 640 (D.C. Cir. 1994) (determining that plaintiff's speech went beyond her "individual grievance" and addressed discrimination against a broader class, and therefore was related to a matter of public concern).  Plaintiff, unlike the plaintiffs in *Lefande* and *Tao*, only alleges claims regarding her purely personal, individual dispute with Mr. Hastings, and her complaint is devoid of any factual allegations suggesting that Mr. Hastings violated the law with respect to any other person or class of persons.

misconduct by a public agency or public officials," but instead brought the lawsuit to address her alleged injuries.  *Id.*

Similarly, Plaintiff's claims only involve allegations relating to her individual personnel dispute and do not involve any allegations relating to broad public or public policy concerns, such as procedures that would inform the public's evaluation of the police department, *see Lefande v. Dist. of Columbia*,  613 F.3d 1155, 1161 (D.C. Cir. 2010), or whether other employees have been discriminated against, *see Tao v. Freeh*, 27 F.3d 635, 640 (D.C. Cir. 1994).  *See* Compl. ¶¶ 18, 24-29, 42-44, 48, 51, 55, 56, 59, 64, 68.  For example, when Plaintiff complained to Mr. Turner, she discussed with him Mr. Hastings' alleged sexually harassing conduct directed at her alone.  *See* Compl. ¶¶ 22, 45, 61, 67.  Moreover, her complaints to Mr. Edward Joseph and Ms. Marlene Kaufmann were only about Mr. Hastings' alleged sexual harassment of her, *see* Compl. ¶¶ 48, 51, not others.  In fact, Plaintiff specifically alleges that her claims do not encompass other employees.  *See* Compl. ¶ 20 ("Mr. Hastings did not bring gifts to any other staff member"); *id.* at ¶ 23 ("Mr. Hastings did not call other staff members in a similar fashion"); *id.* ¶ 39 ("Mr. Hastings did not hug others in the same manner").  Since Plaintiff has failed to meet the first prong of the four-part test outlined above, her constitutional claim for retaliation must be dismissed.[25]

---

[25]     Although Plaintiff's constitutional retaliation claim (Count Four) appears to be based on the First Amendment, *see, e.g.,* Compl. ¶ 97 (describing "speech acts"), the complaint nevertheless includes a single sentence claiming that "the *Fifth Amendment* prohibits retaliation against an employee for reporting or otherwise opposing unlawful sexual harassment."  Compl. ¶ 96 (emphasis added).  In fact, the law does not support this stray assertion.  *See, e.g.*, *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (noting that the "harms that [the plaintiff] sets forth in her [Fourteenth Amendment] equal protection claim are alleged to be the product, not of discrimination, but of retaliation for her complaints of discrimination.  Although claims of retaliation are commonly brought under the First Amendment …, and may also be brought under Title VII …, we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination"); *Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 340 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation.").  Accordingly, Plaintiff's retaliation claim also does not

### 2. *Plaintiff's Complaint Fails To Allege That Mr. Hastings Took Any Retaliatory Action*

The complaint also fails to state a constitutional claim of retaliation for the additional reason that it does not allege that Mr. Hastings personally took part in any retaliatory conduct.[26] In order to prevent dismissal of the *Bivens* claims, Plaintiff was required to "plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009) (emphasis added). In *Iqbal*, the Supreme Court confirmed that "each Government official … is only liable for his or her own misconduct." *Iqbal*, 129 S. Ct. at 1949; *accord Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997*)* ("The complaint must at least allege that the defendant federal official was personally involved in the illegal conduct."). Here, Plaintiff alleges only that "*Defendants* took adverse retaliatory actions" against her by: (1) "creating a hostile work environment by repeatedly threatening her job"; (2) "refusing to allow her to return to her position as Policy Advisor in Washington, D.C."; and (3) "intentionally marginalizing her from the rest of the U.S. Mission to the OSCE." Compl. ¶ 98 (emphasis added). But these "bare assertions" are "not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1951. Rather, the complaint must contain "well-pleaded factual allegations" that support the legal conclusion that *Mr. Hastings* retaliated against Plaintiff. *Id.* at 1950.

Plaintiff's nonconclusory factual allegations describe *no* retaliatory action by Mr. Hastings. First, the complaint describes only two "threats" to Plaintiff's employment; however,

---

allege a cognizable Fifth Amendment violation. Although *Bernheim* and *Ratliff* involve the Fourteenth Amendment, the rights guaranteed by the equal protection component of the Fifth Amendment and the Equal Protection Clause of the Fourteenth Amendment are coextensive. *See Adarand Const.*, 515 U.S. at 224.

[26]     This is true irrespective of the constitutional provision on which the retaliation claim purports to be based.

these "implicit threats" supposedly were made by a Commission employee, not Mr. Hastings. *See* Compl. ¶¶ 52, 62.  Second, Plaintiff makes no allegation that Mr. Hastings took any action to prevent her return to Washington, D.C.  Indeed, Plaintiff does not even allege that Mr. Hastings was aware that she wanted to return to her position in Washington, D.C., much less that Mr. Hastings took any action to prevent that return or that his conduct was motivated by a desire to retaliate against Plaintiff.[27]  *See* Compl. ¶¶ 38, 41, 52, 57.  Finally, Plaintiff makes no allegation that Mr. Hastings did anything to intentionally marginalize her from the U.S. Mission to the OSCE.  *See* Compl. ¶ 50 (describing only conduct by another defendant).  Accordingly, Plaintiff has not alleged that Mr. Hastings was personally involved in any of the allegedly retaliatory conduct.  *See Johnson v. Gov't of Dist. of Columbia*, --- F. Supp. 2d ----, 2011 WL 1517106, at *12 (D.D.C. Apr. 21, 2011) (Collyer, J.) (dismissing *Bivens* claims on summary judgment where there was no allegation that defendant "personally conducted" allegedly unconstitutional actions).

The absence of any retaliatory action by Mr. Hastings is further underscored by examining what Plaintiff does in fact allege.  As an initial matter, Plaintiff clearly states that, as of August 2009, Mr. Hastings had not taken any retaliatory action against her.  *See* Compl. ¶ 49 (describing her "fear that [Mr. Hastings] would *begin* retaliating against her *once he realized* that she would not succumb to his advances") (emphasis added).  Moreover, examining the allegations of the complaint, it is clear that the retaliation by Mr. Hastings that Plaintiff allegedly feared in August 2009 never in fact began.  Instead, after August 2009, Plaintiff alleges "several

---

[27]     Even if Plaintiff's complaint were read to allege that, in January 2010, Mr. Hastings learned of Plaintiff's desire to return to Washington, D.C., *see* Compl. ¶ 57, Plaintiff states that at that time she "told [Mr. Turner] that … she wanted to return to Washington, D.C. in July 2010" and "Mr. Turner *agreed* that she could return to Washington, D.C. by July 31, 2010" (*see* Compl. ¶ 57 (emphasis added)).  According to the complaint, Plaintiff did in fact return by the end of July 2010.  Compl. ¶ 73.

months of enduring *Mr. Turner's* retaliatory conduct." Compl. ¶ 50-51 (emphasis added).

Similarly, each subsequent allegation of retaliation in the complaint is directed at Mr. Turner, not

Mr. Hastings.[28] *See* Compl. ¶¶ 53, 55, 68-70. Accordingly, Plaintiff's retaliation claim fails

because she has not alleged a single fact suggesting that Mr. Hastings, "through [his] own

individual actions," *Iqbal*, 129 S. Ct. at 1948, took any retaliatory action against her.

### C.     Mr. Hastings Is Entitled To Qualified Immunity

Plaintiff's claims also fail because Mr. Hastings is protected by qualified immunity

where, as here, the complaint fails to allege violations of clearly established constitutional rights.

It is settled that "government officials performing discretionary functions generally are shielded

from liability for civil damages insofar as their conduct does not violate a clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982). Mr. Hastings is thus entitled to qualified immunity with

respect to Plaintiff's constitutional claims unless (1) the facts that Plaintiff has alleged "make out

a violation of a constitutional right," *and* (2) the constitutional right at issue was "clearly

established" at the time of the alleged misconduct.[29] *Pearson v. Callahan*, 555 U.S. 223, 129 S.

Ct. 808, 815-16 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As discussed

above, each of Plaintiff's claims fails under the first prong of the qualified immunity analysis

because it does not allege a violation of any First or Fifth Amendment right.

---

[28]     In any event, even those allegations that Plaintiff directs at Mr. Turner amount to no more than "bare assertions" and "legal conclusion[s] couched as [] factual allegation[s]." *Iqbal*, 129 S. Ct. at 1950-51.

[29]     The Court may decide that qualified immunity bars Plaintiff's claims on a motion to dismiss. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").

That said, even if the Court were to find that Plaintiff did adequately plead a violation of a constitutional right, such a right was not clearly established at the time of the alleged conduct. "Clearly established" in this context means "settled, indisputable law." *Zweibon v. Mitchell*, 720 F.2d 162, 172-73 (D.C. Cir. 1983). Thus, for example, even if the law were not so clear that workplace retaliation is not actionable under the Fifth Amendment, *see supra* n.25, any ambiguity must necessarily be decided in favor of recognizing qualified immunity. As the Supreme Court noted in *Pearson*, "[i]f judges thus disagree on a constitutional question, it is unfair to subject [a defendant] to money damages for picking the losing side of the controversy." 129 S. Ct. at 823 (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)); *see also Zweibon*, 720 F.2d at 173-74 n.19 ("It was only necessary for [defendant] to show that the law was unsettled[.]"). Similarly, qualified immunity cannot be overcome if there is some question as to whether the rule extends to the facts at issue. *See Crawford-El v. Britton*, 523 U.S. 574, 592-93 (1988) (noting that "there may be doubt as to the illegality of the defendant's particular conduct" even where the general rule has been well established). Where, as here, Plaintiff does not allege a violation of any "settled, indisputable" constitutional right, *Zweibon*, 720 F.2d at 172, Mr. Hastings is entitled to qualified immunity.

## <u>CONCLUSION</u>

For the foregoing reasons, Representative Hastings respectfully requests that the Court enter an Order dismissing Counts III and IV of Plaintiff's complaint.

Respectfully submitted,

/s/ *Tonya Robinson*
Tonya Robinson (DC Bar #468506)
Thomas F. Connell (DC Bar #289579)
WILMER CUTLER PICKERING HALE
 AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
 (202) 663-6000

*Attorneys for Defendant Alcee L. Hastings*

Dated:  July 9, 2011

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on July 9, 2011, a copy of the Motion of Defendant Alcee L. Hastings to Dismiss Counts III and IV of Plaintiff's Complaint and the accompanying Memorandum of Points and Authorities in Support of Defendant Alcee L. Hastings' Motion to Dismiss Counts III and IV of Plaintiff's Complaint and Proposed Order Granting Defendant Alcee L. Hastings' Motion to Dismiss Counts III and IV of Plaintiff's Complaint were filed electronically with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all parties and counsel in this case, including those noted below.

          /s/ *Tonya Robinson*

          Tonya Robinson
          Attorney for Defendant Alcee L. Hastings

CM/ECF System sent notification of filing to:

Paul J. Orfanedes
James F. Peterson
Attorneys for Plaintiff Winsome A. Packer

Charles S. Leeper
Mark H.M. Sosnowsky
Attorneys for Defendant Fred Turner

Russel Gore
Gloria Lett
Ann R. Rogers
Attorneys for Defendant The U.S. Commision
on Security and Coooperation in Europe