1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

WINSOME PACKER,                  .   Case No. 1:11-CV-00485
                                 .   (RMC/JMF)
             Plaintiff,          .
                                 .   Washington, D.C.
       v.                        .   March 11, 2014
                                 .
UNITED STATES COMMISSION         .
                                 .
ON SECURITY AND COOPERATION      .
                                 .
IN EUROPE,                       .
. . . . . . . . . . . . . . .

DISCOVERY STATUS CONFERENCE
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     By:  WINSOME PACKER, PRO SE

For the Defendant:     U.S. House of Representatives
                       By:  ANN R. ROGERS, ESQ.
                       1036 Longworth House
                       Office Building
                       Washington, DC 20515

_____

```
 1           (Proceedings commenced at 3:30 p.m.)
 2                THE CLERK:  Okay.  This is Civil Case, Year
 3      2011-485, Winsome Packer v. United States Commission on
 4      Security and Cooperation in Europe.
 5                Winsome Packer is representing herself as pro
 6      se.
 7                Ann Rogers and Russell Gore representing the
 8      Plaintiff -- the Defendant, I'm sorry.
 9                This is a discovery status conference.
10                THE COURT:  Good afternoon.
11                THE PLAINTIFF:  Good afternoon.
12                MS. ROGERS:  Good afternoon.
13                MR. GORE:  Good afternoon.
14                THE COURT:  We are assembled to ascertain
15      what are the open issues with reference to discovery,
16      to see if we can resolve them and, if not, we'll need
17      to rule.
18                As I review the documents, the issues before
19      us are a protective order which would protect the
20      information that is exchanged in discovery;
21                an attempt to arrive at a agreed-upon data
22      protocol so that there would be a common understanding
23      with reference to the search terms and the protocols
24      that would be used to identify discoverable information
25      in what I suppose is a large data set; and
```

1          releases from Plaintiff for her medical,

2   educational and employment records, and there's where

3   we stand.

4          Are there any other issues that the parties

5   wish to address?

6          THE PLAINTIFF:  (Inaudible.)

7          THE COURT:  Please come to the podium.

8          THE PLAINTIFF:  The Defendants, where they

9   insist on obtaining records into every facet of my

10  life, have resisted their obligation to turn over the

11  (unintelligible) of the records that are pertinent to

12  this case.

13         At the same time that they're arguing that

14  the -- they have a right to examine all issues

15  pertinent to my health, and have, over the last 4

16  years, had full access to my emails that were -- use

17  them selectively, obtained records which they have

18  partially included and partially excluded.

19         In their arguments here today, they continue

20  to refuse me access to these emails.

21         My contention is that since they've had full

22  access to my emails and have used them over the past

23  several years, then if they are unable to deduce how to

24  select emails and will not agree on terms because

25  there's just no way to do it, that I should have full

1    access to the Commission's database so that I can judge

2    what are the pertinent records to this Complaint.

3              In addition, the Court has already ruled on a

4    number of these issues, and the (unintelligible)

5    they're seeking, first of all, they sought to have you

6    in charge of this matter, and they have sought to have

7    the rules already established by the Court, changed in

8    a way that is to their liking and what they perceive to

9    be their client's benefit.

10             THE COURT:  What rules are they?  What rules

11   are they?

12             THE PLAINTIFF:  The rules governing what

13   evidence might or might not be included in the

14   procedures to request authorization from the Court on

15   these matters, the scope of records that might be

16   requested pertaining to my medical records.

17             THE COURT:  If I can back up a bit.

18             Each party served on the other, requests to

19   produce documents under Rule 34.

20             THE PLAINTIFF:  Yes, we have.

21             THE COURT:  All right.

22             Have objections -- Have they ever been

23   responded to by you and by them?  Is there a full

24   record so that someone was asked, "Give me X, Y and Z,"

25   and that person from (unintelligible) the demand was

1    made said, "You may have X but you may not have Y or

2    you may not have Z?"  Where are we in terms of that

3    issue?  What's before the Court to resolve?

4              THE PLAINTIFF:  They have -- They answered,

5    but not really.  They have raised objections to

6    particularly every interrogatory and request for

7    information that I submitted to them, on scurrilous

8    bases.

9              They -- My interrogatories were actually

10   shaped from the ones they submitted to me, a pro se

11   Defendant, and in response, they have claimed that many

12   of these are vague and arbitrary and -- which really is

13   an effort to further delay and confuse this process.

14             THE COURT:  Okay, but in terms of the

15   ripening of an issue for judicial resolution, are we at

16   the point where you know what they have said and they

17   know what you have said with reference to the request

18   to produce documents?

19             THE PLAINTIFF:  Yes, Your Honor.

20             THE COURT:  Okay.

21             And you're saying that a motion to compel

22   would lie against them because they have not produced

23   what they should, and their objections are frivolous?

24             THE PLAINTIFF:  They are.

25             THE COURT:  All right.

1          And conversely, what have they said about

2     your objections?

3          THE PLAINTIFF:  They have said that some of

4     them are deficient.

5          THE COURT:  All right.

6          THE PLAINTIFF:  And I would have been

7     inclined to give them supplemental information, and

8     actually had offered to allow them to copy additional

9     documents.  I gave them a substantial amount, but

10    you've seen the response to my interrogatories, which

11    basically they answered almost none of them, and the

12    names of the witnesses they gave, none of them were

13    present when the incidents of sexual harassment

14    occurred.  Instead, they have included people that I

15    may have met per -- or not met at all over the --

16    during the years I was in Vienna, and arguing that they

17    would know about my work reputation, or something along

18    those lines, having nothing to do with the sexual

19    harassment.

20         THE COURT:  Okay, but where we are now is it

21    would be appropriate for you, or for them, or for both

22    of you, to move to compel responses because the

23    responses you have gotten are insufficient; is that

24    right?

25         THE PLAINTIFF:  Yes, Your Honor.  I would --

1              THE COURT:  Okay.

2              Just for your purposes, what happens is if

3      you get answers to any of the discovery devices,

4      whether it's a request to produce interrogatories,

5      excuse me, and your opponent's answers, in your view,

6      insufficient, you have to ask the Court to compel a

7      response, and you do that by moving to compel.

8      Conversely, they can do the same thing to you.  At that

9      point, the issue ripens, I look at the discovery, and

10     decide what I have to decide.

11             THE PLAINTIFF:  At which point would you

12     decide the appropriateness of the request?

13             THE COURT:  At -- Right now.

14             THE PLAINTIFF:  Okay.

15             THE COURT:  I mean, if you make that motion,

16     of course I'll resolve it.

17             THE PLAINTIFF:  May I just respectfully ask

18     whether you have read all the documents up until this

19     point, of the case?

20             THE COURT:  Of course not.  I haven't seen

21     any of them.  Remember something, I don't see

22     discovery.  It's not filed.

23             You have to -- Why are you looking that like

24     me (phonetic)?  Our rules provide that discovery is not

25     filed.  I would not -- Have you ever caused them to be

1    transmitted to the Court, the interrogatories?

2          THE PLAINTIFF:  I actually provided a copy in

3    response to the Defendant's actions, back in January,

4    where they filed -- they filed a motion and included

5    references to interrogatories and discovery.

6          THE COURT:  So there is now before the Court,

7    a document which you have prepared, which points to the

8    insufficiencies of their response, --

9          THE PLAINTIFF:  I'll show you --

10         THE COURT:  -- and you want me to rule on

11   that?

12         THE PLAINTIFF:  Partially.

13         THE COURT:  Partially.  All right.

14         Do you want to supplement it?

15         THE PLAINTIFF:  I could, Your Honor.

16         I think it would be helpful if we actually go

17   through the requests that have been put forward.  I

18   don't know if that might -- would be appropriate, but I

19   don't see how else you could rule on these matters

20   without those.

21         THE COURT:  Well, obviously I've got to look

22   at them.

23         All right.  Let me hear from them and hear

24   what they have to say, and I'll go through the other

25   issues.

1          MS. ROGERS:  Good afternoon, Your Honor.  Ann

2    Rogers on behalf of the House and Commission on

3    Security and Cooperation in Europe.

4          THE COURT:  Good afternoon, Ms. Rogers.

5          MS. ROGERS:  Well, I think you hit the three

6    big ticket items that we prepared to discuss today: The

7    protective order, ESI protocols, and releases for

8    subpoenas regarding medical, employment, education --

9          THE COURT:  But Ms. Parker (phonetic) wants

10   to talk about the insufficiencies of the responses that

11   you have given to each other.

12         MS. ROGERS:  And we're prepared to do that.

13   We actually did send her a quite detailed deficiency

14   letter on January, excuse me, January 30th of this

15   year, outlining why we thought her responses to

16   interrogatories and document requests were indeed

17   deficient.  We were trying to do that in order to avoid

18   a motion to compel.

19          We have not heard back from her, other than

20   she's not interested in things like a protective order

21   or any further discussions with us, pending something

22   before the Court.

23          We were also going to suggest some

24   housekeeping matters regarding depositions, but I will

25   address --

1          THE COURT:  Let's take --

2          MS. ROGERS:  -- whatever you want me to

3   address.

4          THE COURT:  Let's take first things first.

5          MS. ROGERS:  Okay.

6          THE COURT:  Ms. Parker has just brought to my

7   attention, deficiencies in your responses to her

8   discovery requests, --

9          MS. ROGERS:  Correct.

10          THE COURT:  -- and she wants me to review

11   those now, either to ascertain whether your objections

12   have any merit, and whether your answers are proper,

13   and that, is now, as I understand it, ripe for

14   decision.

15          I have before me all the documents I need to

16   make that determination; is that right?

17          MS. ROGERS:  I -- You don't have our

18   responses.  We brought copies with us, but we can --

19          THE COURT:  All right.  Well, you'll --

20          MS. ROGERS:  -- we're happy to provide those

21   to the Court.

22          THE COURT:  -- you'll leave them here.

23          What I'll do is I'll take whatever anybody

24   wants to give me today.  I'll set a deadline for two

25   weeks for everybody to make any supplemental

1    submissions they wish, and at that point I'll review

2    everything that has been filed and make my

3    determinations as to claims by either side, of the

4    deficiencies of those responses, in the hopes of doing

5    a comprehensive order that brings everything together.

6                 That acceptable to everyone?

7                 THE PLAINTIFF:  Yes, Your Honor.

8                 THE COURT:  All right.  Good.

9                 In terms of a protective order, Ms. Rogers,

10   as you say, you cannot reach an agreement and it is

11   silly for me attempt to achieve one, so I'll just have

12   to look at the protective order and decide what to do.

13   I have the standard one I use.  I'm fairly familiar

14   with that, and I'll just take care of that, as I can.

15                 Now, with reference to these search terms and

16   e-data protocols, the data set we are dealing with is

17   what?  What is being searched?

18                 MS. ROGERS:  I'm going to turn this over to

19   my colleague, --

20                 THE COURT:  All right.

21                 MS. ROGERS:  -- who has the (unintelligible).

22                 If -- I know that -- Forgive me, before I do

23   that, I understand that you have a standard protective

24   order that we looked at on your website, and I can

25   either do it now or we can do it in subsequent papers,

1  on why we asked for a deviation from that standard.

2          THE COURT:  Well, tell me why.

3          MS. ROGERS:  Okay.

4          Well, essentially a number of things.  There

5  is extensive medical evidence that we believe is going

6  to be relevant and going to be introduced in this case,

7  but in terms of how things differentiate or differ from

8  the -- just the standard copy that's on your website, a

9  couple of things.

10          One, given the breadth of the ESI that has

11  been preserved on the part of the Defendant, we are

12  concerned that there might be revelation of potentially

13  privileged materials, and we want have a clawback

14  provision for anything that is given over --

15          THE COURT:  Privileged by the attorney-

16  client?

17          MS. ROGERS:  Privileged by the attorney-

18  client, correct.

19          And just so you know, Ms. Packer has already

20  been the beneficiary of such protections when the Court

21  -- when Judge Collyer, sua sponte, when Ms. Packer

22  revealed a number of her attorney-client communications

23  in one of her court filings, the Judge put that under

24  seal already.

25          So we have a reason to believe that that will

1  actually protect both parties from attorney-client

2  privilege items being revealed.

3          There is also a substantial amount of

4  evidence that is subsidiary to the claims, whether it's

5  in emails or in depositions, where conversations occur

6  that are in conjunction with either confidential or

7  security sensitive information, given the nature of Ms.

8  Packer's job, or the nature of the Commission's

9  mission, or that, excuse me, or that this -- that those

10 matters can be discussed in a deposition.

11         There is -- We're not sure, but there might

12 be some speech or debate documents that are within the

13 electronically-stored information, and that is

14 obviously not part of the standard order.

15         And also, in response to, actually, Ms.

16 Packer's concern, we wanted to incorporate a good faith

17 requirement for designation of things that are

18 confidential, and again, that was in response to

19 something that Ms. Packer had lodged an objection over.

20         I believe that is how we --

21         THE COURT:  All right.

22         Well, before I hear from your colleague, Ms.

23 Parker, may I hear you with reference to what you think

24 of the appropriate contents of a protective order, and

25 why those contents are not appropriate.

1          THE PLAINTIFF:  (Inaudible.)

2          THE COURT:  Please.

3          THE PLAINTIFF:  Your Honor, having worked on

4    -- in Congress for a number of years, I am fully aware

5    that what is really happening here is an attempt to

6    shield from the public, the sort of corrupt and

7    criminal conduct that goes on inside the office that I

8    work, and in the broader institution.

9          I would ask that there be no cookie cutter

10   protective order, but that it looks at the issues

11   individually, and makes an objective determination as

12   to what is pertinent to this case.

13         THE COURT:  All right.

14         Well, to be more specific, the first element

15   counsel proposes would be that a protective order speak

16   to the possible disclosure of attorney-client or work

17   product privilege.  There is now a Rule of Evidence

18   called "502" that permits a party to clawback something

19   that it has inadvertently disclosed to the other side

20   that is privileged, and if, under the rule, it does so

21   properly, it can get the document back (unintelligible)

22   that.

23         The second thing would be, as I understand

24   it, conversations and other data that is sensitive,

25   from a national security perspective, and should be

1    protected from public disclosure before it (phonetic),

2    which unfortunately is probably the most complicated,

3    is documents that are protected by this speech and

4    debate clause, and they ask, finally, that the

5    designations that the parties are permitted to make

6    under the protective order, that a certain thing is

7    confidential, be done in good faith, so that both sides

8    are forced to claim privilege only when there is a good

9    faith basis to believe it exists.

10          So those are the elements they want in the

11   protective order.

12          Do you have any problem with any of those?

13          THE PLAINTIFF:  Yes, Your Honor.

14          First of all, this issue of attorney-client

15   privilege, as you have not, as you admitted, read all

16   of the materials in this matter, I would like to bring

17   to your attention that much of what the Defendant has

18   basically withheld evidence and redacted some of the

19   emails, are clearly attorney-client privilege on the

20   basis that Mr. Hastings, the perpetrator in this case,

21   interactions with senior staff of the Commission,

22   including my immediate supervisor, are privileged on

23   this basis.  This is completely bogus and inviolate.

24          This -- My immediate supervisor could not be

25   his attorney because he is a Commission staff director

1    to whom we are directed to report complaints of such

2    behavior, and the Defendants of the Commission have

3    redacted and prepared significant motions of evidence

4    on this basis.

5              I therefore would ask you, they cannot

6    unilaterally make such a determination, and therefore

7    would ask you a look at the evidence, or have your

8    staff look at the evidence, to determine what is valid

9    here, and what is not.

10             THE COURT:  Okay.

11             Now, would you speak then, to the

12   conversations that might be protected by national

13   security?

14             THE PLAINTIFF:  Well, this same thing goes,

15   Your Honor.  I think that one of the substant

16   (phonetic) issues in this case is that Representative

17   Hastings was mentioned in a book by the former foreign

18   minister of Kazakhstan, who alleged that he shook down

19   the President of Kazakhstan and accepted sex in the

20   presidential mansion.

21             The Defendants would argue that this is a

22   security sensitive matter because it involves a foreign

23   government and our relations with them.  I contend it

24   is pure corruption and it's not protected.

25             So again, you will have to find out what

1    they're defining as "national security" and what

2    comprises this in this context.

3             THE COURT:  Okay.

4             Well, there's a difference here, and it's an

5    important one.

6             The protective order says only that as

7    information is produced, it is subject to the

8    protective order, so you see it.  That is different

9    than a claim by you, that a claim of privilege is

10   invalid.

11            So, under the Supreme Court's decision in

12   Seattle Times, discovery is private.  It's nobody's

13   business but these parties.  So the protective order

14   simply explains to all the world, that you -- that

15   these two parties in this litigation have reached some

16   understandings, and the Court has confirmed them, as to

17   what will be publicly disclosed, has nothing to do with

18   whether you see it.

19            Now, if you see it and it is redacted, you

20   are -- it is perfectly appropriate for you to say that

21   the claim of privilege asserted, whether it is

22   attorney-client, or national security, or speech and

23   debate, is not a legitimate one.  That raises an issue

24   that I'll have to resolve, but the protective order is

25   designed to make sure that this information is not made

1    public because it is not, by definition, public, it's

2    exchanged in a lawsuit.  That's what a protective order

3    does.  They're two related concepts.  Okay?

4           So in any event, I'll issue a protective

5    order, but I'll take into account what you're saying,

6    and reserve you the right to challenge any claim of

7    privilege that is being made.

8           Okay.  Thank you.

9           Now, you wanted to speak to the data, and

10   then we'll hear from Ms. Parker on that front

11   (phonetic)?

12          MS. ROGERS:  Your Honor, I did want to

13   clarify one point.  I wasn't just saying that it's just

14   not -- it's not just national security that we're

15   concerned with.  Given the nature of what the

16   Commission does, and who they have communications with,

17   in terms of representatives of foreign governments,

18   representatives of non-governmental agencies, we're

19   concerned about things like discussions with those

20   entities, that would be compromised if the

21   communications were made public.

22          So it's not just, you know, a threat to any

23   kind of national security of the United States, it is

24   compromising relationships abroad.

25          It also includes data regarding congressional

1    delegations abroad, and meetings with heads of foreign

2    governments.  So it's --

3            THE COURT:  I understand.

4            MS. ROGERS:  Okay.

5            THE COURT:  The point here, is under Rule 26

6    you're obliged, when you claim a privilege, to do so

7    expressly.

8            MS. ROGERS:  Absolutely.

9            THE COURT:  You are then obliged to create a

10   document, and I hate the word "privilege log" because

11   it doesn't say what the rule says, that permits me to

12   rule on whether the privilege does apply, without

13   looking at the document.  So it has to be a very

14   fulsome description.  Even then, if I still can't do

15   it, then I'll have to look at the documents one by one.

16           You understand that?

17           MS. ROGERS:  Understood.

18           THE COURT:  Okay.  But, in other words, it's

19   -- I will not be content with simply being told

20   "national security."

21           MS. ROGERS:  And nor would we do that.

22           THE COURT:  That's not going to work.  You've

23   got to explain to me, how it relates, what this

24   document is.  I would like to think and hope that you

25   would comply with the rule and make as fulsome a

description as possible, without disclosing the
contents of the document itself, but if you -- if that
proves impossible, then I will look at the document in
camera and -- whether in whole or in part.  I'd prefer
not to do that, but there's no other way around it,
particularly if Ms. Parker is going to claim, as she
does -- Ms. Packer is claiming, as she does, that the
privileges that you are asserting are not properly
being asserted.

            MS. ROGERS:  Correct.  And the national
security, we're not so much asserting as a privilege,
but as one of the reasons why a document should be
confidential.

            The documents that we have --

            THE COURT:  Well, --

            MS. ROGERS:  -- produced -- Well, we produced
over 1300 pages of documents, and we produced a -- now
I don't want to say it, but a privilege log regarding
the attorney-client privilege, and it was robust and it
was very detailed, and we'll be happy to provide that
to the Court, as well.

            THE COURT:  Uh-huh.

            MS. ROGERS:  I'm going to turn it over to my
co --

            THE PLAINTIFF:  If I could just comment, Your

1   Honor?

2          Thirteen hundred pages of documents that the

3   Defendant produced included emails where I'm arranging

4   dates with people outside the Commission, having

5   nothing to do with the Commission.

6          It includes documents relating to social

7   issues that have nothing to do with the Commission, but

8   very little to do -- to provide evidence that are

9   pertinent to this case, and so when they broadly assert

10  they provided 1300 pages, similar to the irrelevant

11  witnesses that they provided to me, it applies in this

12  matter too.

13          THE COURT:  Thank you, Ms. Packer.

14          Okay.  So the protective order --

15          Now, Counsel, you wanted to speak as to the

16  possible protocols, or search terms that might be used

17  to search the assets (phonetic)?

18          MR. GORE:  Yes, Your Honor.  Good afternoon.

19          I would like to address one point before I

20  get to that, on the issue of the discovery responses.

21          What would be helpful is, is that we don't

22  know -- We know that Ms. Packer has said that there are

23  things about our discovery responses that she objects

24  to, but we don't know specifically, which is normally

25  what happens, which is why we prepared a detailed

1   deficiency letter and asked Ms. Packer to meet, so we

2   could talk about that.  She knows what our concerns

3   are, and we can presumably give you that deficiency

4   letter, and you would clearly see what our concerns

5   were with her responses.

6          We don't -- We're not in the position of

7   knowing what her concerns are, so we would like to have

8   some opportunity to be made aware of what they are, in

9   specificity, and respond to those so that you -- we'd

10  have that so that would be before you when you would

11  rule.

12          THE COURT:  All right.

13          MR. GORE:  With respect to e-data, what I'd

14  like to do is give you a --

15          THE COURT:  Let me see if I understand this.

16          This data was created at what point, and by

17  who?

18          MR. GORE:  The e-data?  Yes, I was going to

19  go through the background.

20          THE COURT:  Please do so.  I didn't mean to

21  interrupt you.  Go ahead.

22          MR. GORE:  Okay.  Well, there's a long

23  background.  This case has been going on since October

24  2010.

25          THE COURT:  Okay.

1          MR. GORE:  The lawsuit was filed in March

2     2011, but under the Congressional Accountability Act,

3     an employee must first go through an administrative

4     processes.

5          THE COURT:  I'm well aware that, yes.

6          MR. GORE:  Once Ms. Packer did that, we then

7     -- or our client, I should say, on our direction, began

8     the process of e-preservation, which I'll go into --

9     explain in just a moment.  That started in October

10    2010.

11         There were additional reservations done, and

12    I'm going to go through all the details, to the extent

13    that you want to hear about that, there were additional

14    presentations done in 2011 as a result of ancillary

15    proceedings that Ms. Packer had initiated.  We have all

16    of that data, and what I will -- what I can do, and I

17    do have this data, and this is -- First of all, this is

18    part of what we had asked Ms. Packer to meet so we

19    could discuss and explain to her.  She refused to do

20    so, so part of it is I need to now do that with respect

21    to you, and I can go through all of this.  We've

22    actually retained a consultant to assist us with that.

23         But let me begin by saying that data was

24    preserved by employees of the House of Representatives.

25    There's a department within the House of

1   Representatives called "House Information Resources"

2   that preserved data.  We identified, back in October

3   2010, who, at that point, we believed to be the

4   individuals who would be relevant custodians of

5   potential data.

6        Data was preserved, and what we did is we had

7   someone from HIR prepare an affidavit that went through

8   some great detail about each step in the process of

9   what he preserved, and how the preservation was done.

10   It's a four-page, single-spaced attachment.

11        We provided this affidavit to Ms. Packer's

12   fourth set of counsel in January 2013, in preparation

13   for the meet and confer conference, so that we could

14   discuss, "This is what we did.  We want to know if you

15   have any questions.  Do you think it should be

16   broader?", that kind of thing.

17        Mr. Davidson, her fourth counsel, was unable

18   to have that discussion before he withdrew.

19        We then attempted to have that discussion

20   with Ms. Packer in October of last year at our third

21   meet and confer, which was just with Ms. Packer.

22   Unfortunately, as you probably have seen from the

23   papers, that discussion was not productive, and counsel

24   who were present were threatened by Ms. Packer at that

25   meeting.

1          So since then, we then sent an email, which

2     is attached to our motion for requesting discovery

3     conference that we filed in January, asking --

4     explaining to Ms. Packer, and I've quoted the email in

5     our motion, that we have preserved a lot of data.

6               "We would like to meet with you to discuss

7               what was preserved and discuss protocols."

8               Ms. Packer's response, which I believe you've

9     seen, and if you've not, I can read it to you because

10    it was attached, was very clear that she didn't want to

11    have such a meeting, that she wanted all of the data.

12    So what -- And obviously, we understand if we were

13    dealing with a Plaintiff that was represented, or a

14    Plaintiff that had previously been involved with this,

15    there would be an understanding about what the ESI

16    protocol is.  So we've been trying to be helpful on

17    that end, but we've been met with silence.

18              So what I'm going to do now, if I can, is

19    briefly say what we've done, and then what we would

20    propose to resolve it, which is normally what I would

21    be saying at a meet and confer with the Plaintiff.

22              THE COURT:  Go ahead.

23              MR. GORE:  As I said, we identify four

24    potential custodians that we thought would be relevant,

25    and we prepared a data map.  This has been subsequently

1  prepared based upon the affidavit, about what we

2  believe to be -- happened.  This would be something we

3  would have provided.  I'm happy to provide a copy to

4  Ms. Packer and to the Court now, if you'd like to see

5  it, but it's a --

6         THE COURT:  Yes, I do.

7         MR. GORE:  -- it's a data map that identifies

8  who the relevant custodians are.

9         Would you like a copy of it now?

10         THE COURT:  Please.

11      (Pause.)

12         MR. GORE:  And again, this was prepared -- we

13  have retained, in the last -- At the end of last year

14  we retained a consultant, Mr. Marc Hirschfeld, who is

15  here with us, if need be.  At this point we're not

16  designating him as a witness.  He's a consulting person

17  with respect to us.  We may, at some point, need to, if

18  this becomes an issue.

19         What he did is he came in and looked at all

20  the preservation that was done at our direction by

21  House staff, talked to various people, looked where the

22  information was stored, looked what past practices were

23  because, again, this was done in 2010/2011, and

24  basically developed a data map of what was -- who were

25  the custodians and where the data was obtained.

1          Now again, there's an affidavit that was

2    developed by HIR personnel, House employees, two years

3    ago, that has already been provided to Ms. Packer, and

4    I would like to go ahead and just, so that you have a

5    complete record, provide that to you, as well, not that

6    we need to read through this today because I'm going to

7    summarize it, but I wanted you to have it, and again,

8    Ms. Packer already does have this, but in the interest

9    of full disclosure we'll give it to her again.

10         And as Your Honor will see, this affidavit

11   was prepared in April of 2012.  That was shortly before

12   Ivan Iverson, he was the HIR person, he left employment

13   with the House, so we felt that it was important to try

14   to get the extent of what he had done and what he had

15   been involved with before he left, so that was part of

16   the reason for having that done.

17         What happened was when we got Mr. Hirschfeld

18   to come and take a look, because a lot of the data

19   preserved, but we didn't do very much with a lot of the

20   preserved data because we were in a holding pattern for

21   a while.  Discovery really just got underway in --

22   early last year, and it started before, but there was

23   some fits and starts as a result of requests on both

24   sides, as a result of Ms. Packer needing time for new

25   attorneys, that kind of thing.

1              When we obtained the services of Mr.

2    Hirschfeld, he basically collected in a various --

3    various stages, all the data that had been preserved.

4    That turned out to be about -- over 4 terabytes of

5    data.  Part of the reason that it's so much is that, as

6    I said, there were a number of separate preservations

7    done.  Not all of them were done for respect to this

8    civil action, they were done for other purposes, but we

9    got those preservations and put them all together for

10   purposes of this.  He then took that data and he did a

11   three-step preprocessing of that data.

12             First, he removed -- And I say "4 terabytes

13   of data," that's 4 terabytes of data that were copied

14   of a hard drive, some of which were copied, as I

15   understand it, logically, and some were actually

16   physically copied, and we -- they were done different

17   ways, and again, that can be described.

18             And so what he did, the first level of the

19   preprocessing was he removed system files and non-user

20   generated data that would clearly not include anything

21   that would be responsive.  That brought the data down.

22             Then he went through and he went through a

23   two-step de-duplication process.  One was he compared

24   the hash values of PST files and other files to each

25   other, to be able to determine which were duplicates,

1    and there were a lot of duplicates.

2              After that, he then found that there were very

3    near -- I think the term might be near dup files

4    (phonetic) that he was able to -- once he had gone

5    through the first stage of de-duplication, and he was

6    able to then further reduce the duplication.  So he

7    basically went through this process, and I'm

8    simplifying it, he went from over 4 terabytes to

9    700,000 documents, which is about 50 to 60 gigabytes, I

10   believe, is what we can just -- determine.

11             So the corpus of data that is potentially

12   relevant, potentially, is now that we have 750,000

13   documents.  Of course, at this point we don't know if

14   Ms. Packer is saying she wants the 4 terabytes or if

15   she wants something in between, or even the 700,000.

16   It's our view that even the 700,000 would be completely

17   inappropriate in a case like this, for a couple of

18   reasons.

19             The maximum, if everything were to go Ms.

20   Packer's way, the maximum she could recover in this

21   case is $300,000.  The cost for us to review over

22   700,000 documents would be outcome determinative just

23   on that.  So what we've done is we wanted to talk with

24   Ms. Packer about a mechanism for how we could identify

25   the appropriate documents to be searched.

1          We considered a variety of search options,

2     but again, Ms. Packer is not represented, so we

3     determined that search terms would be ideal.

4          I should also mention that all this case

5     involves, this case is more appropriate for search

6     terms because all it is now, there's no retaliation

7     claim, it's simply a hostile work environment claim

8     that consists of a series of alleged physical hugs,

9     cheek-to-cheek greetings, inappropriate comments and --

10    alleged inappropriate comments, and alleged invitations

11    to visit.  So it's a limited universe of what is at

12    issue, and those are the kinds of things that seem to

13    be more appropriate for search terms, because it's not

14    like we're looking for a legally operative document in

15    a trade secrets case.

16         So anyhow, Ms. Packer wouldn't meet with us

17    to advance the ball.  What we did, and normally we

18    wouldn't do this because it could be considered work

19    product, but we went and we reviewed what's left of the

20    Complaint after Judge Collyer's two rulings limiting

21    it.

22         We also looked at other filings that Ms.

23    Packer has made, to see what some of her allegations

24    are, and we've dealt with her for a while, and we came

25    up with 54 search terms that we combined, some of them

1    -- some with bouillon (phonetic) terminology based upon

2    her allegations.

3              For three of the custodians who are alleged

4    to be critical individuals, one of them is Ms. Packer.

5    When we did that, we came up with a total of 13,110

6    documents, and what I'd like to do is give this to you

7    so you can see this is what we would normally proposed.

8              THE COURT:  Please.

9              MR. GORE:  So the document that you're seeing

10   right here is basically a search of the 700 or 750,000

11   corpus, after they've been preprocessed, with these 54

12   search terms that are based on Ms. Packer's

13   allegations, and it shows -- it shows for the three

14   custodians that we think would be relevant: Ms. Packer;

15   Fred Turner, who was her supervisor at the time, during

16   part of the relevant issues that she claims was

17   knowledgeable about this; and Marlene Kaufmann, who was

18   a -- the other individual who allegedly -- who did

19   investigate the allegations once they became to the

20   attention of the Commission.

21             There are no emails for Alcee Hastings

22   because Representative Hastings does not use email.  So

23   there were -- and I don't believe that is an issue

24   that's in dispute.

25             Now, the other thing we did is there's

1    another custodian that we preserved data before, that

2    had a lot of data because of the number of computers

3    and various other information.  Her name is Mischa

4    Thompson.  Mischa Thompson is a limited --identified in

5    a few spots in the Complaint, with limited areas of

6    knowledge.

7           So what we did is we took a more narrow

8    version of search terms, based upon Ms. Packer's

9    allegations of what Ms. Thompson allegedly heard or

10   observed or witnessed, and we ran those, and came up

11   with a 1948 -- 1,948 documents.

12          (Pause.)

13          MR. GORE:  And just let the record reflect

14   that I have handed Ms. Packer both of those search

15   terms made by -- the three custodian search terms that

16   came up with about 13,000, and the Mischa Thompson

17   search terms which came up with about 2,000.  That puts

18   us into a situation where we think we have about 15,000

19   documents.  In our view, in a case of this nature, in a

20   case of this value, is a much more appropriate way to

21   look at that.

22          Now I say that -- "15,000."  Some of that is

23   going to contain attorney-client privileged

24   information.

25          Another thing I should point out is Ms. Packer

1    alleges that the last allegation of sexual harassment

2    occurred on February 19th, 2010.  What we did is we

3    limited the time period to -- from when she started

4    employment with the Commission, which is May of 2007,

5    through October 2010.  So we went several months beyond

6    the last incident of sexual harassment because there

7    was an investigation up to the time that the

8    administrative processes began.  So these 15,000

9    documents, the 13,000 for the three custodians, and the

10   2,000 for Mischa Thompson, are the limited terms in

11   that limited time frame, from the 700 or 750,000.  We

12   believe that that is an appropriate way to review.

13          Now, again, we're not prepared tomorrow, to

14   turn those over to Ms. Packer.  We need to review those

15   documents for privilege, and obviously we haven't

16   reviewed them because we don't have an agreement that

17   -- on how to go about this protocol, and that would be

18   a waste of time to do that.  So we would still need to

19   review them for privilege, and things of that nature.

20          That is essentially what we've proposed.  I

21   know I've given you a lot of information --

22          THE COURT:  No, I understand it.  I thank you

23   for your doing so, and right now --

24          THE PLAINTIFF:  May I comment, Your Honor?

25          THE COURT:  Of course.  Of course.  I'll give

1    you all the time you need, but as I understand the

2    situation, Mr. Hirschfeld has now isolated that

3    information.  So when you use the words "documents,"

4    you mean electronically-stored information that can be

5    produced on another format?

6              MR. GORE:  Yes.

7              THE COURT:  And, Mr. Hirschfeld, could that

8    be searched again using search terms or some other

9    methodology?

10             (No audible response.)

11             THE COURT:  Do you understand what they did?

12             THE PLAINTIFF:  Yes, Your Honor.

13             Just to respond to Mr. Gore's statement,

14   first of all, the Defendant's attorneys have repeatedly

15   accused me of refusing to meet with them, and also have

16   now put in various court documents that I threatened

17   them.  If they felt threatened, then why are they

18   insisting on meeting with me?  Why would they want to

19   be in my presence if they felt so threatened?

20             Secondly, there's always an undercover

21   security officer with them, I'm fully aware of that,

22   whenever we're together.  So it would be incredibly

23   stupid of me to threaten them or, according to Ms.

24   (unintelligible), finding that the gestures of my arms

25   that they -- that I was threatening them.  That is

absurd.

They threatened to release my medical records to the media if I didn't sign their confidential agreement, and I told that there would be serious consequences if they did, and I meant it.  I wanted them to take it seriously and -- that I would not continue to be bullied by them.

I would like you to ask them to refrain from continuing to besmirch my name and my reputation by repeating these allegations which are completely false.

Secondly, yes, I refused to meet with them because of this very issue, that I feel that I am the one who is in danger, that they will use and misrepresent my actions when I am alone with them without counsel, to make all kinds of charges, that I am alone, unable to defend when they put forward these allegations in the public.

So I -- no, I do not wish to meet with them, and furthermore, I do not think it's necessary.  There are four lawyers working on this case in -- and then there are the House Information sort of staff that's available to them.

I personally went back from 2007 through all the emails on my system.  I selected the emails that are relevant to this case and pertinent to their

interrogatories.  It's not rocket science.  It does not require all this elaborate technology.

They have had 4 years to look through these emails, I mean, four staffers working on this, and I believe that they have because they have included numerous emails, some of which that they told a former Magistrate that if they were presented to a Court, they would -- it would put into question, my reputation. These are emails were I said -- I made remarks about foreign diplomats being hot or being sexy.  They have nothing to do with Mr. Hastings or this case.

So they have selectively gone through my records and chosen emails that they think are helpful to them to put forward, and relevant to the case, but have nothing to do with the interrogatories.

I'll give you an example.  There's not -- There is really no way for us to set search terms effectively.  Mischa Thompson sent an e-mail shortly after I was hired, and the subject of the email was to that.  And she says to me:

"So, it's 7 p.m. at a Thai restaurant on the Hill."

That is because she previously come to me and said Mr. Hastings wanted to set this dinner with me. So there's no way anyone, I have previously submitted

1    this document to the Court, anyone could put a search

2    term in there and reasonably find this document because

3    it's a party, so tonight.

4         Certainly the Plaintiffs included among the

5    documents that they intend to use, one from a colleague

6    that says -- it actually says "Hope (phonetic) fine,"

7    and in it she invites me to a party, and I told her

8    that I had been ill and was on antibiotics.

9         The Defendant selected only that component of

10   the message, and did not include an email to my

11   supervisor from me, just a week prior, that said -- or

12   couple of days prior that said, "I'm on antibiotics

13   because I have a sinus infection."

14        They clearly, in there, in the argument to my

15   medical records, that they should have all these

16   records because my being on antibiotics could infer

17   that I have a series of illnesses that are being

18   treated, and they need -- therefore they need access to

19   all these doctors, and the evidence is right here.  It

20   says to my boss, "I have sinus infection and I'm on

21   antibiotics," but they excluded this document.

22        THE COURT:  Ms. Packer, you've lost me here.

23        The purpose of the gentleman's statements to

24   me was to explain that he looked at, or he and his

25   colleagues, looked at the potential source of relevant

1    information that would be discoverable in these

2    databases, identified the potential custodians, caused

3    there to be a collection of universal -- of what was on

4    their computers.  After that collection was made, it

5    was de-duplicated and the system data was

6    (unintelligible).

7           Then, using the search terms that he has,

8    he'd narrowed the number of documents that he

9    indicated, and his question is, are you satisfied with

10   the sufficiency of what he did?

11          THE PLAINTIFF:  No, Your Honor.  It's common

12   sense.  They need to individually have their staff look

13   at the system and look at each email, as I had to do,

14   and I'm doing it without counsel.

15          There's no way that --

16          THE COURT:  Well, how did you get them?  You

17   got them from your own computer?

18          THE PLAINTIFF:  From my computer, --

19          THE COURT:  All right.

20          THE PLAINTIFF:  -- the ones -- but I can't

21   access the other --

22          THE COURT:  But you can't possibly look at

23   the computers of Kaufmann, Turner and Thompson.

24          THE PLAINTIFF:  And Alex Johnson, who should

25   be included in this --

1       THE COURT:  All right.

2       THE PLAINTIFF:  -- in this matter.

3       THE COURT:  Why should Mr. Johnson be

4   included?

5       THE PLAINTIFF:  Mr. Johnson, if you read the

6   Complaint, Your Honor, Mr. Johnson was used by Mr.

7   Hastings, to try to engineer situations where I was

8   alone with him.

9       On one occasion he cancelled my hotel and

10  flight reservations in Kiev -- From Kiev, Ukraine to

11  Odessa.  I had followed (phonetic) that Mr. Hastings

12  would be and Kiev at the same time that I was, and I

13  asked -- literally asked to be reassigned to Odessa.

14  When I arrived in Kiev, Mr. Johnson informed me that he

15  had booked me in the same hotel with Mr. Hastings and

16  had canceled my hotel reservation and flight

17  reservation because Mr. Hastings asked that we be in

18  the same city.

19      He -- He's complicit in a number of

20  situations of that sort.

21      THE COURT:  So the first problem you have

22  with this is the -- to use the terms of art that have

23  been used in this area of electronically-stored

24  information, electronic discovery, the first problem is

25  he's left out a custodian, Johnson.  That's the first

problem.

THE PLAINTIFF:  And not all of -- The office
manager should -- Daniel Redfield should be included in
this, as well, Your Honor.

THE COURT:  So the first objection you have
is that the number of custodians is improper, there are
two more who should have been included.

Now, with reference to the methodology that
was used, do you have any objection as to the de-
duplication, the getting rid of the systems files, and
then attempting to use the key words they did to arrive
at a more manageable set of documents?

THE PLAINTIFF:  I don't need 15,000
documents, Your Honor.  The relevant documents are far
fewer, and if they would sit down and go through the
emails as I did, they would find that it might sound
impressive to you, but it's really not at all.  It is
designed to sound impressive, but it's just common
sense.  They need to individually go through the emails
and find the pertinent ones.  It would not require
10,000 e-mails.

THE COURT:  But they have another problem,
which is you have made a demand for documents.  They
have to satisfy that demand, but before they do, they
have to review the documents to see if (a) they meet

1    your demand and, if they do, whether they nevertheless

2    should object to their production, in whole or in part,

3    because they may be privileged.

4           It has been my experience in this -- these

5    cases, and the universal experience of the federal

6    courts, that the cost of that review are ten times the

7    cost of anything else.  That's where the money is

8    spent.

9           So what they're saying is if you and they

10   could agree on a narrower search, the narrower the

11   search, the fewer documents.  The fewer the documents

12   that have to be reviewed, the less likely it is they

13   will have to spend a lot of time and money on reviewing

14   for privilege, the different ones that are pertinent.

15   That's what happens in every one of these cases I've

16   ever seen.

17           THE PLAINTIFF:  As I've --

18           THE COURT:  That's the point that.

19           THE PLAINTIFF:  As I said --

20           THE COURT:  You're trying to get -- You know,

21   there's nothing quite like litigation and, you know, in

22   discussions of this, in places like the

23   (unintelligible) conference, I think it was Microsoft

24   drew this gigantic funnel, and what they said is you

25   put all of this information in the top of the funnel,

1    and then after goes through the funnel, you'll come out

2    with a handful of documents that are relevant.

3            So what everybody is trying to do now, this

4    age of big data, where we have storage capacity that is

5    very cheap, and the capability of storing immense

6    amount of documents without an accompanying records

7    management policy.  We have a massive number of

8    documents, and the idea is how to literally separate

9    the wheat from the chaff.

10           How do you get down to those handful the

11   documents that are truly pertinent here?

12           Now, the methodology he used in his search,

13   there's another methodology called "predictive coding,"

14   in which you train the data set by having it -- by

15   finding documents that are particularly pertinent,

16   putting them back into the computer, and the computer

17   yields documents that are similar to.  So everybody

18   involved in this area is now attempting to use

19   methodologies that reduces the cost of looking at a

20   document.

21           The truth of the matter is, you know as well

22   as I do, if you have to look at a terabyte of

23   information, Ms. Packer, neither you nor I have enough

24   lifetime left.  It's just too immense.

25           THE PLAINTIFF:  Your Honor, I'll just make

1   the point and I'll sit down.

2          There is not one reference to sexual

3   harassment in any of the emails that they actually gave

4   to me, where they're discussing the harassing behavior.

5   They talk in codes.  They talk in vague terms.  They do

6   not use specific references that they're putting

7   forward here.  So there is no way they would find

8   pertinent documents on the basis that they're putting

9   forward.

10         I can provide you with some of those emails

11  in order for you to make your determination, but this

12  is a game, it's a ploy, and they're fully -- they fully

13  know it.

14         THE COURT:  And so you believe that this

15  process has not been engaged in, in good faith, --

16         THE PLAINTIFF:  It has not, and I can provide

17  you the email --

18         THE COURT:  -- and accordingly, it should not

19  be trusted.  Instead, they should go through each

20  document, each piece of electronically-stored

21  information, one by one, to ascertain its relevance,

22  and after they have done so, then review the ones they

23  have -- that have been produced in that fashion for

24  privilege, and then produce those ones that meet the

25  relevant standard under Rule 26, and are not

1   privileged.  The ones that are privileged, as I

2   discussed with Ms. Rogers, are going have to be

3   separately logged in a privilege (inaudible).

4          That's the methodology everybody uses in this

5   area.  It's hideously complicated and hideously

6   expensive, but there it is.  Nobody's figured out some

7   magic wand to do it any other way.

8          Now, predictive coding supposedly holds out

9   the hope that this will get more efficient and cheaper

10  as the years go by, I don't know, but the methodology

11  that is used here are search terms, has been used for a

12  long time.

13         Indeed, my decisions in <u>United States v.</u>

14  <u>O'Keefe</u> and <u>Equity Analytics</u> talk about this from the

15  perspective of (inaudible).  So --

16         THE PLAINTIFF:  I'm talking about facts, Your

17  Honor.  As I said, none of the emails that they have

18  submitted to me have any reference to sexual harassment

19  or any of the terms that they have put forward.

20         THE COURT:  I would be amazed if they did.

21         THE PLAINTIFF:  All right.  So it's -- I

22  mean, I --

23         THE COURT:  You don't particularly find

24  emails saying, "I'm going to sexually harass the woman

25  down the" --

1          THE PLAINTIFF:  No, but from the beginning of

2    the -- this case I feel like justice has been deprived

3    and delayed for me because it is not expedient to do

4    the things that are necessary to get the facts.

5    Everybody wants to get to the end and the lawyers want

6    a settlement.  I'm asking for justice.

7          THE COURT:  All right.  Well, it looks like

8    there's no hope that you can meet and I'm just going to

9    have to rule after I examine all of the documents that

10   have been produced, and whether not any additional

11   methodology is necessary.  It's a very frustrating

12   position to be in but I don't see any other solution.

13          MR. GORE:  Your --

14          THE COURT:  I mean, I'm not going to have a

15   series of meaningless meet and confers.  It's not going

16   to happen.  That's just a waste of everybody's time to

17   meet.

18          MR. GORE:  Your Honor, there's several points

19   I'd like to address.

20          THE COURT:  Certainly.

21          MR. GORE:  Thank you.

22          First of all, let me -- we have not completed

23   our production of documents.  I mean, part of the idea

24   here, was that we expected that there would be

25   additional documents that would be provided once the e-

1    data review had been done.

2            So what we have provided is 1300 pages, and I

3    also need to clarify before we leave today, whether you

4    want us to provide you with those full 1300 pages, but

5    -- so we have never represented that we provided all of

6    the documents at this point, but because of the kind of

7    allegations that have been made about the motives of

8    the counsel in this case, we've been trying to proceed

9    very, very cautiously.

10           I feel that what we proposed, we're not

11   getting any sort of alternatives.  I'll address the

12   Alex Johnson/Ms. Packer custodian issue in a minute,

13   but other than that, we're not getting any alternatives

14   for Ms. Packer.

15           THE COURT:  Indeed you aren't.

16           MR. GORE:  We're just being told, "They

17   should have to look through everything."  Well, Federal

18   Rule 26 doesn't require that.  If Ms. Packer wants to

19   pay 30 or $40,000 for us to try and hook up (phonetic)

20   predictive coding, then we'll consider that, but at

21   this point we've already spent tens of thousands of

22   dollars of Mr. Hirschfeld's time, not to mention all

23   the time of all the employees, on the preservation that

24   we've done, and I don't think that's -- particularly in

25   a case like this, it would be outcome determinative to

1   require us to do predictive coding on 700,000

2   documents, or 4 terabytes of documents.

3           So I guess I would say that I do agree with

4   you that we are at impasse.  We've been at this impasse

5   for some time.  We've tried numerous times to resolve

6   it.

7           THE COURT:  Well, we're going to get out of

8   it, one way or the other.  Obviously, --

9           MR. GORE:  And -- But I would say that I

10  think what we've proposed is a very reasonable

11  solution, and we haven't heard anything --

12          THE COURT:  All right.  Let me hear you as to

13  why Johnson and the other gentleman are not proper

14  custodians.

15          MR. GORE:  Well, first of all, this is the

16  first time we've ever heard any reference to Daniel

17  Redfield.  He's not mentioned, I don't believe, at all

18  in the Complaint.

19          And Alex Johnson, I'm not even sure he's

20  mentioned in the Complaint, except the one point.

21  These are very tangential individuals.  Ms. Packer has

22  now suggested that they are relevant.  They do not

23  appear to us to be relevant.  I mean, if we thought

24  they had relevant data, we would have preserved their

25  emails as well, because they would presumably help us,

1    and we would want to find those emails.  So we didn't

2    preserve it because we didn't think they were relevant.

3    If she thinks they're relevant, I think she needs to

4    provide something more detailed, and we can then

5    consider what the cost would be to go back and try to

6    preserve data.

7         I mean, again, this was 4 years ago, so I

8    don't know what data exists.  We made a reasonable

9    effort at the time, based upon what we knew.  So I

10   don't think she's provided enough information as to why

11   Mr. Johnson or Mr. Redfield should have been custodians

12   who were preserved, and so I would like to hear that.

13        I'd also like to address a few other things,

14   and one of the things -- this was -- this part of our

15   discussion of the ESI was supposed to be two part,

16   because we have some significant concerns about Ms.

17   Packer's preservation, so I do want to have the

18   opportunity to address that.

19        THE COURT:  Please do so.

20        MR. GORE:  But before I -- The points I want

21   to mention is one of the things that became apparent

22   when Ms. Packer was up here speaking, is that she

23   believes that responsive documents in the e-data are

24   limited to communications.  She didn't talk about

25   anything else.

1           So at the very least, it seems like we might

2      now be able to at least get agreement that we can

3      search just email data.  That would be helpful.  I

4      mean, it seemed to me that what we appeared to hear her

5      say was if there's something responsive, she mentioned

6      -- today is the first time I've ever heard about the

7      fact that she used code, or something.  I don't know

8      what that is, but --

9           THE COURT:  They used them.

10          MR. GORE:  -- or -- Oh, they use code which,

11     again, I've not heard of that before, but it would seem

12     to me that she's referring to communications.  So at

13     least if we could reduce the data from -- to anything

14     -- just communications and PSD files and emails, that

15     would be helpful.  So now that we know that I would

16     further refine the two search term lists I gave you, to

17     include only review of the email data, unless she

18     believes that there are documents, and she can provide

19     some reasonable basis to suggest that there might be

20     documents other than email.

21          THE COURT:  This was a Microsoft Outlook

22     system?

23          MR. GORE:  It was in Microsoft Outlook system

24     at that time, and this -- it's a little complicated,

25     but at the time -- it's now in a vault system, but at

1   the time, in the initial preservation, it was -- the

2   PSTs were locally stored, I believe.

3          So we have -- There's some time to figure

4   that issue out, so we can give you more details, if

5   that's necessary.

6          THE COURT:  No, it's -- I was just asking so

7   I had some sense of what the data (inaudible).

8          MR. GORE:  So, I think that I do want to talk

9   about her response, but there are a couple of things

10  that have to be addressed.

11         We've never had an undercover officer present

12  for any meeting with Ms. Packer.  The only reason we've

13  asked for meetings with Ms. Packer is because it's our

14  job to represent our client, and part of the job of

15  being an attorney in litigation is you have to work

16  with the other side on certain things.  That's why we

17  want to meet with Ms. Packer, nothing more.  When we've

18  tried to explain that to her, she  accused us of being

19  Nazi war criminals because they were just doing their

20  job.

21         So we're having great difficulty with basic

22  kinds of communication.  We're not getting responses to

23  any inquiries, so we would request that Ms. Packer is

24  pro se, she's gone through five attorneys.  She does

25  need to comply with the Federal Rules, and part of the

 1    Federal Rules require cooperation, so we would ask that

 2    part of the -- what the court order is, that she does

 3    cooperate with us.  She doesn't have to be friendly.

 4    She doesn't have to like us, that's not required, but

 5    you have to be professional and you have to be

 6    responsive, and that hasn't happened, and now we are

 7    two months into discovery having been produced and

 8    we're not getting any responses on certain issues, and

 9    we have a discovery cutoff in July and no depositions

10    were taken, and again, these are things Ms. Rogers will

11    address in housekeeping.

12              THE COURT:  All right.  We'll get to those in

13    good time.

14              MR. GORE:  Ms. Packer's e-preservation, let

15    me just get my notes for this.

16         (Pause.)

17              MR. GORE:  Quick background on this.

18              In the administrative stage, Ms. Packer was

19    represented by the first set of lawyers, George Chuzi.

20              After the administrative change, she was then

21    represented by a second set of lawyers, Debra Katz and

22    Alex Ronickher, who are employment attorneys.

23              Then she was represented when then litigation

24    was filed, by Judicial Watch.  We attempted to raise

25    the issue of whether or not she had preserved data with

1    Judicial Watch in, I believe it was early 2012 --

2              UNIDENTIFIED SPEAKER:  March 2012.

3              MR. GORE:  March 2012.  I don't recall we got

4    much of a response because Judicial Watch then moved to

5    withdraw and then there was a long lag.

6              Then Mr. Davidson, her fourth counsel, became

7    part of the case.  And so in December of 2012 we asked

8    Mr. Davidson about e-preservation because we were

9    concerned about it.

10             In January 2013, Mr. Davidson filed, on the

11   Plaintiff's position, part of the Rule 16.3 statement,

12   the following:

13             "Plaintiff was not notified by her prior

14             counsel, of a litigation hold the Defendants

15             requested in a letter" of March -- "in March

16             2012 on her personal e-mail and social media

17             accounts.  Plaintiff, however, has taken no

18             active steps to delete material relevant to

19             this matter, if any, although she has deleted

20             various data for maintenance in the normal

21             course of her using her accounts."

22             We have not been able to get anything further

23   than that in every time we've tried to bring it up.

24             And Mr. Davidson withdrew from representing

25   Ms. Packer shortly after that.  She refuses to discuss

1   this issue.  We obviously are very concerned because

2   simply saying, "I haven't deleted data that I don't

3   think is relevant," as the Court knows, is not

4   sufficient under Rule 26.

5            So we have some very serious concerns about

6   what data has been preserved.  I mean, Ms. Packer seems

7   to think, which I can understand for a pro se

8   Plaintiff, but again, she was represented by five sets

9   of attorneys throughout this process.  I can understand

10  how she would think, "Just going through my in-box is

11  sufficient," but that's not what the Federal Rules

12  require.

13           So one of the things we would like to discuss

14  with you, since we can't seem to get anywhere in years

15  of trying with Ms. Packer, is to get some sense of what

16  she has done.  We may have to wait and do that at her

17  deposition, and again, Ms. Rogers is going to talk

18  about what our proposal is for her deposition, which

19  was -- which Judge Collyer already said could be a

20  period of two 7-hour days, but that's one of the other

21  things that we really would like to address.

22           THE COURT:  All right.  Let me hear from Ms.

23  Packer.

24           THE PLAINTIFF:  Your Honor, at the outset let

25  me say that at every phase in this case the Defendant's

1    counsels have drawn out that I have had four attorneys

2    in this -- dealing with this case, in order to bias

3    what -- whichever judge is sitting in that chair, that

4    I am a difficult client, and therefore, you know,

5    unreasonable.

6            THE COURT:   I will not hold it against you.

7    Please go on.

8            THE PLAINTIFF:   Well, I have repeatedly

9    terified (phonetic) to the Court that the first -- I

10   fired the first lawyer because he showed up in court

11   asking me for documents that he -- that I'd previously

12   said is totally unprepared.

13           This second set up counsels agreed to do

14   mediation only.   That was all they wanted.   They wanted

15   a settlement.

16           As for Judicial Watch, well, it is privileged

17   information and it is in the records, if you want to --

18           THE COURT:   Then don't say anything about it.

19   It's none of my business.

20           THE PLAINTIFF:   It was -- Their repeated

21   attempts to besmirch my reputation leaves me speechless

22   because they want to win this case based on hearsay and

23   slander, rather on providing the facts to this case.

24           Secondly, discovery was not cut off in July,

25   as Mr. Gore said, because it didn't begin until

1    December, when Judge Collyer ordered it to start.

2             As to my not cooperating, I'm sorry you

3    haven't read the court documents because they would

4    clarify -- I mean, I cannot begin to go through all of

5    what has transpired here --

6             THE COURT:  You have my assurance I will read

7    every one of them.

8             THE PLAINTIFF:  As to the preservation of

9    data, they have again repeatedly, if you read the court

10   documents, at every step, every judge, bring out this

11   notion that I haven't preserved data.  They have not

12   provided a shred of evidence that I destroyed any data,

13   and I would welcome -- I've asked them in answers to

14   the Court, "Tell me which e-mail or what data I am

15   alleged to have destroyed and I will perfectly take

16   responsibility for accepting sanctions," obviously --

17            THE COURT:  I think the point they're making

18   is somewhat different.  They are saying they would like

19   an assurance that you have made preservation efforts.

20            THE PLAINTIFF:  Your Honor, if you have a

21   court manuscript from November 22nd and December 20, I

22   believe these same issues are raised and I answered

23   clearly, "I have not deleted any evidence."

24            THE COURT:  Okay.  So be it.

25            THE PLAINTIFF:  I stand by everything that I

1    said in this case.  I'm not lying, and I take the good

2    and the bad.  I have not destroyed any evidence in this

3    matter.

4               THE COURT:  All right.  That's fine.

5               Do you have a so-called "social media"

6    account with Facebook or Twitter?

7               THE PLAINTIFF:  I do.  I do.

8               THE COURT:  Have those been preserved?

9               THE PLAINTIFF:  They are.

10              THE COURT:  All right.

11              THE PLAINTIFF:  Even though, you know, this

12   is one of the issues that the Defendants -- They argue

13   that no evidence should be -- there should not be

14   (unintelligible) to provide evidence outside of the

15   scope of the sexual harassment allegations, outside of

16   the time line of such because it's not pertinent, and

17   never asking for my Facebook records, which Facebook

18   also has established in December 2010, and the case was

19   (unintelligible) of clients in August 2010.

20              So I'm not sure how the equity is allocated

21   here, but I don't understand why it's not pertinent for

22   them to provide documents to me after September 2010,

23   but I should provide to them, documents and records

24   established after December.

25              THE COURT:  Well, okay.

1            Now, before we talk about depositions, we
2    have to deal with these releases.  You've asked for
3    certain releases in -- for medical, education and
4    employment records.
5            Defendant alleges that Judge Collyer has
6    already ordered Plaintiff to sign those releases, but
7    she hasn't done so.  That's what you claim.
8            Why is that?
9            MS. ROGERS:  Well, we -- what we were looking
10   for -- we are looking for is the medical, educational
11   and employment records and bank records that Judge
12   Collyer has said are relevant to this matter.  She did
13   narrow down the scope of what those were.
14           Specifically, Judge Collyer ordered that
15   because Ms. Packer's request for damages has placed her
16   physical and mental health at issue, we may --
17   Defendant may obtain copies of her medical records
18   relevant to the damages that she seeks.  That is
19   exactly what we're doing.
20           This is not a garden variety claim for
21   emotional damages.  The litany includes insomnia,
22   stress, fainting spells, high blood pressure, coronary
23   artery disease, chest pain, depression, extreme
24   emotional distress, anxiety, nausea and physical
25   weakness, and that's what's just named in the

1    Complaint.  There have been subsequent filings with the

2    Court and, I believe, letters to the Court in which she

3    claims that for the past 6 months she suffers from

4    uncontrollable shaking, which she apparently still

5    attributes to the sexual harassment, which she admits

6    stopped in February of 2010, and Ms. Packer is willing

7    to concede that her health conditions are not related,

8    then we would further limit our requests for medical

9    information, but as the case is, she's saying that she

10   still suffers from the alleged medical --

11           THE COURT:  Okay.

12           Have you identified, in any way, the specific

13   providers from whom you want this information; that is,

14   do you know it's the X, Y, Z Hospital and they

15   obviously are demanding a release, or are these

16   releases in blank, and you're going to serve them on

17   every hospital you can find?  What are you going to do?

18           MS. ROGERS:  We -- They started out as blank.

19   Ms. Packer has since, in her response to our

20   interrogatories, provided six doctors that she

21   identifies from various local hospitals and practices.

22           We then created subpoenas to issue to those

23   doctors, and she objected, saying that we were not --

24   we should not be privy to that information, and that's

25   one of the reasons that we are here.  Not only do we

want the information from those doctors that she
intends to call as witnesses, and that she has stated
support her claim that the medical conditions were
caused by sexual harassment, but we want to know about
other doctors, some of which she has identified in her
initial disclosures, two of whom are in Vienna,
Austria.

There's also a reference to a therapist that
is not identified in her responses, but yes, we want to
know the landscape of medical practitioners that she
saw during the relevant time period and for some period
before, and this is why.

She has named -- She has identified, in some
of the documents that we have seen and in talking to
witnesses, a number of medical conditions and symptoms
that she claims were caused by the alleged sexual
harassment, which could be easily attributed to other
medical conditions and symptoms that she mentions in
her emails, including talking to her -- you know,
emailing her supervisor, talking about how she's
struggling with the side effects of hormone therapy.

Well, a quick search of WebMD reveals that
many, if not all of the symptoms and medical conditions
that she claims are the result of Alcee Hastings'
alleged sexual harassment, can be attributed to some,

1   if not all of the medical conditions that she

2   references in emails to her --

3           THE COURT:  What kind of -- I have your

4   point.

5           What kind of educational records do you want?

6           THE PLAINTIFF:  She places -- I mean, she --

7   in her Complaint she talks about her -- that she's a

8   highly-educated individual, we don't dispute that, but

9   she placed her educational background and --

10          THE COURT:  Okay.  All right.

11          How about employment?

12          MS. ROGERS:  Employment --

13          THE COURT:  How long has she -- Well, for

14   what period of time do you want it?  Before her

15   employment?  Subsequent to her employment?

16          MS. ROGERS:  We would like it definitely

17   before her employment with -- Well, she started

18   employment with the Commission in 2007.  We would like

19   to go back, I think we initially asked for 10 years.  I

20   think we wanted to go back 20.  We asked for 20.  I'm

21   sorry, we'd like to go back 20.

22          She has --

23          THE COURT:  What is that going to tell you?

24          MS. ROGERS:  Well, in an interview -- in a

25   television interview that she conducted to promote her

1    novel, she referenced specific allegations against

2    another employer who happens to be a member of

3    Congress, of sexual harassment.

4              In talking to witnesses in this case, we're

5    aware of at least one other employer who we believe she

6    may have also alleged some kind of discrimination,

7    prior to her working for the Commission.

8              THE COURT:  Do you know the names of these

9    persons?

10             MS. ROGERS:  We know -- We definitely know

11   the name of the initial individual, but we are looking

12   for her employment history, I think we can say from

13   1987 to the present.

14             THE COURT:  All right.  Thank you.

15             Yes, Ms. Packer?

16             THE PLAINTIFF:  Your Honor, Judge Collyer --

17   I would really insist that you read the records --

18             THE COURT:  I will.

19             THE PLAINTIFF:  -- because I don't see --

20             THE COURT:  I will read --

21             THE PLAINTIFF:  -- how --

22             THE COURT:  -- every word of this record, Ms.

23   Packer, and I don't need instructions from you.

24             Please tell me what your arguments are.

25             THE PLAINTIFF:  Well, I really -- I mean --

1          THE COURT:  Ms. Packer, let me see if I can

2     explain something to you that may be difficult to

3     understand.

4          Under the Federal Rules of Civil Procedure

5     discovery is designed to be an engine that runs by

6     itself, by the lawyers.  It requires cooperation.  It

7     requires good faith.  Judge's never ever get involved

8     in discovery at this level of detail.  If they did they

9     wouldn't do anything else.

10          So, the one Judge, God rest his soul, Judge

11     Jackson, when he would call a status conference and the

12     lawyers would say, "Your Honor, what do we do if we

13     have a discovery dispute?", he said, "You won't have

14     any discovery disputes.  Next question."

15          And I can tell from your attitude, Ms.

16     Packer, you don't want to listen to me, but I must tell

17     you, your insistence that the Court supervise this

18     discovery at this level of detail is unusual at this

19     point, strikingly unusual.

20          Basically, there is always the hope that

21     lawyers or, in your case, you and the lawyers can

22     arrive at compromises.  They're not perfect but they

23     move the case from Point A to Point B.

24          Today, in an hour and 10 minutes we've been

25     here, I haven't heard a single thing resolved.  So I'm

1  going out to supervise this case, read every piece of

2  paper and supervise this case to the nth degree.

3  That's going to take a lot of time and a lot of

4  expense, I assure you, but that's what you are

5  confronting us with.

6          I have a whole -- I'll have to get the

7  transcript of this, go through these issues one by one,

8  resolve them in some way, but that's where we are.

9          THE PLAINTIFF:  I'm sorry, it's just not that

10  I --

11          THE COURT:  You want go to trial but you're

12  not going to be able to go to trial unless we finish

13  discovery.  At this pace it's going to be a struggle to

14  finish in the time permitted.

15          THE PLAINTIFF:  It is not that I don't want

16  to listen, I'm just astounded at the lie the Plaintiff

17  -- lies that the Defendant's lawyers have come up here

18  and repeated.

19          Judge Collyer never ordered me to sign

20  releases for -- She actually asked them to send the

21  releases, and if we had disputes then she would review

22  them.  The court records speak for themselves.  You

23  don't have to take my word for it.

24          She also mentioned that some of these orders

25  were overly broad and she would take a look at them.

1          THE COURT:  I will look to each one.

2          THE PLAINTIFF:  Yes.

3          The issue of my shaking, which Ms. Rogers --

4    and that is -- that I attributed to the sexual

5    harassment, is patently false.  That issue is raised in

6    relation to the additional claims of retaliation from

7    Fred Turner, the staff director, and the court records

8    are there.  I -- It was not pertaining to Mr. Hastings.

9          My educational background has not been put

10   into question.  I have held this top secret clearance

11   since 2004, which required me to provide this

12   information.  It is a public record.  It is -- This --

13   I mean, --

14         THE COURT:  But I think the point is more

15   subtle than that.  What they are saying is in -- that

16   in other instances in your career, you have made

17   complaints similar to the ones that you have made here,

18   and they are baseless.

19         Now, there is a principle of law that would

20   support that conclusion.  In other words, from -- the

21   proposition that a person has frequently filed lawsuits

22   and those lawsuits have been found not -- to lack

23   merit, that's admissible evidence in this circuit.

24   It's called the Anderson case.

25         THE PLAINTIFF:  My educational background, I

1    really -- they say, they say it has not -- they haven't

2    provided any facts to this basis.  I mean, they simply

3    -- they have thrown out these fishing rods because

4    they're demanding information in all facets of my life

5    without providing an iota to me, of the evidence I've

6    been seeking that is relevant to this case.

7           As to the 20 years of -- Again, you know, I

8    really -- I'm not sure -- Basically the Defendants want

9    -- they're fishing.  They're not -- They have not

10   provided you any evidence that any of these purported

11   allegations are -- have any basis in fact, but they're

12   fishing and they expect me to help them defame my

13   character that -- with issues that have nothing to do

14   with the case, instead of providing the basic evidence

15   that I've been asking for, for 3 years.

16          THE COURT:  I understand.

17          All right, Ms. Rogers, you have anything

18   else?  I don't -- I think the questions of depositions

19   is rather premature, to put it mildly, and I intend to,

20   after we intensely review all these issues and issue

21   some orders, to reassemble you, hopefully, to see where

22   we are now.

23          As I say, this is going to be an example of

24   nearly minute judicial supervision of the discovery

25   process, so we'll be seeing a lot of each other, but

1   you certainly weren't going to notice the depositions

2   today without any of these records, were you?

3          MS. ROGERS:  No, we're not going to notice

4   their depositions --

5          THE COURT:  Well, why don't we leave that for

6   another day.

7          MS. ROGERS:  Okay.

8          THE COURT:  Okay.  All right.  The Court will

9   take the matter under advisement, review all the

10  documents and issue pertinent orders.  Thank you.

11         Court's in recess.

12      (Proceedings concluded at 4:45 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


_____                    April 7, 2014

STEPHEN C. BOWLES